1  CARL McCONNELL – BAR NO. 42976
   JOHN H. ADAMS, JR. – BAR NO.  253341
2  HOGE, FENTON, JONES & APPEL, INC.
   Sixty South Market Street, Suite 1400
3  San Jose, California 95113-2396
   Phone: (408) 287-9501
4  Fax:  (408) 287-2583
   Email: clm@hogefenton.com
5  Email: jha@hogefenton.com

6  TIMOTHY J. HOBAN – BAR NO. 192461
   Regional Counsel
7  Toll Brothers, Inc.
   725 Town & Country Road, Suite 500
8  Orange, CA 92688
   (714) 347-1300
9
   Attorneys for Plaintiff
10 TOLL BROTHERS, INC.

11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

15 TOLL BROTHERS, INC.                | No. C08 00987 MMC

16          Plaintiff,                | FIRST AMENDED COMPLAINT FOR
                                      | RESTITUTION AFTER RESCISSION,
17 vs.                                | DAMAGES FOR BREACH OF CONTRACT,
                                      | FORECLOSURE OF CONTRACTUAL LIEN
18 CHANG SU-O LIN; HONG LIEN LIN;     | AND FORECLOSURE OF PURCHASER'S
   HONG YAO LIN,                      | LIEN
19
          Defendants.                |
20

21        Plaintiff Toll Brothers, Inc., alleges as follows:

22                              **PARTIES**

23        1.      Plaintiff Toll Brothers, Inc., ("Toll") is a Delaware corporation whose principal

24 place of business is Horsham, Pennsylvania.  Toll engages in the business of building and

25 selling homes.

26        2.      Defendants Chang Su-O Lin, Hong Lien Lin and Hong Yao Lin (collectively,

27 "the Lins") are individuals and on information and belief are part-time residents of California

28 and citizens and residents of Taiwan.

                                      -1-

**JURISDICTION**

3.    This court has subject matter jurisdiction of this action under 28 U.S.C. Section 1332(a)(2) because:

      a. Toll is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Horsham, Pennsylvania;

      b. The Lins are individuals who are part-time residents of California, where they also own and buy and sell land; and on information and belief they also reside in and are citizens of Taiwan;

      c. There is complete diversity of citizenship between Toll and the Lins; and

      d. The amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    This court has personal jurisdiction over the parties to this action because:

      a. The Lins have extensive real estate holdings and other business dealings in the state, leading to significant and continuing contacts within the State of California.

      b. This lawsuit arises from a contract to purchase real estate from the Lins by Toll Brothers, Inc., who have built and sold homes on such real estate.

**VENUE**

5.    Venue is proper in this District under 28 U.S.C. Section 1391(a) because:

      a. A substantial portion of the events on which this claim is based occurred in this District; and

      b. The property that is the subject of this action is located within this District.

**INTRADISTRICT ASSIGNMENT**

6.    Pursuant to Local Rule 3-2(c), this action arises out of Alameda County, the county in which the property that is the subject of this action is located.  Thus, assignment to the San Francisco Division or Oakland Division of this District is proper.

////

////

-2-
FIRST AMENDED COMPLAINT FOR RESTITUTION AFTER RESCISSION, DAMAGES FOR BREACH OF CONTRACT, FORECLOSURE OF CONTRACTUAL LIEN AND FORECLOSURE OF PURCHASER'S LIEN
\\HFJAFS\NDrive\79675\Ple\318209_3.doc

# FIRST CAUSE OF ACTION

## (Rescission)

7.     On May 27, 2004, Toll and the Lins entered into a written contract (the "Contract") for the purchase and sale of approximately 147 gross acres of unimproved real property ("the Property") located in Alameda County, California, for valuable consideration. A true and correct copy of the Contract is attached to this First Amended Complaint (the "Complaint") and incorporated by reference in the Complaint as Exhibit A.

8.     Under the terms of the Contract, the Lins were to convey the Property to Toll on June 30, 2007, in the Approved Title Condition (as defined in the Agreement) and free of any material physical defects, encumbrances or conditions that would preclude or materially limit the Property's development as a master-planned community.  The Lins were further required to, among other things, grade the Property pursuant to the terms of the Agreement.  The Property was to be developed in three phases, the third of which is at issue in this Complaint.

9.     Toll has paid the Lins the sum of $7,735,000 as a deposit applicable to the purchase price of the Property and duly performed all the terms and conditions required of it by the Contract except as excused by the Lins' breaches and failures of conditions.

10.    The Lins have failed and refused to provide the Property in the Approved Title Condition and free of any material physical defects, encumbrances or conditions that would preclude or materially limit the Property's development as a master-planned community.

11.    Specifically, the Lins have installed six large aboveground utility vaults, four belowground utility vaults and two overhead power lines on the Property.  The Lins further failed to complete the grading of the Property in violation of the terms of the Contract.

12.    The structures were installed without the consent of Toll and for the benefit of the Lins.  These structures are not included in the Approved Title Condition and materially limit the Property's further development as a master-planned community.

////

-3-

13.    The Lins also caused easements related to these conditions to be recorded for the benefit of the Lins and without Toll's consent.  These encumbrances are not included in the Approved Title Condition and materially limit the Property's development as a master-planned community.

14.    Beginning in or about August 2006, Toll learned that the Lins had installed the offending structures on the Property and gave to the Lins numerous written and verbal notices of Toll's objections to the structures.  Prior to June 30, 2007, Toll provided further notice to the Lins that the Lins were in default of the Agreement by, among other things, failing to grade the Property pursuant to the Agreement.  The Lins refused to take steps to cure.  Toll gave the Lins notice of its termination and/or rescission of the Contract on December 7, 2007.

15.    The Lins have had a period of time reasonably sufficient to have cured these material conditions and defects and have failed to take commercially reasonable steps to do so.  The Lins continue to fail and refuse to cure these material defects.

16.    The cumulative effect of these conditions, encumbrances and defects constitutes material failure of consideration for Toll's obligation under the Contract.

17.    Toll hereby offers to restore any consideration furnished by defendants, if any has been delivered, on condition that the Lins restore Toll's consideration, consisting of the deposit of $7,735,000 plus prejudgment interest at the legal rate and Toll's out-of-pocket damages, according to proof.

WHEREFORE, Plaintiff prays as hereinafter prayed.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

18.    Toll restates and incorporates by reference paragraphs 1 through 17 contained within this Complaint.

19.    The Lins are in breach of contract because they failed to cure conditions causing changed circumstances, including the construction of utility vaults without Toll's consent, which was required, which did not meet Toll's  design requirements; the

-4-

1  construction of temporary overhead power lines; the recordation of easements on title

2  contrary to the Approved Title Condition; the failure to convey the Property in the Approved

3  Title Condition; and the failure to complete grading as agreed by the parties. As a result of

4  these breaches and changed circumstances and the Lins' failure to cure these conditions,

5  Toll is excused from further performance under the Agreement.

6       20.    By reason of the Lins' breach of contract, Toll has been damaged in the

7  amount of its $7,735,000 deposit, prejudgment interest at the legal rate and out-of-pocket

8  damages, according to proof.

9       WHEREFORE, Plaintiff prays as hereinafter prayed.

10  **THIRD CAUSE OF ACTION**

11  **(Foreclosure of Contractual Lien)**

12       21.    Toll restates and incorporates by reference paragraphs 1 through 20

13  contained within this Complaint.

14       22.    Under a Memorandum of Agreement executed by Toll and the Lins on May 5,

15  2004, and recorded in the County of Alameda on May 28, 2004, the Lins granted to Toll a

16  lien against the Property pursuant to Civil Code Sections 2881 and 2884 to secure

17  performance of the Lins' obligation to refund Toll's deposit of $7,735,000. A true and

18  correct copy of the Memorandum of Agreement is attached to this Complaint and is

19  incorporated by reference in the Complaint as Exhibit B. This instrument was agreed to by

20  Toll and the Lins and operates as a mortgage on the Property in favor of Toll.

21       23.    The Property is described in Exhibit B, which is incorporated by reference

22  herein.

23       24.    The Lins have or claim to have an interest in the Property, which interest is

24  subject to the lien of the Memorandum of Agreement.

25       25.    The Lins have defaulted under the terms of the contract by failing and

26  refusing to provide the Property in the Approved Title Condition and free of any material

27  physical defects, encumbrances or conditions that would preclude or materially limit the

28  Property's development as a master-planned community.

-5-

26.    Toll is entitled to a declaration of its contractual lien against the Property and for an order for the sale of the Property in accordance with law and application of the proceeds from the sale to satisfy the Lins' debt to Toll.

WHEREFORE, Plaintiff prays as hereinafter prayed.

## FOURTH CAUSE OF ACTION

### (Foreclosure of Purchaser's Lien)

27.    Toll restates and incorporates by reference paragraphs 1 through 26 contained within this Complaint.

28.    Toll is entitled to a purchaser's lien under Civil Code Section 3050 on the Property in the sum of its deposit of $7,735,000, as well as prejudgment interest and Toll's out-of-pocket damages, according to proof.

29.    The Lins have or claim to have an interest in the Property, which interest is subject to Plaintiff's purchaser's lien.

30.    The Lins have defaulted under the terms of the contract by failing and refusing to provide the Property in the Approved Title Condition and free of any material physical defects, encumbrances or conditions that would preclude or materially limit the Property's development as a master-planned community.

31.    Toll is entitled to a declaration of its purchaser's lien against the Property and for an order for the sale of the Property in accordance with law and application of the proceeds from the sale to satisfy defendants' debt to Toll.

## PRAYER

WHEREFORE, Plaintiff requests judgment as follows:

As to the First Cause of Action:

1.    Rescission of the Contract.

2.    Restitution of the deposit of $7,735,000 plus prejudgment interest at the legal rate and according to proof.

////

////

-6-

FIRST AMENDED COMPLAINT FOR RESTITUTION AFTER RESCISSION, DAMAGES FOR BREACH OF CONTRACT, FORECLOSURE OF CONTRACTUAL LIEN AND FORECLOSURE OF PURCHASER'S LIEN
\\HFJAFS\NDrive\79675\Ple\318209_3.doc

As to the Second Cause of Action:

1.      Damages for the deposit, out of pocket costs incurred by plaintiff and accrued prejudgment interest, according to proof.

As to the Third Cause of Action:

1.      A declaration that Plaintiff has a contractual lien against the Property herein described to secure repayment of the said sum.

2.      An order for the sale of the premises in accordance with law and pursuant to Plaintiff's contractual lien against the Property, and that the proceeds from the sale be used to satisfy the indebtedness of $7,735,000 plus prejudgment interest.

3.      An order awarding Plaintiff judgment and execution against Defendants, and each of them, for any deficiency that may remain after applying all the proceeds of the foreclosure sale that are applicable to the satisfaction of the amounts found due by the court.

4.      An order that Plaintiff or any other party to this suit may become a purchaser at the foreclosure sale.

As to the Fourth Cause of Action:

1.      A declaration that Plaintiff has a purchaser's lien against the Property herein described to secure repayment of the said sum.

2.      An order for the sale of the premises in accordance with law and pursuant to Plaintiff's purchaser's lien against the Property, and that the proceeds from the sale be used to satisfy the indebtedness of $7,735,000 plus prejudgment interest.

3.      An order awarding Plaintiff judgment and execution against Defendants, and each of them, for any deficiency that may remain after applying all the proceeds of the foreclosure sale that are applicable to the satisfaction of the amounts found due by the court.

4.      An order that Plaintiff or any other party to this suit may become a purchaser at the foreclosure sale.

////

-7-

1    As to all Causes of Action:

2    1.    Reasonable attorney's fees.

3    2.    Costs.

4    3.    Such other relief as the court deems proper.

5  DATED: May 30, 2008

6                          HOGE, FENTON, JONES & APPEL, INC.

7  By _____

8                          John H. Adams, Jr.
                           Attorneys for Plaintiff
9                          TOLL BROTHERS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR RESTITUTION AFTER RESCISSION, DAMAGES FOR BREACH OF
CONTRACT, FORECLOSURE OF CONTRACTUAL LIEN AND FORECLOSURE OF PURCHASER'S LIEN
\\HFJAFS\NDrive\79675\Ple\318209_3.doc

# PURCHASE AND SALE AGREEMENT
# AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT (this *"Agreement"*) is entered into as of May 27 2004 by and between Chang Su-O Lin, Hong Lien Lin and Hong Yao Lin, collectively the Lins (*"Seller"*) and Toll Brothers, Inc., a Delaware corporation (*"Buyer"*), in the following factual context. For purposes hereof, the term *"Effective Date"* shall mean the date that Escrow Holder (as defined below) confirms in writing to Buyer and Seller that it has received a fully executed original or copy of this Agreement.

    A.    Seller is the legal and beneficial owner of approximately 147 gross acres of unimproved real property intended for the construction of attached and detached homes, a neighborhood park, two neighborhood squares, stream corridor improvements and related public improvements located in Alameda County, California (*"County"*), in the City of Dublin (*"City"*), as more particularly described in Exhibit A. This real property, together with all improvements and all right, title and interest of Seller in and to all privileges, rights, easements and appurtenances belonging to the real property, all minerals, water, and oil, gas and other hydrocarbon substances, and all air and water rights relating to the real property, is referred to as the *"Land."* The Land will be sub-divided into three areas: Sub-Area 1, Sub-Area 2 and Sub-Area 3, all as more particularly described in Exhibit A.

    B.    Seller may also own certain tangible and intangible personal property relating to the Land, including without limitation some or all of the following: (i) governmental approvals, governmental permits, licenses, applications, re-zoning, wetlands permits under Section 404 of the Clean Water Act, water quality certifications pursuant to Section 401 of the Clean Water act, incidental take authorizations pursuant to the Endangered Species Act and California Endangered Species Act, wildlife mitigation agreements and other rights arising under the *"Environmental Development Approvals"* (as defined below), subdivision maps and applications therefore, school fee mitigation agreements, special district and utility will serve agreements, building permit and development allocations, development rights arising out of the Master Development Agreement between the City of Dublin and the Lin Family for the Dublin Ranch Project (Areas A, B, C, D, E, F, G and H) recorded as Document No. 99251790 recorded July 8, 1999 in the Official Records of the County (the *"Master Development Agreement"*), development rights arising out of the Supplemental Development Agreement Between the City of Dublin and the Lin Family for the Dublin ranch Project (Areas F, G and H) recorded as Document No. 2000335772 recorded October 13, 2000 (the *"Supplemental Development Agreement"*), development rights arising out of any Stage One or Stage Two PD Zoning, licenses and easements, improvement agreements, utility allocations and permits and will serve commitments, and other entitlements and development rights relating to the Property granted by any "Agency" (as defined below); (ii) utility and other permits; (iii) fee credits (including those described in Section 5); (iv) rights arising under these documents listed on the Document Schedule; and (v) contract rights, warranties and guaranties relating to any services provided or improvements constructed in connection with the Land (collectively, the *"Intangible Property"*). The Land and the Intangible Property and such other tangible and intangible property acquired by Seller in connection with the Land are referred to collectively as the *"Property"*.

EXHIBIT A
PAGE 1 OF 72

C.    The term *"Property"* does not include other real property owned by Seller or affiliates of the Seller located within the planning area known as Dublin Ranch intended for commercial, retail, office or open space uses (the *"Seller's Other Property"*), as shown on Exhibit E.

D.    As used herein, the term *"Agency"* or *"Agencies"* means (a) the City, (b) the County, (c) the State, (d) the United States Army Corps of Engineers, the United States Fish and Wildlife Service, the California Department of Fish and Game and the San Francisco Bay California Regional Water Quality Control Board (such Agencies are referred to herein collectively as the *"Environmental Agencies"*), (e) any other bureau or department or entity organized under the federal government, (f) all utility companies having approval authority over the development of the Property, and (g) all other governmental or quasi-governmental entities having or asserting jurisdiction over the development, marketing and occupancy of the Property.

E.    As used herein, the term *"Approved"* means, with respect to the various entitlements and development approvals, that the development approval has been: (a) formally approved by the City and all other applicable agencies in a form and content and subject to conditions of approved by Buyer and/or Seller as appropriate; and (b) any statutorily provided appeal periods to protest the approval of the development approval have expired without an appeal being taken. If any appeal is taken or any challenge to the approval is made, the development approval shall be deemed approved when the forum or court to which the matter is appealed has made a formal, final finding upholding approval of the development approval in a form and content and subject to conditions of approval reasonably acceptable to Buyer and all further appeal periods have expired without further appeal being taken.

F.    Buyer desires to purchase the Property from Seller, and Seller desires to sell the Property to Buyer.

In this factual context, the parties agree as follows:

**Section 1.    Purchase and Sale of Property.**

Subject to the terms and conditions of this Agreement, Seller shall sell to Buyer and Buyer shall purchase the Property from Seller.

**Section 2.    Purchase Price.**

**2.1    Amount.** The purchase price for the Property shall be Two Hundred Forty One Million Five Hundred Thousand Dollars ($241,500,000) (the *"Purchase Price"*). The Purchase Price may be reduced as provided below at Section 5.3.1, 5.5(e), 7.5, and 7.6.

**2.2    Deposits; Manner of Payment.** The Purchase Price shall be paid as follows:
(a)    Deposit.

(i)    On or before 5:00 p.m. May 27, 2004, Buyer shall deliver to Escrow Holder a deposit in the amount of Twenty One Million Seven Hundred Thirty Five

EXHIBIT A
PAGE 2 OF 72

Thousand Dollars ($21,735,000) (the "*Deposit*"). Upon receiving the Deposit, Escrow Holder shall record the Memorandum (as defined below) and then at 5:00 p.m. May 28, 2004 release the Deposit in the total amount of Twenty One Million Seven Hundred Thirty Five Thousand Dollars ($21,735,000) to Seller. Upon the release of the Deposit to Seller, it shall become non-refundable to Buyer, except as otherwise provided in this Agreement, and shall be applicable to the Purchase Price at each close of escrow as set forth in Section 2.2(c), below.

        ii)    Prior to the end of the Feasibility Period, the parties shall execute a memorandum of this Agreement in the form attached hereto as <u>Exhibit B</u> (the "*Memorandum*"). If Buyer gives the Feasibility Approval Notice, then Seller shall cause Escrow Holder to immediately record the Memorandum in the Official Records. Prior to recordation of the Memorandum, Escrow Holder shall prepare and Buyer shall execute and deposit with Escrow Holder a quitclaim deed terminating of record Buyer's interest in this Agreement and in the Property. The quitclaim deed shall be held by Escrow Holder, and if Buyer thereafter fails to purchase the Property for any reason other than Seller's default, Escrow Holder, after giving Buyer and Seller ten (10) business days prior notice of its intention to record, shall record the quitclaim deed in the Official Records.

      **(b)**    **Balance of Purchase Price.** The balance of the Purchase Price, Two Hundred Nineteen Million Seven Hundred Sixty Five Thousand Dollars ($219,765,000) subject to adjustment as provided in Section 2.1 above, shall be payable in immediately available funds in three payments which correspond with three Closings (as defined in Section 5).

      **(c)**    **Application of Deposit.** The Deposit shall be credited (i) Seven Million Dollars ($7,000,000) at the Closing of Sub-Area 1; (ii) Seven Million Dollars ($7,000,000) at the Closing of Sub-Area 2; and (iii) Seven Million Seven Hundred Thirty Five Thousand Dollars ($7,735,000) at the Closing of Sub-Area 3. The foregoing amounts shall be deducted from the Deposit and credited against the Purchase Price for each respective area at the Closing as set forth in Section 5.

    **2.3**    **Adjustment to Purchase Price.** In the event the Purchase Price for any Area is to be reduced in accordance with section 5.3.1, 5.5(e), 7.5 or 7.6, the adjustment shall take place as soon as practicable, but in no event later than the next scheduled Closing. If an adjustment is to occur for Sub-Area 3 after the Third Closing, then $2,000,000 times the number of acres in question shall be held in Escrow in an interest bearing account pending resolution of the acreage and thereafter distributed in accordance with the resolution.

**Section 3.**    **Title to the Property.**

    **3.1**    **Condition of Title; Title Policies.** At each Closing, Seller shall convey fee title to the appropriate Area by duly executed and acknowledged grant deed in a standard title company form (the "*Grant Deed*"). Seller shall cause the "*Title Company*" (as defined below) to issue to Buyer an CLTA standard coverage owner's policy of title insurance with mechanics lien endorsement (the "*CLTA Title Policy*") or an ALTA extended owner's policy of title insurance (the "*ALTA Title Policy*") if Buyer so elects as hereinafter set forth. The title policy to be issued is referred to herein as the "*Title Policy*"). The coverage limits of each Title Policy shall be

EXHIBIT A
PAGE 3 OF 72

equal to the Purchase Price for each Area (the *"Closing Prices"*).  The Title Policy shall insure fee simple title to the respective Areas vested in Buyer or its nominee(s) as the case may be subject only to a lien for real property taxes and assessments not yet delinquent and those liens, defects and encumbrances mutually agreed to by and between Buyer and Seller during the Feasibility Period (the *"Approved Title Condition"*).

3.2    **Parcel Map to Create Legal Parcel.**  The entirety of the Property is not currently subdivided in a manner that would permit its conveyance in the contemplated Sub-Areas.  Seller shall, at its sole cost and expense, cause the City to record a parcel map or other map or maps (the *"Map"*) in order to create the Property as legal parcels that can be conveyed consistent with the requirements of the Subdivision Map Act and the City's Subdivision Ordinance.

**Section 4.**    **Due Diligence and Other Matters.**

4.1    **Right of Entry and Inspection.**  Buyer and its designees have and will continue to have prior to Closing the right to enter upon all portions of the Property at all reasonable times for purposes of conducting soils tests, tests for the presence of hazardous substances and wastes, engineering, seismic and geologic studies, inspection of structures and any other purposes reasonably related to Buyer's acquisition of the Property and planning, development, improvement and marketing of a residential project thereon.

4.2    **Seller's Delivery of Documents.**  Seller has provided Buyer, at Seller's sole cost and expense, with complete copies of all of the documents and materials in Seller's possession or control concerning the Property and its improvement, development and operation (the *"Due Diligence Materials"*) listed on the attached Schedule 1 (the *"Document Schedule"*).  Seller represents and warrants that the Due Diligence Materials listed on the Document Schedule and delivered to Buyer in connection with this transaction by or on behalf of Seller are:  (i) true, correct and complete copies of what they purport to be; (ii) to the best of Seller's knowledge fairly represent the factual matters stated in the documents; (iii) are in full force and effect; and (iv) have not been modified.

4.3    **Feasibility Period.**  Buyer shall have the period ending at 5:00 p.m. on May 27, 2004 (the *"Feasibility Period"*) in which to:

(a)    review, in Buyer's sole and absolute discretion, the suitability of the Property for Buyer's use and development, including, without limitation, the number of residential units to be contained within the Property, any governmental land regulations, zoning ordinances, architectural and design approvals, development costs, financial and market feasibility, the status of the entitlements of the Property, the presence of *"Hazardous Materials"* (as defined below), existing or potential assessments imposed on the Property and the physical condition of the Property (the *"Feasibility Matters"*); and

(b)    approve or disapprove of the Feasibility Matters; and

(c)    deliver to Seller and Escrow Holder written notice of Buyer's approval of the Feasibility Matters (the *"Feasibility Approval Notice"*) together with the deposit of Twenty

EXHIBIT __A__
PAGE __4__ OF __72__

One Million Seven Hundred Thirty Five Thousand Dollars ($21,735,000) as set forth in Section 2.2(a).

(d)    if Buyer determines within the Feasibility Period, in Buyer's sole and absolute discretion, that it is not feasible for Buyer to purchase or develop the Property on a basis that is satisfactory to Buyer, Buyer may cancel this Agreement and cancel escrow by delivering written notice of cancellation to Seller and Escrow Holder prior to the expiration of the Feasibility Period. Buyer's failure to deliver the Feasibility Approval Notice, or a cancellation notice, to Seller and Escrow Holder prior to the expiration of the Feasibility Period shall constitute Buyer's election to cancel this Agreement. Should Buyer elect (or be deemed to have elected) to cancel this Agreement, this Agreement shall immediately terminate, and Escrow Holder shall immediately return the Deposit including all interest earned thereon to Buyer without any additional instructions from Seller.

4.4    **Default and Liquidated Damages.**  The failure of Buyer to deliver written approval of the Feasibility Matters within the Feasibility Period is not a default under this Agreement, but shall constitute the election by Buyer to immediately terminate this Agreement and the Escrow. In the event of Buyer's default or breach of this Agreement, (except Buyer's failure to timely make any required Deposit for which Seller shall not be required to provide Buyer with written notice) Seller shall provide Buyer with written notice of such default or breach. Buyer shall have ten (10) days after Buyer's receipt from Seller of written notice of such default or breach to cure such default or breach. If Buyer fails to cure such default or breach within ten (10) days after Buyer's receipt of the written notice, Seller may terminate this Agreement and the Deposit released to Seller at the time thereof shall constitute Seller's liquidated damages as provided below. IF THE SALES OF ALL THE RESPECTIVE AREAS OF THE PROPERTY ARE NOT CONSUMMATED AS A RESULT OF BUYER'S DEFAULT UNDER THIS AGREEMENT AND IF SELLER IS NOT ALSO IN DEFAULT, THE PORTION OF THE DEPOSIT WHICH HAS NOT BEEN ALLOCATED TO THE CLOSING PRICE OF ANY AREA(S) ALREADY PURCHASED BY BUYER (AND INTEREST ON SUCH FUNDS ACTUALLY EARNED WHILE IN ESCROW) SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES. IF THE SALE IS NOT CONSUMMATED AS A RESULT OF A DEFAULT UNDER THIS AGREEMENT ON THE PART OF BUYER, THE DEPOSIT IN THE AMOUNT OF TWENTY ONE MILLION SEVEN HUNDRED THIRTY FIVE THOUSAND DOLLARS ($21,735,000) AND INTEREST SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES.  THE PARTIES AGREE THAT SELLER'S ACTUAL DAMAGES, IN THE EVENT OF BUYER'S DEFAULT, WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.  THEREFORE, BY PLACING THEIR INITIALS BELOW, THE PARTIES ACKNOWLEDGE THAT THE DEPOSIT AND ANY INTEREST EARNED WHILE ON DEPOSIT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLER'S DAMAGES AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER, AT LAW OR IN EQUITY, IN THE EVENT THE SALE OF THE PROPERTY IS NOT CONSUMMATED AS A RESULT OF BUYER'S DEFAULT HEREUNDER.  SELLER WAIVES ANY AND ALL RIGHT TO SEEK OTHER RIGHTS OR REMEDIES AGAINST BUYER, INCLUDING WITHOUT LIMITATION, SPECIFIC PERFORMANCE.  THE PAYMENT AND RETENTION OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT

EXHIBIT _A_
PAGE _5_ OF _72_

INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF
CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO
CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA
CIVIL CODE SECTIONS 1671, 1676 AND 1677. SELLER HEREBY WAIVES THE
PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389.

INITIALS: Seller _____    Buyer _____

4.5    **As Is.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, IT
IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT
AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND
OR CHARACTER EXPRESSED OR IMPLIED WITH RESPECT TO THE PROPERTY
INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OR REPRESENTATIONS
AS TO HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR
PURPOSE.

BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, EXCEPT
TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT,
AND SUBJECT TO SELLER'S OBLIGATION TO GRADE THE PROPERTY AS SET
FORTH IN SECTION 9.1, SELLER SHALL SELL AND CONVEY TO BUYER AND
BUYER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS".
BUYER HAS NOT RELIED AND WILL NOT RELY ON AND SELLER IS NOT
LIABLE FOR OR BOUND BY ANY EXPRESSED OR IMPLIED WARRANTIES,
GUARANTEES, STATEMENTS, REPRESENTATIONS, OR INFORMATION
PERTAINING TO THE PROPERTY OR RELATING THERETO, MADE OR
FURNISHED BY SELLER, THE MANAGERS OF THE PROPERTY OR ANY REAL
ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT
SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORAL
OR IN WRITING UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT.
BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND
TAKES INTO ACCOUNT THAT THE PROPERTY IS BEING SOLD "AS IS".

THE PROVISIONS OF THIS SECTION SHALL SURVIVE CLOSING OR ANY
TERMINATION OF THIS AGREEMENT.

**Section 5.    Closings and Conditions to Close.**

5.1    **First Closing.** Buyer shall pay Sixty Four Million Seven Hundred Sixty Five
Thousand Dollars ($64,765,000) into escrow on September 29, 2005 in immediately available
funds. The scheduled closing date of the Second Closing is September 30, 2005.

5.1.1    **Parcels Conveyed.** At the First Closing, Seller shall convey to Buyer title
to the parcel or parcels that constitute Sub-Area 1.

Dublin Development PSA 5.25.04                    6

EXHIBIT A
PAGE 6 OF 72

INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677.  SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389.

INITIALS: Seller _____        Buyer _____

4.5     As Is.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER EXPRESSED OR IMPLIED WITH RESPECT TO THE PROPERTY INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT, AND SUBJECT TO SELLER'S OBLIGATION TO GRADE THE PROPERTY AS SET FORTH IN SECTION 9.1, SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS",.  BUYER HAS NOT RELIED AND WILL NOT RELY ON AND SELLER IS NOT LIABLE FOR OR BOUND BY ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO, MADE OR FURNISHED BY SELLER, THE MANAGERS OF THE PROPERTY OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORAL OR IN WRITING UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT. BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE PROPERTY IS BEING SOLD "AS IS".

THE PROVISIONS OF THIS SECTION SHALL SURVIVE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.

Section 5.     Closings and Conditions to Close.

5.1     First Closing.  Buyer shall pay Sixty Four Million Seven Hundred Sixty Five Thousand Dollars ($64,765,000) into escrow on September 29, 2005 in immediately available funds.  The scheduled closing date of the Second Closing is September 30, 2005.

5.1.1     Parcels Conveyed.  At the First Closing, Seller shall convey to Buyer title to the parcel or parcels that constitute Sub-Area 1.

EXHIBIT ___A___
PAGE ___1___ OF _72_

5.1.2 **Special Closing Condition.** In addition to the *"General Closing Conditions"* (as defined below), the following *"Special Closing Conditions"* are established for the First Closing.

(a)    **Legally Conveyable, Legal Parcels.** The entirety of Sub-Area 1 shall be conveyed in the First Closing pursuant to an Approved Map.

(b)    **TIF Credits.** At the Closing, Seller shall transfer to Buyer such TIF 1 credits as may be necessary for the number of residential units approved in Sub-Area 1. Buyer and Seller acknowledge that even upon transfer to Buyer of the TIF 1 credits, City will require Buyer to remain responsible to pay certain TIF related fees (the *"TIF Fees"*) to the City when Buyer obtains building permits to construct homes on the property. The cash portion is currently in the amount of 3% of Category 1 Fees but Buyer shall be solely responsible for the cash portion should the City change the amount in the future and Seller shall have no further responsibility for the TIF obligation. All Category 2 TIF fees shall be the sole obligation of Buyer.

(c)    **Community Park Credits.** The Master Development Agreement for Dublin Ranch creates 44.5 acres of credit to apply against the land portion of Community Park Fees. Seller agrees to cause the transfer of sufficient credit to Buyer to satisfy Buyer's obligations for Community Park Fees attributable to Sub-Area 1 with the First Closing.

(d)    **Fire Impact Fee Credits.** At the Closing, Seller shall transfer to Buyer such fire impact fee credits as may be necessary for the number of residential units approved in Sub-Area 1.

(e)    **Construction of Improvements.** Prior to the First Closing, Seller shall construct and complete the *"Seller Work"* as described in Exhibit D attached hereto as applicable to the First Closing.

5.2    **Second Closing.** Buyer shall pay Ninety Nine Million Dollars ($99,000,000) into escrow on June 29, 2006 in immediately available funds. The scheduled closing date of the Second Closing is June 30, 2006.

5.2.1    **Parcels Conveyed.** At the Second Closing, Seller shall convey to Buyer title to the parcel or parcels that constitute Sub-Area 2.

5.2.2    **Special Closing Condition.** In addition to the *"General Closing Conditions"* (as defined below), the following *"Special Closing Conditions"* are established for the Second Closing.

(a)    **Legally Conveyable, Legal Parcels.** The entirety of Sub-Area 2 shall be conveyed in the Second Closing pursuant to an Approved Map.

(b)    **TIF Credits.** At the Closing, Seller shall transfer to Buyer such TIF 1 credits as may be necessary for the number of residential units approved in Sub-Area 2.

EXHIBIT ___ A
PAGE __8__ OF _72_

Buyer and Seller acknowledge that even upon transfer to Buyer of the TIF 1 credits, City will require Buyer to remain responsible to pay certain TIF related fees (the *"TIF Fees"*) to the City when Buyer obtains building permits to construct homes on the property. The cash portion is currently in the amount of 3% of Category 1 Fees but Buyer shall be solely responsible for the cash portion should the City change the amount in the future and Seller shall have no further responsibility for the TIF obligation.  All Category 2 TIF fees shall be the sole obligation of Buyer.

        (c)    **Community Park Credits.**  The Master Development Agreement for Dublin Ranch creates 44.5 acres of credit to apply against the land portion of Community Park Fees.  Seller agrees to cause the transfer of sufficient credit to Buyer to satisfy Buyer's obligations for Community Park Fees attributable to Sub-Area 2 with the Second Closing.

        (d)    **Fire Impact Fee Credits.**  At the Closing, Seller shall transfer to Buyer such fire impact fee credits as may be necessary for the number of residential units approved in Sub-Area 2.

        (e)    **Construction of Improvements.**  Prior to the Second Closing, Seller shall construct and complete the *"Seller Work"* as described in Exhibit D attached hereto as applicable to the Second Closing.

        (f)    **Prior Closings.**  Prior to the Second Closing, Buyer shall have closed escrow on the First Closing for Sub-Area 1.

    5.3    **Third Closing.**  Buyer shall pay Fifty Six Million Dollars ($56,000,000) into escrow on June 29, 2007 in immediately available funds.  The scheduled closing date of the Third Closing is June 30, 2007.

    5.3.1    **Parcels Conveyed.**  At the Third Closing, Seller shall convey to Buyer title to the parcel or parcels that constitute Sub-Area 3.

        (a)    Seller contemplates the possibility of a General Plan/Specific Plan Amendment to the Eastern Dublin Specific Plan and corresponding rezoning for Sub-Area 3 to accommodate a realignment of Dublin Boulevard.  Seller further acknowledges that the City may take other actions in interpreting the available area for land uses in this Sub-Area 3 without a formal amendment of the General Plan/Specific Plan.  Should Seller or City elect to initiate a General Plan/Specific Plan Amendment and should the corresponding rezoning occur or in the alternative should the City unilaterally initiate action interpreting the available area for land uses in Sub-Area 3, the result may be an adjustment in the overall net acreage described for residential uses in Exhibit "A" (27.8 net acres).  Should such an adjustment occur resulting in a variance of more or less than 2% to the net acreage available for residential uses, the Purchase Price for this Sub-Area 3 shall likewise be adjusted (increased or decreased) pro-rata by Two Million Dollars and no/100 ($2,000,000) per net acre.  In the event of a General Plan/Specific Plan Amendment and corresponding rezoning for Sub-Area 3, the applications for General Plan Amendment/Specific Plan Amendment and rezoning shall be approved by the City of Dublin and no appeal or challenge shall have been made to any such approval within the applicable appeal period.  This shall be a Special Closing Condition for the benefit of Buyer.



(b)   The parties also acknowledge that Buyer shall have the right, but not the obligation, to effect a General Plan Amendment/Specific Plan Amendment for Sub-Area 3 to clarify development issues.  Buyer shall have the right to seek such amendment so long as such amendment shall not materially and adversely affect the acreage, density, timing or cost of construction of Seller's Other Property and any increase in the costs of complying with new or revised conditions of approval shall be borne solely by Buyer.  If Seller approves a proposed amendment, Buyer shall not deviate from the parameters approved by Seller without again seeking Seller's prior written approval for any material changes which materially and adversely affect the Seller's Other Property.  This shall be a condition for the benefit of Buyer.  Seller shall reasonably cooperate with Buyer's efforts but shall have no obligation to incur unreimbursed expenses in connection therewith.  Any loss in Gross or net Residential Acres resulting from Buyer's amendments or any increase in the costs of complying with revised or additional conditions of approval shall be borne by Buyer.  Buyer shall be solely entitled to any increase in density and other benefits resulting from an amendment initiated by Buyer.  This shall not be a special or general condition of closing.

   **5.3.2   Special Closing Condition.**   In addition to the "*General Closing Conditions*" (as defined below), the following "*Special Closing Conditions*" are established for the Third Closing.

   (a)   **Legally Conveyable, Legal Parcels.**   The entirety of Sub-Area 3 shall be conveyed in the Third Closing pursuant to an Approved Map.

   (b)   **TIF Credits.**   At the Closing, Seller shall transfer to Buyer such TIF 1 credits as may be necessary for the number of residential units approved in Sub-Area 3. Buyer and Seller acknowledge that even upon transfer to Buyer of the TIF 1 credits, Buyer shall remain responsible to pay certain TIF related fees (the "*TIF Fees*") to the City when Buyer obtains building permits to construct homes on the property.  The cash portion is currently in the amount of 3% of Category 1 Fees but the Buyer shall be solely responsible for the cash portion should the City change the amount in the future and Seller shall have no further responsibility for the TIF obligation. All Category 2 TIF fees shall be the sole obligation of Buyer.

   (c)   **Community Park Credits.**   The Master Development Agreement for Dublin Ranch creates 44.5 acres of credit to apply against the land portion of Community Park Fees.  Seller agrees to cause the transfer of sufficient credit to Buyer to satisfy Buyer's obligations for Community Park Fees attributable to Sub-Area 3 with the Third Closing.

   (d)   **Fire Impact Fee Credits.**   At the Closing, Seller shall transfer to Buyer such fire impact fee credits as may be necessary for the number of residential units approved in Sub-Area 3.

   (e)   **Construction of Improvements.**   Prior to the Fourth Closing, Seller shall construct and complete the "*Seller Work*" as described in Exhibit D attached hereto as applicable to the Third Closing.

EXHIBIT ___A___
PAGE __10__ OF _72_

(f)     **Prior Closings.**  Prior to the Third Closing, Buyer shall have closed escrow on Sub-Area 1 and on Sub-Area 2.

(g)     **Elementary School Parcel.**  Buyer shall have reconveyed to Seller or Seller's assignee the elementary school parcel in Sub-Area 2.

(h)     Seller shall in addition convey to Buyer for no additional consideration the open space parcel adjacent to Sub-Area 3 subject to Seller's right to seek an adjustment in the boundary between the open space and Seller's general commercial site at Fallon Road and Dublin Boulevard.  Seller shall also retain the right to complete its infrastructure obligation for construction and dedication at Fallon Road through the open space parcel and a DSRSD pump station within the open space parcel.  Any credits or consideration from public agencies for these improvements shall be the sole property of Seller.

5.4     **Seller's General Closing Conditions.**  The following are conditions precedent to Seller's obligation to sell the Property:

(a)     All representations and warranties made by Buyer in this Agreement shall be true when made and shall be true as of the Closing Date, without any material adverse change, except for any material adverse change of which Buyer has notified Seller and Seller has accepted;

(b)     Buyer shall not, as of the Closing Date, be in default in the performance of its obligations under this Agreement; and

(c)     Buyer shall not take, nor acquiesce in, and shall vigorously and actively oppose any tentative map conditions and other development approvals with respect to affordable housing that are inconsistent with the Affordable Housing Agreement between Seller and the City dated July 15, 2003.

The conditions contained in this Section 5.4 are intended for the sole benefit of Seller.  If any condition to this Section 5.4 is not satisfied, Seller shall have the right, in its sole and absolute discretion, to either waive the condition and proceed with the Closing or to terminate this Agreement by written notice to Buyer.

5.5     **Buyer's General Closing Conditions.**  The following are conditions precedent to Buyer's obligation to purchase the Property (*"Buyer's Closing Conditions"*):

(a)     Seller shall not, as of the Closing Date, be in default in the performance of its obligations under this Agreement;

(b)     Seller shall be prepared to convey title to the Property to Buyer in the Approved Title Condition and the Title Company shall be irrevocably committed to issue the Title Policy in the Approved Title Condition.  At its expense, Seller shall remove at or before the Takedown of the respective Areas all monetary liens (collectively the "Monetary Liens") affecting the Area including without limitation (i) all delinquent taxes, bonds and assessments


EXHIBIT _A_
PAGE _11_ OF _72_

and interest and penalties and, (ii) all other Monetary Liens whether or not shown on the Title Report (including judgments and mechanic liens, whether or not liquidated and mortgages and deeds of trust with Seller being fully responsible for any fees or penalties). Monetary Liens shall not include a lien for non-delinquent general real property taxes pro-rated in accordance with this Agreement. This condition is for the benefit of Buyer.

(c)    The representations and warranties of Seller set forth in this Agreement shall be deemed remade as of respective Close of Escrow for each area, and shall be true and accurate as of, the Closing Date;

(d)    Seller shall have caused the Map (or Maps) to be recorded;

(e)    If net residential acres are lost in any area as a result of an attempt by Seller to modify any entitlement related to the Property or related to Seller's other Property which is not covered above as a Special Closing Condition, the Closing Price shall be adjusted pro-rata by $2 million per acre. No adjustment to the Closing Price shall be made if gross residential acres are lost as a result of Buyer's attempt to modify any entitlement related to the Property nor shall any adjustment to the Closing Price be made if net acres are lost as a result of Buyer's attempt to modify any entitlement related to the Property. This is a condition for Buyer's benefit.

(f)    Seller shall have satisfied the City's affordable housing requirements with respect to the Property, including without limitation (i) any tentative map conditions and other conditions of development approvals with respect to affordable housing, and (ii) the requirements of that certain Affordable Housing Agreement between Seller and the City dated July 15, 2003, so that upon Close of Escrow, assuming that Buyer had recorded an appropriate final map and obtained necessary building permits, Buyer would be able to commence construction of homes on the Property and sell them upon completion, without having to take any further actions to comply with the City's affordable housing requirements. Seller has represented to Buyer that Seller will satisfy any applicable affordable housing requirements by providing such affordable housing on Parcels H-1, H-2 and H-3 of Dublin Ranch, commonly referred to as *"Fairway Ranch"* or, if permitted by the City, Seller's payment of affordable housing fees in lieu thereof; and Buyer agrees to reasonably cooperate with Seller's efforts to resist the imposition of any conditions of approval or other requirements for affordable housing imposed by the City which are inconsistent with the Affordable Housing Agreement between Seller and the City dated July 15, 2003. This condition is for the benefit of Buyer.

(g)    Seller shall have completed bulk grading, construction of improvements and other obligations to be completed prior to the Closing Date, as described in Section 9.1 below.

(h)    Such documentation as is satisfactory to Buyer in its sole discretion to establish that the closing is not subject to withholding under FIRPTA or California Revenue and Taxation Code Sections 18805(a)(2) and 26131(a)(2) (the *"Non-Foreign Certification"*).



Buyer's Closing Conditions are intended for the sole benefit of Buyer. In addition to Buyer's right pursuant to Section 6.1(c) to extend the close of escrow if Buyer's Closing Conditions are not satisfied, if any Buyer's Closing Conditions remain unsatisfied as of the date then established as the Closing Date, Buyer shall have the right, in its sole and absolute discretion, to (1) waive one or more of Buyer's Closing Conditions and proceed with the Closing.

**Section 6.    Closing and Escrow.**

6.1    **Closing Date.** Provided that all the special closing conditions and the general closing conditions have been satisfied, the "*Closing*" or the "*Close of Escrow*" for each of the areas shall be consummated through an escrow (the "*Close Escrow*") established at the offices of First American Title Company ("*Escrow Holder*") at the address shown in the Notices provision of this Agreement. The dates for the respective closings shall be the later of (a) the discrete dates set forth above or (b) if the special closing conditions and general closing conditions have not been satisfied as of the discrete dates set forth above three (3) business days after all the special closing conditions and general closing conditions have been satisfied (the "*Scheduled Closing Dates*").

6.2    **Personal Property Assignment and License.** Effective at Closing, Seller hereby assigns to Buyer, all of its right, title and interest in all tangible and intangible personal property relating to the Property, including but not limited to, some or all of the following:  (i) governmental permits, licenses, applications, vesting tentative subdivision maps, school fee mitigation agreements and other entitlements and development rights relating to the Property (collectively, the "*Entitlements*"); (ii) rights relating to any services provided or improvements constructed in connection with the Property. Effective at Closing, Seller hereby grants to Buyer a royalty-free, non-exclusive license, with the right to sublicense, to use the name "Dublin Ranch" in connection with the development, subdivision and sale of the Property.   The Entitlements and other tangible and intangible property acquired by Seller in connection with the Property are referred to as the "*Personal Property*" and are included in the Purchase Price. At Buyer's request, at Closing Seller shall execute and deliver to Buyer and Bill of Sale and Assignment in form prepared by Buyer and reasonably approved by Seller, evidencing the foregoing assignments and license, and transfer of the TIF credits described in Section 6.4 below.

6.3    **Other Instruments.** Seller and Buyer shall each deposit such other instruments as are reasonably required by the Title Company or otherwise required to close the Escrow and consummate the purchase and sale of the Property under this Agreement.

6.4    **Prorations.** General *ad valorem* real property taxes payable in the fiscal year in which the Closing Date occurs shall be prorated as of the Closing Date. If such taxes have not been determined as of the Closing Date, the proration shall be based upon the product of the taxes for the prior fiscal year and a factor of [1.025]. If after Closing any supplemental real property taxes or any other additional real property taxes or assessments that are applicable to the period prior to the Closing are levied for any reason, including, without limitation, back assessements, escape assessments or any assessments under "Proposition 8", then Seller shall pay all such additional taxes and assessments, to the extent applicable to the period prior to the

EXHIBIT ___A___
PAGE __13__ OF _72_

Closing. Seller and Buyer hereby agree that if any of the prorations cannot be calculated accurately on the Closing Date, then they shall be calculated as soon as reasonably possible after the Closing Date and any adjustments shall be paid within ten days of the subsequent proration together with interest at the rate of 10% per annum if not paid within ten days after demand.

6.5     **Costs**. Seller shall pay the cost of transfer taxes and recording fees. The increased costs for an ALTA title insurance premium, for extended coverage or for any additional endorsements desired by Buyer shall be paid by Buyer. If Buyer elects to obtain an ALTA title policy, Buyer shall be responsible to obtain and pay for any survey required in connection with such ALTA title insurance policy. Seller and Buyer shall each pay one-half of all escrow fees and any other costs and charges of the Escrow Holder.

6.6     **Possession**. Seller shall deliver exclusive possession of the Property to Buyer at the Closing.

6.7     **Closing**. At the closing the Grant Deed shall be recorded, the Purchase Price less Closing adjustments shall be delivered to Seller, and all other agreements between the parties shall be delivered.

**Section 7.     Buyer Work**.

Except as otherwise provided herein, Buyer shall be responsible for satisfying all work necessary for the improvement and development of the Property to be purchased by Buyer as contemplated herein including but not limited to Buyer obligations set forth on Exhibit "D", paying all "fees" relating to the Buyer obligations, posting all "bonds" for the Buyer obligations, and obtaining all Development Approvals required to complete the Buyer obligations (collectively, the *"Buyer Work"*).

7.1     **Easements and Right to Enter**. Seller hereby expressly grants to Buyer a right to enter across the Property owned by Seller and Seller's Other Property to the extent required to complete all the Buyer work. Seller hereby represents and warrants Seller has the authority to grant such right of entry.

7.2     **Process Development Approvals**.

7.2.1     **Seller Cost**. Seller shall process and record and bear all design and engineering costs and deliver all bonds and pay all fees to record Maps which will create legal parcels out of the Property which must be approved in conjunction with each Closing. Buyer shall, however, post all the bonds and other security, pay all fees and sign all sub-division agreements required by the City in conjunction with the recordation of the Final Sub-Division Map for the property acquired in the First Closing.

7.2.2     **Processing by Buyer**. Buyer shall process with the City and seek the City's Approval of (a) any additional Entitlements required by the Agencies or desired by Buyer for the respective Areas, (b) final engineering required for final improvement plans for any required public improvements within the Areas; and (c) all other approvals, entitlements,



EXHIBIT A
PAGE 14 OF 72

easements, permissions, consents, and permits required to develop the Property and to build, market and occupy the homes to be constructed upon the Property as may be imposed by the Agencies to Complete the Buyer Work, except for the Seller Work as expressly provided herein. Buyer shall have the right to design the Areas and its improvements in any manner which Buyer sees fit so long as Buyer does not negatively and adversely impact the density, timing or cost of the Seller's Other Property. Seller shall cooperate with Buyer's efforts so long as no unreimbursed expenses are incurred and Seller shall review, and if applicable and if Seller has approved the same, sign documents over which Seller has approval rights within ten (10) business days of the receipt of the same when Seller's approval and or the signature of the land owner is required to process such matters. All matters not expressly approved or disapproved within that time period shall be deemed approved. All disapprovals must be specific and reasonable. The parties agree that to the extent the Property or Seller's Other Property require easements for grading, construction, storm drain, acceptance of concentrated drainage flows and sheet flow and access, they shall reasonably cooperate with each other in mutually granting the required easements so long as the granting party is at no significant cost or expense in doing so and so long as such easements do not materially and adversely affect the timing, density or cost of construction of the granting party's property.

   7.2.3 **Separate Duties.** Buyer and Seller shall have no responsibility for costs incurred by the other party for mapping and subdivision work except as expressly set forth herein.

   7.3 **Fees and Bond.** Buyer shall pay all fees and post all bonds to obtain Approvals related to the Buyer Work. If the subject fee is increased or deceased, Buyer shall pay the revised amount. Buyer shall also provide the bonds required by City or applicable agencies to secure completion of the Buyer Work or obtain any development approvals to be obtained by Buyer. Buyer shall execute all subdivision improvement agreements with the City as may be required to record Neighborhood Final Maps. The parties shall cooperate with each other to minimize the bonds required from each and to release and replace such bonds when the applicable Buyer Work or Seller Work is completed.

   7.4 **Water Quality.** Seller shall obtain approval for a Storm Water Pollution Prevention Plan and comply with all other requirements of the National Pollutant Discharge Elimination System for storm water originating from the various Areas for the period ending with the respective Closings. As of the respective Closings, Buyer shall obtain approval for its own Storm Water Pollution Prevention Plan and comply with all other requirements of the National Pollutant Discharge Elimination System for storm water originating from the Property for the period commencing with the respective Closings.

   7.5 **School Parcels.** Buyer shall stub to the back of the curb of the street in which the connection is located utility services, sewer service laterals, reclaimed water service laterals, and water service laterals to serve the School Parcels in or adjacent to the Property. Seller shall designate the locations for such services. Such utilities, sewer and water improvements shall be appropriately sized for the intended uses as directed by the City, Dublin San Ramon Services District or the Dublin Unified School District.

EXHIBIT ___A___
PAGE __15__ OF __72__

(a)    **Elementary School Site Sub-Area 2.**  The parties acknowledge that an as yet unidentified portion of Sub-Area 2 is intended to be dedicated to the Dublin Unified School District to serve as the site of a K5 elementary school.  The Parties shall cooperate with the District and one another in identifying and configuring the school site.  The school site shall be a minimum of 10 net usable acres graded to a 2% maximum slope.  The parties shall use all commercially reasonable efforts to cause the school site to be designed and located to maximize the opportunity for residential development of the remainder of Sub-Area 2.

(b)    Buyer shall acquire title to all of Sub-Area 2 subject to the obligation to reconvey the school site to Seller, or Seller's assignee, without consideration and with no new title exceptions but otherwise without any representation, warranty or liability to Seller when Buyer has obtained a Parcel Map creating the school site as a legal parcel.

(c)    The Closing Price for Sub-Area 2 shall be reduced pro-rata by $2,000,000 per acre if the net usable acreage of the school site exceeds 10 net usable acreage by more than 2%.

7.6    **Neighborhood Square and Neighborhood Park Parcels.**  Buyer acknowledges that within Sub-Area 1 and Sub-Area 3 the City of Dublin will require the dedication of a Neighborhood Square and within Sub-Area 2 the City of Dublin will require the dedication of a Neighborhood Park.  The Buyer shall cooperate with the City and one another in identifying and configuring the Neighborhood Park and the Neighborhood Squares.  Each Neighborhood Square shall be a minimum of 2 net useable acres graded to a 2% maximum slope and the Neighborhood Park shall be a minimum of 5 net useable acres graded to a 2% maximum slope.  The Closing Price for Sub-Area 1 and Sub-Area 3 shall be adjusted pro-rata by $2,000,000 per acre if the net useable acreage of the Neighborhood Square exceeds 2 net useable acres each by more than 2%.  The Closing Price for Sub-Area 2 shall be adjusted pro-rata by $2,000,000 per acre if the net useable acreage of the Neighborhood Park exceeds 5 net useable acres by more than 2%.

7.7    **No Changes Without Consent.**  Neither Buyer nor Seller shall make any material changes to the design of any public improvements required by the PD Rezone and Master Vesting Tentative Maps without first obtaining the prior written consent of the other and all required amendments from the City.  Each party agrees it shall not unreasonably withhold, condition or delay such consent.

7.8    **Cooperate With Environmental Conditions.**  Buyer shall cooperate with Seller's processing of all Conditions of Approval including any which have an environmental purpose or concern (the *"Environmental Development Approvals"*).  Buyer shall not violate or allow its contractors, subcontractors or agents to violate any of the Environmental Development Approvals.  Without limiting the generality of the foregoing, Buyer shall perform all work required to maintain compliance with the Storm Water Pollution Prevention Plan required for the NPDES general construction permit on and for the Property when acquired by Buyer or upon which Buyer has been granted access by Seller, at Buyer's sole cost and expense.  Except for the work to be completed by Buyer as set forth in the section of this Agreement below titled "Compliance With Mitigation Plan", Seller shall be responsible for implementing, maintaining, and complying with all mitigation required by the Environmental Development Approvals.

EXHIBIT ___A___
PAGE _16_ OF _72_

7.9    **Generally.** Buyer shall perform all other Conditions of Approval and shall pay all other sums and perform all other obligations relating to Buyer Work.

7.10    **Design of Projects.** Buyer shall be solely responsible for and solely entitled to create the design of the various projects which shall be constructed on the Property, so long as the same do not materially and negatively affect the timing, density or cost of construction of any of Seller's Other Property. Seller shall have no obligation to Buyer if the required density is allocated to the Areas of the Property by the Entitlements but Buyer is unable to design the various housing products to take advantage of such density in a manner approved by the City.

**Section 8.**

8.1    **Entry Permit.** After Buyer has approved the Feasibility Review and continuing to the close of Escrow for each Area, Buyer shall have the right to go upon the respective Areas to develop the same upon those terms and conditions described below.

(a)    **License to Enter.** Seller hereby grants to Buyer a non-exclusive license and permission to enter upon the Areas for the purposes set forth herein (the "License"). The term of the License shall commence as of Buyer's approval of the Feasibility Matters, and shall terminate upon the earlier to occur of (a) Buyer's default of this Agreement, or (b) the acquisition by Buyer of title to all the Areas.

(b)    **Purpose of Entry.** Buyer shall have the right to install roads (and related road improvements such as curb and gutter, traffic medians, street lighting, sidewalk and drive approaches), sewer, storm drains, water, curb and gutter, utilities and perimeter walls, landscaping and irrigation. Buyer may also construct models upon the Property after first obtaining the consent of the Seller to the location of the models and the related parking lots. Buyer may not, however, commence the construction of any production units on any Area. All improvements completed by Buyer shall be Completed in compliance with approved plans and specifications for the same. Buyer shall be solely responsible for obtaining all required permits and approvals and shall pay all related fees. Buyer shall be solely responsible for erosion control and water quality permits and compliance and dust control for Buyer Work during the term of the License. Buyer shall maintain all improvements it commences.

(c)    **Notice of Nonresponsibility.** Buyer shall post for Seller notices of non-responsibility as often as Seller desires.

(d)    **Mutual Cooperation.** Buyer and Seller agree not to unreasonably interfere with each other's work. The parties hereby give each other such further assurances that each shall take such action as may be required to work efficiently upon the Areas.

(e)    **Indemnification.** Buyer shall not suffer or permit a mechanics lien or materialmen's lien to be attached to or enforced against any Area as a result of work performed by, under or through Buyer or any of its employees, contractors, subcontractors, consultants or agents (the "Representatives"). Buyer shall pay or cause to be paid all liens, claims or demands

EXHIBIT    A
PAGE 17 OF 72

before any action is brought to enforce the same against the Property. Buyer expressly agrees to indemnify, defend and hold harmless Seller, its partners, its successors and assigns, and its tenants (the "Indemnitees") from all liability for any and all work done on the Property.

(f)    **Other Claims.** Buyer hereby agrees to indemnify, defend and hold harmless Seller and the Indemnitees from and against any loss, damage, liability, claim, cost or expense (including but not limited to attorneys' fees) of any kind or character (the "Claims") arising from or caused by any death, bodily injury, property damage, accident, fire or other casualty arising out of the presence by Buyer or any Representative on the Property. Notwithstanding the foregoing, neither Seller nor any Indemnitee shall be entitled to indemnification hereunder to the extent any Claim is ultimately established by a court of competent jurisdiction to have been caused by the negligence or willful misconduct of Seller or such Indemnitee.

(g)    **Insurance.** Prior to entering upon the Property for any purpose, Buyer shall deliver to Seller certificates of insurance evidencing that Buyer has in full force and effect, at its sole cost and expense, throughout the term hereof the following forms of insurance.

i) Buyer shall maintain a commercial general liability insurance policy covering liability for bodily injury and property damage. Such insurance shall be in the amount of not less than Five Million Dollars ($5,000,000.00) per occurrence, combined single limit.

ii) Buyer shall maintain a business automobile liability insurance policy or the equivalent form covering liability for bodily injury and property damage and including coverage for owned, non-owned and hired automobiles. Such insurance shall be in the amount of Two Million Dollars ($2,000,000.00) per occurrence, combined single limited.

iii) Buyer shall maintain a workers compensation insurance policy with statutory limits and employers liability insurance with limits of not less than Two Million Dollars ($2,000,000.00) per accident.

iv) Buyer shall provide to Seller certificates of insurance evidencing the coverages described above in this Paragraph. Each of such certificates shall name Seller as an additional insured and will each provide that at least the first Five Million Dollars ($5,000,000.00) in the coverages described above are primary to any insurance coverage obtained by Seller. All certificates of insurance provided by Buyer shall bear the endorsement "Not to be canceled or modified without thirty (30) days' prior written notice to Seller" and shall be issued by insurance companies with an A. M. Best rating of not less than A-, Class XII (or equivalent rating), and qualified to do business in the State of California.

(h)    **Ownership of Improvements.** All the improvements completed by Buyer upon any Area shall be the property of Seller until the close of Escrow for such Area. If Escrow fails to close because of the default of Buyer, the improvements shall all be the property of Seller. Buyer agrees to sign a bill of sale or other instruments witnessing the ownership of Seller in and to the improvements in that case. From and after the close of Escrow, the improvements shall be the sole property of Buyer. If Buyer does not acquire any Area, Buyer



EXHIBIT ___A___
PAGE __18__ OF __72__

shall assign all the plans and specifications and construction contracts to Seller that Seller may request with respect to such Area. The assignment of plans and specifications by Buyer to Seller shall be without any representation or warranty of fitness for any purpose, and any use or reliance thereon by Seller or any of its successors and assigns shall be at the sole cost, expense and risk of such user.

(i)    **License for Signage and Trailers.** Seller agrees to grant temporary licenses to Buyer over Seller's Other Property within ten (10) business days of Seller's request for marketing signs and for the installation of construction and marketing trailers after reviewing and approving Buyer's reasonable requests for the same. Buyer's requests shall be in writing and shall present the information reasonably required for Seller's informed consideration of such request. Seller agrees it shall not unreasonably withhold, delay or condition its approval.

**Section 9.    Seller Work.**

Except as otherwise specifically provided for herein, Seller shall be responsible for satisfying all the Seller obligations set forth on Exhibit "D", paying all fees related to its obligation, posting all bonds for such obligations, and obtaining all Approvals required to complete the Seller obligations. All such work is referred to herein collectively as the "Seller Work". Without limiting the generality of the foregoing, the Seller Work includes the following, which Seller shall accomplish at its sole cost and expense. As used herein, the term "*Complete*" shall mean that the Project's civil engineer shall certify in writing for the benefit of Buyer and Seller that all applicable Seller improvements have been constructed in a good and workmanlike manner and in compliance with the plans and specifications approved by the appropriate agency or agencies and that the agency or agencies have inspected the subject improvements, created a punch list and that all the punch list items have been completed as required. With respect to any grading this Agreement provides that additional certification shall be required from the civil engineer and the soils engineer for the Project to determine completion. Unless Buyer or Seller objects within ten (10) business days of its receipt of the engineer's certification concerning completion with specific reasons why the Seller improvements are not complete the Seller improvements shall be deemed complete. If Buyer or Seller delivers a proper and timely object, the parties shall resolve any dispute pursuant to the dispute resolution provisions of this Agreement.

**9.1    Grading.**

(a)    Seller shall grade the parcels in Sub-Area 1 in accordance with the grading plans prepared by MacKay & Somps provided to Buyer in the Document Schedule. If Buyer desires to change the amount of soil for export from Sub-Area 1, Buyer shall provide Seller with its alternative earth quantities approved by the City for Sub-Area 1 by May 31, 2004 and then Seller shall grade the parcels consistent with Buyer's earth quantities. Any sub-excavation, sub-drains or extraordinary grading pursuant to the Buyer's earth quantities beyond the grading contemplated by MacKay & Somps plans referenced above shall be at Buyer's sole expense.

(b)    Seller proposes to grade Sub-Area 2 and Sub-Area 3 in accordance with the grading exhibit attached as Exhibit E. If Buyer desires to change the amount of soil for


EXHIBIT A
PAGE 19 OF 72

export or change the amount of soil for import in Sub-Area 2 and Sub-Area 3, Buyer shall provide Seller with its alternative earth quantities approved by the City for Sub-Area 2 and Sub-Area 3 by November 30, 2004 and then Seller shall grade the parcels consistent with Buyer's earth quantities. Any sub-excavation, sub-drains or extraordinary grading pursuant to the Buyer's earth quantities beyond the grading contemplated by Exhibit E shall be at Buyer's sole expense.

(c)     In addition to other requirements of this Agreement related to witnessing the Completion of Seller's Work, in order to witness the Completion of the Grading identified in Section 9.1, Seller shall cause to be prepared and delivered to Buyer a final soils report covering the said Grading. Seller shall also deliver to Buyer a certification by the civil engineer and by the soils engineer prepared for Buyer's reliance stating that all remedial grading and compaction if any is called for in the Seller's (or if modified by Buyer as provided for herein, as called for in Buyer's) Grading plan has been completed.

9.2     **No Violation.** Seller shall not violate nor allow any of its successors, assigns, contractors, subcontractors, permittees or invitees to violate any Environmental Condition of Approval. Buyer agrees it shall reasonably cooperate with Seller's efforts to obtain all the Environmental Development Approvals and shall not take any action intended to frustrate or make more difficult or expensive the obtaining of any such approvals or compliance with such approvals.

9.3     **Engineering.** At the completion of the Seller's grading work it shall prepare a final soils report covering the Seller Work.

9.4     **Generally.** Seller shall be responsible for funding and satisfying all Conditions of Approval and shall pay all sums and perform all other obligations related to the Seller Work.

9.5     **Land Dedications and Easements/Abandonments.** Seller shall provide either by dedication or by appropriate easements land which is not part of the Property, owned by Seller as may be required to satisfy all Conditions of Approval including but not limited to dedications of school sites, pump station location, streets and roads, park land, bike paths and pedestrian paths and trails, open space corridors, streams, utilities, storm drain easements and water quality ponds. The preceding sentence applies only to the providing of the land and does not make all the related improvements into Seller obligation or Seller public improvements. The obligations of the parties with respect to public improvements to be constructed on such parcels is controlled by other provisions of this Agreement. Seller shall abandon easements or rights of way as necessary to comply with any Conditions of Approval.

9.6     **Fees and Bonds.** Seller shall pay all Fees and post all Bonds required to obtain the Approvals related to the Seller Work. If the subject fee is increased or decreased, Seller shall pay the revised amount. Seller shall also provide the bonds required by City or applicable agencies to secure completion of the Seller Work or obtain any Development Approvals to be obtained by Seller. Seller shall execute all improvement agreements with the City as may be required for the Seller Work. The Parties shall cooperate with one another to minimize the bonds

EXHIBIT ___A___
PAGE __2⁰__ OF __72__

required from each and to release and replace such bonds when the applicable Seller Work or Buyer Work is completed.

Section 10.    **Construction Deadlines.**

The parties have established dates by which the respective parties are to complete the Buyer Work and the Seller Work (the "*Construction Deadlines*"). Some of the Construction Deadlines apply to important milestones in the Buyer Work and the Seller Work and separate Construction Deadlines may be established for those milestones. Subject to "*Unavoidable Delays*" (as defined below) the Parties agree to complete the appropriate work whether for the entire task or for milestone on or before the related Construction Deadlines.

Section 11.    **Unavoidable Delay.**

As used herein, in the term "*Unavoidable Delay*" means any prevention, delay or stoppage in the performance of any duty of any party which is caused by (a) an act of God, war, inability to obtain labor or materials or reasonable substitutes therefore after diligent efforts, (b) the failure to another party to complete work reasonably required to be completed prior to the completion of other tasks, but only where such inability directly or materially prevents or delays the performance by the parties of their obligations under this Agreement; (c) unusual or unseasonal weather which prevents construction for more than two (2) days at a time, or (d) other matters or causes beyond the reasonable control of a party which a party could not and did not actually foresee and thereby have the opportunity to avoid or mitigate and which the party cannot overcome by commercially reasonable and appropriate measures. An Unavoidable Delay shall extent the time within which this Agreement requires certain acts to be performed for a period or periods equal to any period of such Unavoidable Delay; provided, however, that (a) nothing in this Paragraph shall excuse the prompt payment of money from one party to another as required by this Agreement or the performance of any act rendered difficult solely because of a party's financial condition, and (b) in no event shall any extension for any period of time be deemed to have occurred unless the party gives the other affected parties written notice within ten (10) calendar days after the occurrence of any such claimed Unavoidable Delay, setting forth the facts giving rise thereto.

Section 12.    **Self Help Right.**    The parties acknowledge the failure of the other party to complete its work pursuant to the prescribed schedules shall have a substantial, negative effect upon the work of the other party. The Parties also agree that one Party may desire to accelerate the Work of the other Party in order to construct or market or sell homes on it's own property. The parties desire to establish a method by which either party shall have the right to complete work set forth on Exhibit "D" to be completed by the other party to mitigate damages resulting to the parties and to perform the other Parties Work on an accelerated basis. (the "*Self Help Right*").

12.1    **Self Help Party.**    If either party (the "*Self Help Party*") determines that the other party has failed to meet a deadline or Milestone and that such failure has or shall have a material adverse effect upon the project and such failure is causing a delay in the Self Help Party's progress or if the Self Help Party desires to accelerate the pace of the other Party's Work, the

Self Help Party shall have the right, but not the obligation, to exercise the Self Help Right after following the procedures set forth in this Paragraph below.

    12.2    **Self Help Notice.**  The Self Help Party shall give the other party (the "*Noticed Party*") written notice (the "*Self Help Notice*") describing (a) the work which has not been timely completed or which the Self Help Party desires to accelerate (the "*Noticed Work*"), (b) the manner in which the Self Help Party is actually being held up in the completion of work and the damages resulting from such delay or the effects on the Self Help Party's property if the Noticed Work is not accelerated (the "*Noticed Damages*").  Upon receipt of the Self Help Notice, the Noticed Party shall have a period of ten (10) business days to respond to the Self Help Notice.  In such response, the Noticed Party shall either (a) describe any "*Unavoidable Delays*" (as defined in Section 10) which excuse the late completion of the Noticed Work and the extent of the claimed excused delays, if the Self Help Party is claiming a default (no description is required from the Noticed Party if the Self Help Party is desiring to accelerate the Noticed Party's Work), set forth the schedule by which the Noticed Party shall commence and the date by which the Noticed Party shall complete the Noticed Work as described, or (b) offer to allow the Self Help Party to commence and complete the Notice Work.  If the Noticed Party selects the first of its two choices, Self Help Party shall have the right for a period of ten (10) business days to evaluate the response of the Noticed Party.  If the Self Help Party does not reasonably agree with the response of the Notice Party, the Self Help Party shall have the right, immediately upon delivery to the Noticed Party of written notice, to commence the Noticed Work.  If the Self Help Party elects to move forward, the Noticed Party shall provide reasonable, good faith assistance in transitioning to the Self Help Party the "Approved Plans and Specifications" and all requisite Development Approvals required to complete the Noticed Work.

    12.3    **Approved Plans and Specification.**  Whenever the Self Help Party exercises the Self Help Right, it shall use the plans and specifications for such work approved by the City or applicable Agency (the "*Approved Plans and Specifications*").  The Noticed Party shall complete all Noticed Work in a manner substantially complying with the Approved Plans and Specifications, and in a good and workmanlike manner.  After commencing any Noticed Work under the Self Help Right, the Self Help Party shall diligently and continuously continue with the Noticed Work until it is completed.  After the Self Help Party completes the Noticed Work, it shall deliver to the Noticed Party a copy of the Approved Plans and Specifications which have been corrected to show "as-built" conditions.

    12.4    **Construction Easements.**  Each party hereby grants and establishes over its Property for the benefit of the other party temporary easements of access, ingress, egress, construction, grading, import and export of soils, to the extent required to complete the subject Noticed Work.  The easements granted pursuant to this subparagraph shall run with the land for the benefit of the Self Help Party and its successors and assigns and shall be binding upon the respective properties of the parties and upon the heirs, personal representatives, successors and assigns of the Parties.  The Noticed Party shall execute and acknowledge such instruments and documents as the Self Help Party may reasonably require to formally reflect, confirm or provide record notice of the easements hereby granted.



12.5    **Reimbursement.**  The Self Help Party shall be entitled to reimbursement for the direct costs of construction incurred in completing the Noticed Work, plus five percent (5%) of such direct costs as an overhead and administrative fee.  The Self Help Party shall be entitled to offset reimbursements against sums owed to the Noticed Party or to payment within thirty (30) days of its delivery of an invoice to the Noticed Party together with paid invoices, reasonable proof of payment, and unconditional lien releases for the Noticed Work.  The Self Help Party shall be deemed to be a "mechanic" under the California mechanics lien laws with the right to impose a mechanics lien upon the property of the Noticed Party in the amount of any sums remaining unpaid thirty (30) days, and to foreclose such lien and to exercise the rights accorded to mechanics and suppliers under the California mechanics lien laws. If the Self Help Party is completing the Noticed Parties Work to accelerate the same, the Self Help Party's right to reimbursement shall be limited to the lesser of the Noticed Party's cost estimates for the Work or the Self Help Party's direct costs (without 5% as an administrative and overhead fee) and the Self Help Party's right to reimbursement shall be limited to an offset against sums owed to the Noticed Party at the time of the scheduled closing associated with the Noticed Party's work as set forth on Exhibit "D".  The provisions of Section 8 shall apply to the Self Help Party and it's entry onto the property of the Noticed Party.

**Section 13.    Covenants.**

13.1    **Pre-Closing Mutual Cooperation.**    Seller and Buyer each covenants to cooperate with the other in pursuing the matters required to be performed by the other as set forth in this Agreement and in otherwise fulfilling the conditions to Closing.

13.2    **Preservation of the Property.**  Except as necessary to comply with the terms of this Agreement, Seller shall not:  (a) sell, encumber or transfer any interest in all or any portion of the Property between the date of this Agreement and the Closing Date; (b) take any action that would or could adversely affect title to the Property; or (c) without Buyer's written consent which shall not be unreasonably withheld or delayed, enter into any other agreement of any type affecting the Property that would or could survive the Closing Date. Seller shall fully and timely comply in all material respects with any obligations that are applicable to the Property.  Seller shall pay all real property taxes, assessments and other levies against the Property before the original delinquency date therefor, and Seller shall not enter into any plan or agreement with any governmental authority permitting payment of any such impositions after such date. Seller shall maintain and keep the Property in at least as good condition and repair as on the date of this Agreement, and all entitlements, licenses, permits, easements and rights-of-way affecting the Property shall be maintained in full force and effect. Seller shall not make any improvements or material alterations to the Property other than those described herein, or required by the terms hereof, and those required by the existing approvals of the City of Dublin, USACOE, USF&WS, CDF&G and the CRWQCB, without Buyer's prior written consent which shall not be unreasonably withheld or delayed.

13.3    **Improvements.**  Seller shall complete all off-site improvements required to be made pursuant to the permits and requirements of the USACOE, USF&WS, CDF&G and the CRWQCB, such that Buyer, after Close of Escrow, will be able to commence and complete construction of its Project on the Property. All such improvements shall be completed by such

EXHIBIT ___A___
PAGE _23_ OF _72_

dates as will not delay in any way Buyer's ability to obtain building permits for the construction of its project on the Property, nor delay Buyer's ability to obtain a certificate of occupancy for each of home in the project upon completion of Construction of such home. The scope of work for such improvements (the *"Environmental Improvements"*) and the schedule for completion are set forth in the Orders of the USACOE dated May 23, 2003, USF&WS dated July 1, 2002, CDF&G dated June 5, 2003 and the CRWQCB dated April 16, 2003 together with the Environmental Mitigation Plan.

    **13.4    Assessment Districts.**  The Property is not now subject to special assessments district or community facilities district. Seller shall not take, nor acquiesce in, and shall actively and vigorously oppose any action regarding the Property which might result in the Property becoming subject to any special assessment district or community facilities district not agreed to by Buyer or its purchasers. Buyer acknowledges that Seller contemplated the formation of an Assessment District for financing purposes that would have included the Property but that said District has been abandoned. Buyer acknowledges that Seller contemplates the formation of a Benefit District for the construction of the G-3 Storm Drain Project. The Property shall not be encumbered to secure payment of any assessments or special taxes related to the G-3 Drainage project.

    **13.5    Compliance With Mitigation Plan.**  After Close of Escrow, Buyer shall take all necessary steps to ensure that the Environmental Mitigation Plan (Project Area Mitigation and Monitoring Plan prepared by H. T. Harvey and Associates dated July 25, 2003) for the Property is not violated by its agents, contractors and business invitees, and shall cooperate with Seller's prior implementation of the Plan, including but not limited to, the orders of the USACOE dated May 23, 2003, USF&WS dated July 1, 2002, CDF&G dated June 5, 2003 and the CRWQCB dated April 16, 2003. Buyer shall have the sole responsibility for the timely construction and improvement, maintenance and Agency acceptance of the on-site drainages described in the above Project Area Mitigation and Monitoring Plan prepared by H.T. Harvey and Associates dated July 25, 2003.

    **13.6    Water Quality Improvements.**  After Seller's completion of grading on the Property for those areas which Buyer has purchased or entered upon to grade, Buyer agrees to construct and provide for the on-going maintenance of water quality improvements as called for in the Order of the CRWQCB Order No. R2-2003-0032 dated April 16, 2003 for the project. Said improvements shall be subject to the Order and the conditions of the planned development District approvals for the Property.

    **13.7    Use of Specified Consultants.**  So long as their services are provided to Buyer in a satisfactory manner, as determined by Buyer in its reasonable business judgment, Buyer agrees that it shall continue to use the following specified consultants for the following purposes regarding the Property:

        (a)    MacKay & Somps for civil engineering, mapping and surveying. Buyer may utilize the services of other consultants for in-tract improvement work.

        (b)    Berlogar Geotechnical Consultants for soil.

EXHIBIT _A_
PAGE _24_ OF _72_



(c)  H.T. Harvey & Associates for compliance with Environmental Mitigation Plan.

**13.8    Directions to Title Company.** To the extent that the Title Company is needed to cooperate in or take actions to perform the obligations of Seller under this Agreement, Seller instructs the Title Company to perform those obligations for the benefit of Buyer. If Title Company requires supplemental instructions, Seller shall promptly provide them and Title Company shall comply with them.

**13.9    DSRSD Sewer Permits.** If Buyer gives written notice to Seller to obtain sewer permits required by the Dublin San Ramon Service District for the subject Area, Buyer shall deliver to Seller with such notice a check to pay the price of such sewer permits. Seller shall not be required to pay for such sewer permits, but Seller agrees it shall seek such sewer permits using the funds provided by Buyer. At the respective Closings, any permits obtained in the name of Seller shall be assigned to Buyer.

**13.10    Assignment of Entitlements.** Effective as of each Closings with respect to the Area involved Seller hereby assigns to Buyer all the Intangible Property and all Entitlements related to the Area involved. This assignment shall become effective as of the respective Closings for the respective Entitlements. If requested by Buyer, Seller shall make specific assignments of Intangible Property or Entitlements at the Closings pursuant to forms of assignments reasonably approved by the parties. The parties acknowledge that the development rights under the Entitlements may extend to more than the Property and very often Entitlements also apply to Seller's Other Property. Therefore, the assignments to be given by Seller shall apply only to the residential development rights in and to the Area involved and not to Seller's Other Property. Buyer shall assume duties under the Intangible Property and the Entitlements only to the extent consistent with the division of labor between Buyer and Seller pursuant to this Agreement.

**13.11    Soils Storage Site.** Effective as of the release of the Deposit as set forth in Section 2.2(a), Seller hereby grants to Buyer a temporary and non-exclusive license to enter upon the Property and Seller's Other Property as shown on Exhibit E prior to Closings for Sub-Area 1, Sub-Area 2 and Sub-Area 3 and place excess soils coming from all Areas of the Property Buyer has purchased pursuant to this Agreement as Buyer completes the grading of the Property so purchased (the **"Soils Storage Site"**). The Buyer and Seller shall agree upon the exact location or locations of the Soils Storage Site for soil coming from F1, F2 and Sub-Area 1 prior to May 31, 2004 and for soil coming from Sub-Area 2 and Sub-Area 3 prior to November 30, 2004. Buyer agrees to deposit excess soils from grading on the Property on the Soils Storage Site for no additional consideration being paid by Seller to Buyer. The Buyer shall obtain all permits for the Soils Storage Site and shall be responsible for all dust and erosion control. Buyer is hereby granted an easement of ingress and egress over the Property (including the right to move soils across street improvements installed by Seller) sufficient to efficiently utilize the Soils Storage Site. Buyer shall be solely responsible for protecting improvements installed by Seller and shall repair or replace any damage caused as a result of Buyer's actions hereunder. The license to deposit excess soils upon the Property and the easement for ingress and egress shall become

EXHIBIT __A__
PAGE __25__ OF __72__

effective as of the release of the Deposit. Buyer shall have no right to deposit more than 100,000 cubic yards of soil on Seller's Other Property as shown on Exhibit "E" without prior written approval.

**13.12 Unspecified Work.** Buyer and Seller agree that any requirements (a) set forth in Conditions of Approval; (b) for payment of other sums; and (c) performance of any other obligations relating to the obligations to be performed by Buyer and Seller shall become either Buyer's Work or Seller's Work as necessary for the completion of their respective obligations as set forth on Exhibit "D". Any dispute as to the allocation of said work to either party shall require the parties to meet and confer and if unable to agree shall be resolved in accordance with Section 17 below. Notwithstanding the above, by accelerating the completion of a portion of the Noticed Party's Work the Self Help Party does not transform any of the Noticed Party's Work into the Work of the Self Help Party so that the Noticed Work retains it's original character as Buyer Work or Seller Work as appropriate.

**13.13 School Parcel in Sub-Area 2.** Buyer agrees that it will acquire title to Sub-Area 2 subject to the obligation to reconvey the School Parcel to Seller, or Seller's assignee, without consideration and with no new title exceptions but otherwise without any representation, warranty or liability to Seller when Buyer has obtained a Parcel Map creating the School Parcel as a legal parcel.

**Section 14.    Representations, Warranties and Covenants.**

**14.1    Seller's Representations and Warranties.** Seller makes the following covenants, representations and warranties for the benefit of Buyer:

(a)    **Disclosure.** The documents delivered to Buyer in connection with this transaction by or on behalf of Seller are listed on the attached Exhibit C (the *"Disclosure Schedule"*) and, to the best of Seller's knowledge: (i) represent all of the documents reasonably believed by Seller to be currently material to the acquisition, development, subdivision or marketing of the Property, and (ii) are true and complete copies of what they purport to be. Seller has attached, or may attach no later than five business days prior to the end of the Due Diligence Period, as Schedule 1 a list of matters that Seller wishes to disclose to Buyer regarding the Property (the *"Document Schedule"*). Any matter described in the Disclosure Schedule or in the documents listed in the Document Schedule, or otherwise described to Buyer in writing at least five days prior to the end of the Due Diligence Period, is deemed to have been *"Disclosed"* to Buyer.

(b)    **Authorization.** At the time of their execution and delivery, this Agreement and all other documents executed by Seller and delivered by Seller to Buyer shall be: (i) duly authorized, executed and delivered by Seller; (ii) legal, valid and binding obligations of Seller (and, with respect to those documents which are instruments of conveyance, sufficient to convey title); and (iii) enforceable in accordance with their respective terms.

(c)    **No Options.** Except as Disclosed, no individual or entity holds any valid and enforceable option, right of first refusal or other right to purchase all or any part of the Property or any interest in the Property.

EXHIBIT __A__
PAGE __26__ OF __72__

(d) **Physical Condition.**  Except as Disclosed, to the best of Seller's knowledge, the Property is free of any material physical defects or conditions that would preclude or materially limit its development as a master planned community as contemplated by this Agreement.

(e) **Actions and Defaults.**  Except as Disclosed, there are no existing actions, suits, proceedings, judgments, orders, decrees, arbitration awards, defaults, delinquencies or deficiencies pending, outstanding or threatened against Seller or the Property.

(f) **Condemnation.**  Except as Disclosed, Seller has no notice of any condemnation, environmental, zoning or other land-use regulation proceedings, either instituted, or planned to be instituted, which would detrimentally affect Buyer's proposed use of the Property or the value of the Property, nor has Seller received notice of any special assessment proceedings affecting the Property.

(g) **Hazardous Substances.**  To the best of Seller's knowledge, except as Disclosed: (i) the Land is in compliance with all Environmental Laws, and neither Seller nor any other present or former owner, tenant, occupant or user of the Land has received any notice of violation issued pursuant to any Environmental Law with respect to the Land; (ii) neither Seller, nor any other present or former owner, tenant, occupant or user of the Land has used, handled, generated, produced, manufactured, treated, stored, transported or Released any Hazardous Substance on, under or from the Land; (iii) there are no Hazardous Substances stored on the Land, no Hazardous Substance has been Released on, beneath or from or in the surface or ground water associated with the Land during the time Seller has owned the Land; and (iv) there are no reports, data, surveys, maps, assessments or other documents in the possession or control of Seller or Seller's contractors or consultants other than those listed on the Document Schedule concerning the environmental condition of the Land or the presence of Hazardous Substances on or under the Land or in the ambient air at the Land.

For purposes of this Agreement:  (1) *"Hazardous Substances"* shall mean and include any substance which is defined or regulated under any Environmental Law; (2) *"Environmental Law"* shall mean and include all present federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements pertaining to the protection of human health and safety or the environment; and (3) *"Release"* shall mean and include any accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, discharging, injection, escaping, leaching, migrating, dumping, burying or disposing into the air, land, surface water, ground water or the environment.

(h) **Taxes.**  Seller has filed all required federal, state, county and municipal tax returns and has paid all taxes owed and payable to date, and Seller knows of no basis for any additional assessment of ad valorem real or personal property taxes regarding any Area for time periods prior to the corresponding Area Closing Date.

(i) **Seller's Knowledge.** For purposes of this Agreement, references to *"the best of Seller's knowledge"* or phrases of similar import shall mean the actual, not constructive, knowledge of Martin W. Inderbitzen, James Tong, without a duty of investigation; provided,

EXHIBIT ___ A

PAGE __27__ OF __72__

however, that none of the these individuals shall have any personal liability arising solely from serving as the measure of Seller's Knowledge under these representations and warranties.

14.2    **Buyer's Representation And Warranty.**   Buyer represents and warrants for the benefit of Seller that at the time of their execution and delivery, this Agreement and all other documents executed by Buyer and delivered by Buyer to Seller shall be: (i) duly authorized, executed and delivered by Buyer; (ii) legal, valid and binding obligations of Buyer; and (iii) enforceable in accordance with their respective terms.

14.3    **Changed Circumstances.**   If any representation or warranty given by Seller or Buyer becomes untrue in any material respect prior to the applicable Area Closing due to changed circumstances, the representing party shall promptly give written notice to the other party of the changed circumstances. The party making the representation and warranty shall take all commercially reasonable steps to address the changed circumstances so as to make the representation and warranty true and correct in all material respects once again. If the party making the representation and warranty is unable to do so to the other party's reasonable satisfaction within a reasonable time, or to give reasonably satisfactory assurances to the other party that the representation and warranty will be true and correct in all material respects as of the corresponding Area Closing Date, then (i) if the party making the representation and warranty is Buyer, Seller shall have the right to terminate this Agreement in full and exercise its remedies under Section 1.4, and (ii) if the party making the representation and warranty is Seller, Buyer shall have the Right to Terminate. Nothing in this Section shall be interpreted to waive or limit the liability of either party for a breach of the representations and warranties in this Agreement.

**Section 15.    Loss by Casualty or Condemnation.**

15.1    **Condemnation.**   If, prior to the Closing Date, any proceedings are commenced to take all or any portion of the Property by eminent domain, or any individual or entity with the power of eminent domain threatens to take all or any portion of the Property which would result in the loss of 20% or more potential residential units, Buyer shall have the right, in its sole discretion, to terminate this Agreement and have the Deposit returned. If Buyer does not elect to terminate, Buyer shall have the right to participate in the proceedings in order to attempt to maximize the amount of the award, minimized the adverse impact of the taking and otherwise protect its interests. If the taking is completed before Closing, the portion of the Property taken shall be excluded from the Property and the Purchase Price shall be reduced by the entire amount awarded to Seller. If the taking is not completed until after Closing, Seller shall credit Buyer at Closing all amounts received on account of the award and provide an assignment of all of Sellers' right, title and interest in and to any remaining award for the taking of the Property. Seller shall notify Buyer in writing immediately upon receipt of notice, and in any event prior to Closing, of any pending or threatened condemnation proceeding against all or any portion of the Property. Seller shall request that the condemning authority allocate any award between the Property and any other property which is the subject of the condemnation.



EXHIBIT __A__
PAGE __28__ OF __72__

**Section 16.    Exchange Cooperation.**

Buyer agrees to reasonably cooperate with Seller in the event Seller attempts to effectuate a Section 1031 exchange with respect to the Property; provided however that such exchange shall not extend the Closing Date, and Buyer shall not be required to obtain title to any exchange property, or incur any additional expense, cost or liability whatsoever (including, but not limited to, liabilities or warranties of title, or assumption of indebtedness) with regard to the Section 1031 exchange.  Seller hereby agrees to indemnify and hold harmless Buyer and its officers, shareholders, directors, affiliates, attorneys, successors and assigns (collectively, the *"Buyer Related Parties"*), from any claim, damage, liability, demand, cause of action, loss, cost, or expense (including, without limitation, reasonable attorney's fees) Buyer or any of the Buyer Related Parties may suffer or incur as a result of Buyer's participation in the aforesaid exchange or exchanges. The obligations of Seller under this Section shall survive the Close of Escrow.

**Section 17.    Dispute Resolution.**

17.1    **Dispute; Confidentiality.**  Any controversy or dispute arising out of or in any way related to this Agreement (a *"Dispute"*) shall be subject to non-binding mediation, as set forth below, before any party may institute litigation. Each party agrees that any Dispute, and all matters concerning any Dispute, will be considered confidential and will not be disclosed to any person, except (a) disclosures to a party's attorneys, accountants and other consultants who assist the party in the resolution of the Dispute, and (b) as provided in Section 9.2 with respect to the Mediation or as otherwise required by applicable law.

17.2    **Mediation.**

(a)    Either party may initiate non-binding mediation (the *"Mediation"*), conducted by a retired judge or other mediator who is a member of Judicial Arbitration & Mediation Services, Inc. (*"JAMS"*) or other agreed upon mediator (the *"Mediator"*).  Either party may initiate the Mediation by written notice to the other party.

(b)    The Mediator shall be a retired judge or other mediator, selected by mutual agreement of the parties, and if they cannot agree within 15 days after the Mediation notice, the Mediator shall be selected through the procedures regularly followed by JAMS.  The Mediation shall be held within 15 days after the Mediator is selected, or a longer period as the parties and the Mediator mutually decide.

(c)    If the Dispute is not fully resolved by mutual agreement of the parties within 15 days following completion of the Mediation, either party may bring an action in a court of competent jurisdiction to resolve the Dispute.  However, nothing in this Section 9 shall limit a party's right to seek an injunction or restraining order from a court of competent jurisdiction in circumstances where such relief is deemed necessary to preserve assets.

(d)    The parties shall bear equally the cost of the Mediator's fees and expenses, but each party shall pay its own attorneys' and expert witness fees and any other associated costs.


EXHIBIT __A__
PAGE _29_ OF _72_

(e)    EACH   PARTY   WAIVES,   TO   THE   FULLEST   EXTENT
PERMITTED BY LAW, ITS RIGHT TO A TRIAL BY JURY OF ANY DISPUTE.

Section 18.    Miscellaneous.

18.1    Attorneys' fees.  If any legal action or other proceeding is commenced to enforce
or interpret any provision of, or otherwise relating to, this Agreement, the losing party shall pay
the prevailing party's actual expenses incurred in the investigation of any claim leading to the
proceeding, preparation for and participation in the proceeding, any appeal or other post
judgment motion, and any action to enforce or collect the judgment including contempt,
garnishment, levy, discovery and bankruptcy.  For this purpose "expenses" include, without
limitation, court or other proceeding costs and experts' and attorneys' fees and their expenses.
The phrase "prevailing party" shall mean the party who is determined in the proceeding to have
prevailed or who prevails by dismissal, default or otherwise.

18.2    Construction of Agreement.  The parties mutually acknowledge that they and
their attorneys have participated in the preparation and negotiation of this Agreement.  In the
cases of uncertainty this Agreement shall be construed without regard to which of the parties
caused the uncertainty to exist.

18.3    Further Assurances.  Each party, at any time before or after the Closing, shall at
its own expense execute, acknowledge and deliver any additional deeds, assignments,
conveyances and other assurances, documents and instruments reasonably requested by the other
party, and shall take any other action consistent with the terms of this Agreement that may
reasonably be requested by such other party, for the purpose of confirming and effectuating any
of the transactions contemplated by this Agreement.

18.4    Notices.  All notices, consents, request, demands or other communications to or
upon the respective parties shall be in writing and shall be effective for all purposes upon receipt
on any work day before 5:00 p.m. local time and on the next work day if received after 5:00 p.m.
or on other than a business day, including without limitation, in the case of (i)  personal delivery;
(ii) delivery by messenger, express or air courier or similar courier, (iii)  delivery by United
States first class certified or registered mail, postage prepaid, and (iv)   transmittal by
electronically confirmed telecopier or facsimile, addressed as follows:

To Seller:            Charter Properties
                      4690 Chabot Drive, Suite 100
                      Pleasanton, CA 94588
                      Attn:  James Tong
                      Telephone:  925-463-1666
                      Facsimile:  925-463-1861

EXHIBIT    A
PAGE    30    OF   72

With a copy to:      Martin W. Inderbitzen, Esq.
                     7077 Koll Center Parkway, Suite 120
                     Pleasanton, CA 94566
                     Telephone: 925-485-1060
                     Facsimile: 925-485-1065

To Buyer:            Toll Brothers, Inc.
                     725 Town and Country Road, Suite 500
                     Orange, California 92868
                     Attn: James W. Boyd, Vice President
                     Telephone: 714-347-1300
                     Facsimile: 714-541-5197

With copies to:      Jon Paynter
                     Toll Brothers, Inc.
                     100 Park Place, #140
                     San Ramon, CA 94583
                     Telephone: 925-855-0260
                     Facsimile: 925-855-9927

                     Mark Foster
                     Regional Counsel
                     Toll Brothers
                     725 Town and Country Road, Suite 500
                     Orange, California 92868
                     Telephone: 714-347-1300
                     Facsimile: 714-541-5197

                     Mr. Warren S. Inouye
                     2212 Dupont Drive, Suite D
                     Irvine, California 92612
                     Telephone: 949-757-0757
                     Facsimile: 949-757-0759

In this section **"business days,"** means days other than Saturdays, Sundays, and federal and state legal holidays. Either party may change its address by written notice to the other in the manner set forth above. Receipt of communications by United States first class or registered mail shall be sufficiently evidenced by return receipt. Receipt of communication by facsimile shall be sufficiently evidenced by a machine generated confirmation of transmission without notation of error. In the case of illegible or otherwise unreadable facsimile transmissions, the receiving party shall promptly notify the transmitting party of any transmission problem and the transmitting party shall promptly resend any affected pages.

    18.5    **Relationship.** The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement. The parties do not intend to create any agency,

EXHIBIT A
PAGE 31 OF 72

partnership, joint venture, trust or other relationship with duties or incidents different from those of parties to an arm's-length contract.

18.6    **Severability.** The provisions of this Agreement are intended to be severable and enforced to the maximum extent permitted by law. If for any reason any provision of this Agreement shall be held invalid, illegal or unenforceable in whole or in part in any jurisdiction, then that provision shall be ineffective only to the extent of the invalidity, illegality or unenforceability and in that jurisdiction only, without in any manner affecting the validity, legality or enforceability of the unaffected portion and the remaining provisions in that jurisdiction or any provision of the Agreement in any other jurisdiction. The unaffected portion and provisions of the Agreement will be enforced to the maximum extent permitted by law.

18.7    **Assignability.** This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Neither Buyer nor Seller shall assign all or any portion of its interest in this Agreement without the prior written consent of the other (which consent shall not be unreasonably withheld); provided, however, that (so long as Buyer and Seller remain liable for the performance of it's obligations under the terms of this agreement) either Buyer or Seller shall have the right to assign this Agreement in whole or in part without the other's consent to: (i) any affiliate of Buyer or Seller; (ii) any entity in which Buyer or Seller or such affiliate hold at least a 50% interest; or (iii) as to Buyer, to any entity that serves as a "land banker" for Buyer, and any such assignee shall have the same right to assign with respect to its interest in this Agreement.

18.8    **Time of the Essence.** Time is of the essence in the performance of each party's respective obligations under this Agreement.

18.9    **Transaction Expenses.** Whether or not the transactions contemplated by this Agreement are consummated, each party shall pay its own fees and expenses incident to the negotiation, preparation, execution, authorization (including any necessary meetings or actions) or delivery of this Agreement and in consummating the transactions contemplated by this Agreement, including, without limitation, the fees and expenses of its attorneys, accountants and other advisors.

18.10    **Waiver, Modifications and Amendment.** No amendment of, supplement to or waiver of any obligations under this Agreement will be enforceable or admissible unless set forth in a writing signed by the party against which enforcement or admission is sought. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. Any waiver granted shall apply solely to the specific instance expressly stated.

18.11    **Brokers' Fees.** Other than any commissions owed to James Tong who shall be paid exclusively by Seller, Buyer and Seller represent to each other that they have dealt with no agent or broker in connection with the purchase and sale of the Property. Buyer and Seller each agree to indemnify, defend and hold harmless the other party from and against all liability, costs, damage or expenses (including without limitation attorneys' fees and costs incurred in connection therewith) on account of any brokerage commission or finder's fees which the

EXHIBIT ___A___
PAGE __32__ OF __72__

indemnifying party has agreed to pay or which is claimed to be due as a result of the actions of the indemnifying party. The provisions of this Section shall survive the Closing and any termination of this Agreement.

18.12  **Counterparts.** This Agreement shall be executed in any number of counterparts and each counterpart shall be deemed to be an original document. Delivery of the executed Agreement may be accomplished by facsimile transmission, and if so, the facsimile copy shall be deemed an executed original counterpart of the Agreement. All executed counterparts together shall constitute one and the same document, and any signature pages, including facsimile copies thereof, may be assembled to form a single original document.

18.13  **Authority.** Each party represents to the other that at the time of their execution and delivery, this Agreement and all other documents executed and delivered them shall be: (i) duly authorized, executed and delivered; (ii) legal, valid and binding obligations; and (iii) enforceable in accordance with their respective terms. No consent from, or notice to, any federal, state, local or foreign government, bureau, department, court commission or agency is required to permit the execution, delivery or performance of the obligations under this Agreement.

SELLER                                        BUYER

Chang Su-O Lin                                TOLL BROTHERS, INC.
                                              A Delaware Corporation

_____                     By:_____
Hong Lien Lin
                                              Name:_____
_____
Hong Yao Lin                                  Title:_____

EXHIBIT ___A___
PAGE _33_ OF _72_

indemnifying party has agreed to pay or which is claimed to be due as a result of the actions of the indemnifying party. The provisions of this Section shall survive the Closing and any termination of this Agreement.

    18.12  **Counterparts**. This Agreement shall be executed in any number of counterparts and each counterpart shall be deemed to be an original document. Delivery of the executed Agreement may be accomplished by facsimile transmission, and if so, the facsimile copy shall be deemed an executed original counterpart of the Agreement. All executed counterparts together shall constitute one and the same document, and any signature pages, including facsimile copies thereof, may be assembled to form a single original document.

    18.13  **Authority**. Each party represents to the other that at the time of their execution and delivery, this Agreement and all other documents executed and delivered them shall be: (i) duly authorized, executed and delivered; (ii) legal, valid and binding obligations; and (iii) enforceable in accordance with their respective terms. No consent from, or notice to, any federal, state, local or foreign government, bureau, department, court commission or agency is required to permit the execution, delivery or performance of the obligations under this Agreement.

SELLER

Chang Su-O Lin

_____

Hong Lien Lin

_____

Hong Yao Lin

_____

BUYER

TOLL BROTHERS, INC.
A Delaware Corporation

By: _____

Name: _JAMES W. BOYD_____

Title: _VICE PRESIDENT_____

EXHIBIT A
PAGE 34 OF 72

ACCEPTANCE BY ESCROW HOLDER:

Escrow Holder hereby acknowledges that it has received a fully executed counterpart of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as Escrow Holder thereunder and to be bound by and perform the terms thereof as such terms apply to Escrow Holder.

Dated: _____

First American Title Company

By: _____
Name: _____

A
35 — 72

<u>EXHIBIT A</u>

<u>DEPICTION OF PARCELS TO BE PURCHASED</u>



EXHIBIT A
DEPICTION OF PARCELS TO BE PURCHASED



Recording requested by,
and when recorded return to:

*Toll Brothers*
*725 Town and Country Rd #500*
*Orange, CA 92868*

       THIS MEMORANDUM OF AGREEMENT ("**Memorandum**") is executed as of May _5_, 2004, by and between Chang Su-O Lin, Hong Lien Lin and Hong Yao Lin, collectively the Lins("*Seller*") and TOLL BROTHERS, INC., a Delaware Corporation ("*Buyer*").

       1.     The parties have entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of May _27_, 2004 (the "**Agreement**"), which is incorporated herein by reference as if fully set forth herein. All capitalized terms not defined herein shall have the meanings ascribed to them set forth in the Agreement.

       2.     Subject to and pursuant to the Agreement, Seller hereby agrees to sell to Buyer and Buyer hereby agrees to purchase from Seller that certain real property described on Exhibit A hereto (the "*Property*").

       3.     The parties desire to make the existence of the Agreement a matter of public record and have, therefore, executed this Memorandum and caused it to be recorded in the Official Records of Alameda County, California. However, in the event of any inconsistency between the terms of the Agreement and the terms of this Memorandum, the terms of the Agreement shall control and govern the rights and duties of Buyer and Seller.

       4.     The Agreement provides that if for any reason other than a default by Seller, Buyer does not acquire the Property by the Closing Date as established therein, and as same may be extended as provided therein, then Escrow Holder (as defined in the Agreement) is to record a quitclaim deed executed by Buyer to evidence the termination of the Agreement and to remove this Memorandum from title to the Property.

       5.     Pursuant to Sections 2881 and 2884 of the California Civil Code, Seller hereby grants to Buyer a lien against the Property, and this Memorandum shall constitute notice of such lien, solely to secure the performance of Seller's obligation to refund the Deposit

33

provided by Buyer and disbursed to Seller if Buyer becomes entitled to such reimbursement in accordance with the terms of the Agreement.

IN WITNESS WHEREOF, the parties have signed this Memorandum as of the date first above written.

SELLER:

Chang Su-O Lin  by Hong Lien Lin, her attorney in Fact

Hong Lien Lin:

Hong Yao Lin:

BUYER:

TOLL BROTHERS, INC.
a Delaware corporation

By:
Name: Jon Paynter
Its: VP

34

2

_OWLEDGMENT

AIWAN
CITY OF TAIPEI                              }
                                           }    Taiwan
                                           }    City of Taipei
                                       SS. }    American Institute in    } SS
AMERICAN INSTITUTE IN                      }    Taiwan, Taipei Office
TAIWAN, TAIPEI OFFICE                      }

                                              Mark S. Copeland
ON May 05, 2004          , 2004 BEFORE ME,    Special Notary (PI 96-8)
PERSONALLY APPEARED HONG LIEN LIN AS ATTORNEY -IN-FACT FOR CHANG SU-O LIN, HONG
YAO LIN AND HONG LIEN LIN PERSONALLY KNOWN TO ME (OR PROVED TO ME ON THE BASIS OF
SATISFACTORY EVIDENCE) TO BE THE PERSONS WHOSE NAMES ARE SUBSCRIBED TO THE WITHIN
INSTRUMENT AND ACKNOWLEDGED TO ME THAT THEY EXECUTED THE SAME IN THEIR
AUTHORIZED CAPACITIES, AND THAT BY THEIR SIGNATURES ON THE INSTRUMENT THE PERSONS
OR THE ENTITY UPON BEHALF OF WHICH THE PERSONS ACTED, EXECUTED THE INSTRUMENT.

WITNESS MY HAND AND OFFICIAL SEAL.

SIGNATURE

       Mark S. Copeland
       NAME (PRINTED)

       SPECIAL NOTARY ( 96-8      )

MY COMMISSION EXPIRES 1 9 JUL 2005

EXHIBIT A
PAGE 40 OF 72

ILLEGIBLE NOTARY SEAL DECLARATION (CODE 27361.7)

I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY
SEAL ON THE DOCUMENT TO WHICH THIS STATEMENT IS
ATTACHED READS AS FOLLOWS:

Name of Notary:   **Mark S. Copeland**

Date Commission Expires:     **July 19, 2005**

Commission Number:     **Special Notary 96-8**

**Taiwan
City of Taipei
American Institute in
Taiwan, Taipei Office**

Place of Execution of this Declaration:
**City of Pleasanton, Alameda County, California**

Date: **May 28, 2004**

Signature: _Diane E. Bush_
                    Agent for: First American Title Guaranty Company

May-28-04   11:28am   From-c737                                    T-825  P.010/016  F-876

## NOTARY ACKNOWLEDGMENT

STATE OF CALIFORNIA        }ss
COUNTY OF _Alameda_        }

On _May 28, 2004_, before me, _Diane E. Burton_, a Notary
Public in and for said State, personally appeared _H. Ian Paynter_

_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the
person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _Diane E. Burton_

> DIANE E. BURTON
> COMM. 1285028
> NOTARY PUBLIC - CALIFORNIA
> ALAMEDA COUNTY
> My Comm. Expires Dec. 20, 2004

(This space for official notarial seal)

OPTIONAL:

DESCRIPTION OF ATTACHED DOCUMENT

_Memorandum g Agreement_
Title or Type of Document

_May 5, 2004_
Date of Document

NOTARY.BLK (Rev 8/94)

EXHIBIT _A_
PAGE _42_ OF _72_

May-28-04  11:29am  From-c737

T-925  P.011/016  F-376

ILLEGIBLE NOTARY SEAL DECLARATION (CODE 27361.7)


I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY
SEAL ON THE DOCUMENT TO WHICH THIS STATEMENT IS
ATTACHED READS AS FOLLOWS:


Name of Notary:    Diane E. Burton


Date Commission Expires:    Dec. 20, 2004

Commission Number:    1285028


State: CA                County:        Alameda


Place of Execution of this Declaration:
City of Pleasanton, Alameda County, California


Date:  May 28, 2004


Signature:_____

        Agent for: First American Title Guaranty Company


EXHIBIT ___A___
PAGE __43__ OF _72_

May-28-04    11:29am    From-c737

T-925    P.012/016    F-878

Order Number:  512245AL
Page Number:  9

# LEGAL DESCRIPTION

Real property in the City of Dublin, County of Alameda, State of California, described as follows:

Parcel One:

Being a portion of that certain parcel of land known as: "Parcel B" of that certain final map entitled: "Tract 6959" as filed on the 2nd day of June, 2000 in Book 251 of Maps at Pages 39 to 43, Official Records of Alameda County, California, and a portion of that certain parcel of land known as: "Parcel 1" of that certain final map entitled: "Tract 7148" as filed on the 14th day of February, 2001 in Book 257 of Maps at Pages 3 to 7, Official Records of Alameda County, California, for purposes of a Lot Line Adjustment, lying and being in the City of Dublin, Alameda County, California, and being more particularly described as follows:

Beginning at the Southwest corner of Lot 23 as shown upon said "Tract 6959"; thence along the Northerly property line of said "Parcel 1" as shown upon said "Tract 7148" South 88° 53' 01" East 1010.77 feet to the Northeast corner of said "Parcel 1"; thence along the Easterly property line of said "Parcel 1" as show upon said "Tract 7148" South 0° 38' 11" West 2655.79 feet to the Southeast corner of "Parcel 1"; thence along the Southerly property line of said "Parcel 1" (also being the Northerly right-of-way line of Central Parkway as shown upon said "Tract 7148") the following sixteen (16) courses: (1) North 89° 21' 49" West 43.00 feet; thence (2) South 45° 35' 35" West 28.26 feet; thence (3) North 89° 27' 02" West 39.20 feet to a point of curvature of a tangent curve to the right; thence (4) along said curve having a radius of 2943.00 feet, a central angle of 13° 46' 08", and an arc length of 707.24 feet; thence (5) North 72° 07' 40" West 83.67 feet to a point on a curve to the right whose radius point bears North 15° 56' 48" East therefrom said point; thence (6) along said curve having a radius of 2939.00 feet, a central angle of 1° 26' 35", and an arc length of 74.02 feet to the beginning point of a tangent line; thence (7) along said tangent line North 72° 36' 37" West 103.76 feet; thence (8) North 27° 36' 37" West 28.28 feet; thence (9) North 75° 06' 00" West 92.01 feet; thence (10) South 62° 23' 23" West 28.28 feet; thence (11) North 72° 36' 37" West 502.02 feet to a point of curvature of a tangent curve to the left; thence (12) along said curve having a radius of 3057.00 feet, a central angle of 10° 24' 47", and an arc length of 555.59 feet; thence (13) North 81° 06' 54" West 84.84 feet to a point on a curve to the left whose radius point bears South 5° 23' 21" West therefrom said point; thence (14) along said curve having a radius of 3061.00 feet, a central angle of 3° 17' 32", and an arc length of 175.89 feet; thence (15) North 43° 22' 41" West 28.05 feet; thence (16) North 88° 51' 11" West 59.00 feet to the Southwest corner of said "Parcel 1"; thence along the Westerly property line of said "Parcel 1" the following five (5) courses" (17) North 1° 08' 49" East 1123.10 feet; thence (18) North 88° 39' 20" West 368.18 feet; thence (19) North 1° 13' 07" East 615.00 feet; thence (20) North 5° 56' 41" West 60.94 feet; thence (21) North 1° 44' 49" East 618.51 feet to the Northwest corner of said "Parcel 1" also being a point on a curve to the left whose radius point bears North 19° 21' 27" West therefrom said point, thence along the Northerly property line of said "Parcel 1" the following Eight courses: (22) along said curve having a radius of 816.00 feet, a central angle of 1° 30' 12", and an arc length of 21.41 feet; thence (23) North 69° 08' 21" East 75.12 feet to a point of curvature of a tangent curve to the right; thence (24) along said curve having a radius of 730.00 feet, a central angle of 22° 03' 30", and an arc length of 281.04 feet to the beginning point of a tangent line; thence (25) along said tangent line South 88° 48' 09" East 264.43 feet to a point of curvature of a tangent curve to the left; thence (26) along said curve having a radius of 696.00 feet, a central angle of 9° 43' 27", and an arc length of 118.12 feet; thence (27) South 88° 48' 09" East 573.30 feet; thence (28) South 59° 33' 12" East 186.21 feet; thence (29) South 15° 26' 40" East 228.29 feet; thence continuing along said Northerly property line South 88° 53' 01" East 140.54 feet to the Southwest

*First American Title*

EXHIBIT ___A___
PAGE __44__ OF __72__

May-28-04  11:26am  From-c737                                      T-925  P.013/016  F-878

Order Number:  612245.
Page Number:  10

corner of said "Parcel B"; thence departing from said Northerly property line and entering said
"Parcel 1" the following two (2) courses: (30) along the Southerly prolongation of the Westerly
property line of said "Parcel B" South 1° 50' 20" East 27.68 feet; thence (31) North 88° 09' 40"
East 25.26 feet; thence continuing traversing through said "Parcel1" and entering said "Parcel B"
North 57° 56' 24" East 111.05 feet to the most westerly corner of Lot 24 of said "Tract 6959";
thence along the Southerly property line of said Lot 24 the following two (2) courses: (32) South
52° 18' 04" East 47.82 feet; thence (33) South 79° 31' 50" East 36.46 feet to said point of
beginning.

APN: 985-0009-006
      985-0009-007-03

Parcel Two:

Being a portion of that certain parcel of land as described (Parcel 4) in the deed conveyed to
"Lin, et al" as recorded on the 12th day of October 1999 in Series No. 99-384198, Official
Records of Alameda County, California, and a portion of that certain parcel of land known as
"Designated Remainder Area No. 4" of that certain final map entitled "Tract 6925 - Dublin Ranch"
as filed on the 16th day of July, 1998 in Book 241 of Maps at Pages 39 to 52, Official Records of
Alameda County, California, for purposes of a fee conveyance - Resultant Remainder No. 4 of Lot
Line Adjustment No. LLA-99-19, lying and being in the City of Dublin, Alameda County, California,
and being more particularly described as follows:

Beginning at the Southeast property corner of said "Remainder" parcel, thence along the
Southerly property line of said "Remainder" parcel North 88° 30' 52" West 2693.69 feet to the
Southwest corner of said "Remainder" parcel, thence along the Westerly property line of said
"Remainder" parcel North 0° 38' 11" East 2675.56 feet to the Northwest corner of said
"Remainder" parcel, thence along the Northerly property line of said "Remainder" parcel the
following two (2) courses:
(1) South 88° 53' 01" East 240.01 feet, thence (2) North 82° 53' 29" East 210.00 feet, thence
continuing along said Northerly property line and the Northeasterly prolongation thereof entering
said "Lin" parcel North 39° 54' 38" East 353.00 feet to a point on a curve to the left whose radius
point bears North 39° 54' 38" East therefrom said point, thence continuing through said "Lin"
parcel along said curve having a radius 1391.00 feet, a central angle of 11° 39' 38", and an arc
length of 283.09 feet to the beginning point of a tangent line, thence traversing through said
"Lin" parcel and entering said "Remainder" parcel South 61° 45' 00" East 1426.77 feet to a point
of curvature of a tangent curve to the right, thence continuing traversing through said
"Remainder" parcel along said curve having a radius of 1539.00 feet, a central angle of 11° 47'
52", and an arc length of 316.90 feet to point on a curve to the left who radius point bears South
81° 56' 44" East therefrom said point  and said point being on the Easterly property line of said
"Remainder" parcel, thence along said Easterly property line the following five (5) courses  (3)
along said curve having a radius of 800.55 feet, a central angle of 1° 43' 36", and an arc length
of 24.12 feet , thence (4) South 6° 19' 16" West 1321.37 feet to a point of curvature of a tangent
curve to the left, thence (5) along said curve having a radius of 399.94 feet, a central angle of
44° 12' 02", and an arc length of 308.53 feet to the beginning point of a tangent line, thence (6)
along said tangent line South 37° 52' 46" East 428.46 feet to a point of curvature of a tangent
curve to the right , thence (7) along said curve having a radius of 399.94 feet, a central angle of
10° 23' 54", and an arc length of 72.58 feet to the point of beginning.

Excepting therefrom, all that real property described in the deed  to the City of Dublin, recorded
August 22, 2003, Series No. 2003499117, Official Records.

APN: 985-0027-08 (portion)
      985-0030-01

*First American Title*

EXHIBIT _A_

PAGE _45_ OF _72_

May-28-04   11:29am   From-c737                                   T-925   P.014/016   F-378

Order Number: o.......
Page Number: 11

Parcel Three:

Lot 4, Tract 7453, filed November 24, 2003, Book 273 of Maps, Pages 52 through 56, inclusive,
Alameda County Records.

APN: 985-0027-001 (portion)

*First American Title*

EXHIBIT ___A___
PAGE __46__ OF __72__



### First American Title Company
6665 Owens Drive, Pleasanton, CA 94588
(925) 460-8228 Fax - (925) 463-9683

### ESCROW INSTRUCTIONS
### RELEASE OF FUNDS PRIOR TO CLOSE

To: **First American Title Company**
**Diane Burton, Escrow Officer**

File No.: **612245ALA (DB)**
Date: **May 28, 2004**
Estimated Closing Date:

Re: **Sub Area 1, 2 and 3, Dublin, CA ("Property")**

You hold in the above referenced escrow the sum of **$21,735,000.00**.

Buyer and Seller have agreed that the sum of **$21,735,000.00** is to be released prior to the consummation and closing of this escrow.

Buyer understands that **First American Title Company** and its employees make no warranty or representation of any kind, expressed or implied as to the ownership of, or title to, the property described in this escrow, nor as to any encumbrances or liens thereon, nor as to the condition and/or the ultimate outcome of this escrow nor in any manner or form as an inducement to make the above payment. Buyer further realizes that no ~~instruments in Buyer's favor have been recorded, nor~~ Policy of Title Insurance issued. Buyer nevertheless desires to release said funds, *upon recordation of the memorandum of agreement*.

THEREFORE, from funds now on deposit in this escrow, you are instructed to pay **$21,735,000.00** to the order of: **Chang Su-O Lin, Hong Lien Lin and Hong Yao Lin** *DEDUCT TWO PERCENT (2%) OUT OF THE DEPOSIT.*

Whether or not this escrow closes, you are not to be held liable or responsible for any loss or damage which Buyer might sustain by reason of making the above payment. *PAYABLE TO CREDATOR PROPERTIES*

Escrow Holder will not disburse until funds deposited in escrow have cleared through bank on which drawn.

Each of the undersigned states and declares that he/she has read the foregoing instructions and understands, accepts and approves them and does hereby acknowledge receipt of a copy of these instructions.

_____
Chang Su-O Lin

_____
Hong Lien Lin

_____
Hong Yao Lin

Toll Brothers, Inc.

By _____

Page 1 of 2

EXHIBIT A
PAGE 47 OF 72

**First American Title Company**

File No.:612245ALA (DB )

**Proceeds:** Seller directs that the proceeds check be:

[ ] Held for pick up at this office        [ ] Delivered to Seller's Agent
[ ] Mailed to the address below        [ ] Sent via next day mail (Additional $15.00 charge)
[ ] Sent via certified mail        [ ] Other:_____

[X] Sent via wire transfer (Additional $15.00 charge) *See below*
(If checked, **Attach wiring instructions of _receiving_ bank**)
Note: Receiving Banks may impose a charge for the receipt of any wire transfers.

**Address:**

DR MANAGEMENT LLC
BANK OF THE WEST
300 S. GRAND AVE 7TH FLOOR
LOS ANGELES CA 90071
ROUTING NUMBER 122242843
ACCT. NUMBER 76700 4211

EXHIBIT ___A___
PAGE _48_ OF _72_

## EXHIBIT A TO MEMORANDUM
## OF AGREEMENT

LEGAL DESCRIPTION

Page 1 of 3

### SUB-AREA 1

1.      Parcel 6 as shown on the Master Vesting Tentative Map 7281.

### SUB-AREA 2

1.      Parcels 7 and 13 as shown on the Master Vesting Tentative Map 7281.

### SUB-AREA 3

1.      A portion of Parcel 15 as shown on the Master Vesting Tentative Map 7281 and a portion of Lot 4 of Tract 7453 filed November 24, 2003 in Book 273 of Maps at Page 52-56 Alameda County Records Series Number 2003691750.

MAY-27-2004  18:09    SIERRA LAND DEVELOPMENT    P.08/30



Dublin Ranch-Area F
VESTING TENTATIVE MAP-TRACT 7281
DUBLIN, CALIFORNIA

MACKAY & SOMPS

A

PAGE 50 OF 72

TRACT 7453

A SUBDIVISION OF PARCEL "D" OF TRACT 7148,
AS FILED ON 14 APRIL, 2001, IN BOOK 267
OF MAPS, PAGES

AND THE LANDS OF LIN AS DESCRIBED IN DOCUMENT
SERIES NO. 83-150404, ALAMEDA COUNTY RECORDS

CITY OF DUBLIN
ALAMEDA COUNTY, CALIFORNIA

OCTOBER 2003

LOT 4

LOT 1

LOT 2

LOT 3

INTERSTATE 580

SIERRA LAND DEVELOPMENT

EXHIBIT C

DISCLOSURE SCHEDULE

39

EXHIBIT A
PAGE 52 OF 72

# EXHIBIT C
## DISCLOSURE SCHEDULE

| Item No. | Description |
|---|---|
| 1 | Improvement Agreement Fallon Road North (2/01) |
| 2 | Fallon Road North Improvement Plans |
| 3 | Preliminary Bond Estimate – Fallon Road Extension |
| 4 | Grafton Street Improvement Plans Area F-West |
| 5 | Fairway Ranch Public Street Plans |
| 6 | Dublin Boulevard Fallon Road Plans |
| 7 | Plans, Agreements and Storm Drain Plan relating to the G-3 drainage facility (2 Sets) |
| 8 | DSRSD Pump Station Report (10/03) |
| 9 | Dublin Ranch Drainage Master Plan (M&S 11/03) |
| 10 | Final Action Letter (City of Dublin) |
| 11 | Tract Developer Agreement Between City of Dublin and DRA II regarding Tract 7148 (1/01) |
| 12 | Improvement and Maintenance Agreement for Box Culvert to Channel Drainage from Dublin Ranch (10/03) |
| 13 | H.T. Harvey Project Area Mitigation and Monitoring Plan (7/03) |
| 14 | School Mitigation Agreements |
| 15 | DSRSD Area Wide Facility Agreements |
| 16 | City of Dublin Annexation Agreement Between City of Dublin and the Lins (10/94) |
| 17 | ACOE Permit Package (ACOE Permit; U.S. Fish and Wildlife Biological Opinion; CDF&G Permit; Regional Water Quality Control Board Permit; Mitigation and Monitoring Plan) |
| 18 | Development Agreements |
| 19 | Low-Income Housing Agreements |
| 20 | Interchange Agreements for Tassajara and Fallon interchanges |
| 21 | Improvement Agreement and Right of Entry for Gleason Drive from Tassajara Road to Fallon Road including portions of Fallon Road and Grafton Street |

EXHIBIT __A__
PAGE _53_ OF _72_

| 22 | Dublin Ranch Area F North Stage 1 and Stage 2 Development Plan/Planned Development Rezone Eastern Dublin General Plan/Specific Plan Amendment Master Vesting Tentative Map F1 and F2 Individual Vesting Tentative Maps Site Development Review (M&S 12/03) ONE SET |
| 23 | Dublin Ranch Base Map (M&S 12/03) ONE SET |
| 24 | Tract 7148 Map (M&S) |
| 25 | Gleason Drive Improvement Plans (M&S Job 16034-31) |
| 26 | Dublin Ranch Areas B-E Planned Development District and Land Use and Development Plan/District Planned Development Plan - Eastern Dublin General Plan/Specific Plan Amendment (9/96) |
| 27 | Dublin Ranch Area F - Planned Development Rezone Eastern Dublin General Plan/Specific Plan Amendment (12/98) |
| 28 | Ordinance No. 6-00 |
|    | Resolution No. 35-00 |
|    | Resolution No. 34-00 |
|    | Resolution No. 00-14 |
|    | Resolution No. 141-97 |
|    | Resolution No. 140-97 |
| 29 | Notice of Establishment of Dublin Ranch West Side Storm Drain Benefit District |
|    | Reimbursement Agreement Between the Lin Family and City of Dublin Pursuant to the Dublin Ranch West Side Storm Drain Benefit District |
|    | Engineer's Report (M&S 1/02) |
| 30 | Balance Hydrologics, Inc. Revised Stormwater Management Plan for Dublin Ranch (3/03) |
| 31 | Resolution No. 140-97 |
|    | Resolution No. 141-97 |
| 32 | LOMR issued 9/1/00 for Area G |
| 33 | BGC Geotechnical Report - Parts I and II Preliminary Geologic Investigation Preliminary Site Assessment Toxic Substances Pappas Property, Fallon Road for Chang Su-O Lin (8/88) |

| 34 | BGC Geotechnical Report – Parts I and II Preliminary Geologic Investigation Preliminary Site Assessment – Toxic Substances Fallon Business Park, Fallon Road (8/88) |
| 35 | V&A Consulting Engineers Corrosion Investigation Final Report (9/99) |
| 36 | TJKM Traffic Impact Study for the Proposed Lockhart Street in Eastern Dublin (10/03) |
| 37 | TJKM Traffic Operations Analysis for the Interstate 580/Fallon Road/El Charro Road Interchange (7/03) |
| 38 | TJKM Traffic Study for the Proposed Dublin Ranch Areas F-H Development (9/99) |
| 39 | TJKM Traffic Study for the Proposed Dublin Ranch Areas A-E (7/97) |
| 40 | Assessment District Improvement Plans (M&S 11267-04) |
| 41 | Area F West Site and Grading Plans (M&S)<br>Area F East Site and Grading Plans (M&S) |
| 42 | Area F West Product Elevations ((M&S) |
| 43 | Plans – Grafton Street |

EXHIBIT D

BUYER AND SELLER WORK

40

EXHIBIT___A___

PAGE__56__ OF _72_



Sub Area 1

MAY-27-2004 18:10   SIERRA LAND DEVELOPMENT

BUYER AND SELLER WORK                    2 of 13 pages

16034-0
05/27/04
RTA

# Sub Area 1 ("F West")

Seller's obligations to be completed prior to Sept. 30, 2005

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Grafton Street Streetwork and utilities including street lighting. (Gleason to Central) | • Curb to curb street construction including utilities and street lighting and left turn lanes per (unapproved) plans entitled "Dublin Ranch – Grafton Street – Central Parkway to Gleason Drive" prepared by MacKay & Somps (Job #11267-11) and appurtenant joint trench and street lighting plans. | • Additional dry utility construction as required for service.<br>• Sidewalk west side<br>• Intersection improvements as required to connect onsite streets or close median breaks if required. |
| Gleason Drive Streetwork and Utilities including street lighting. (Brannigan to Grafton) | • Curb-to-curb construction of street, street lighting and utilities per plans entitled "Gleason Drive Improvement Plans – Tassajara Rd. to Fallon Rd. – Dublin, California – July 2003 (Job #16034-31) and appurtenant joint trench and street lighting plans. | • Sidewalk (south side)<br>• Intersection improvements as required to connect onsite streets. |
| Central Parkway Streetwork and Utilities including street lighting. (Brannigan to Grafton) | • **Final 2" lift of asphalt at existing pavement including striping and resetting iron. (when required by the City)** | • Completion of road & utilities (north side).<br>• Additional dry utility construction as required for service.<br>• Sidewalk (north side).<br>• Intersection improvements as required to connect onsite streets or close median breaks for planned intersections if required. |
| Brannigan Street (Gleason to Central) | • None | • All street and utility improvements as required. |

C:\WINDOWS\Temporary Internet Files\Content.IE5\ANAHKQ0S\SubArea1(1).doc

EXHIBIT ___ A

PAGE _58_ OF _72_

MAY-27-2004  18:10    SIERRA LAND DEVELOPMENT
BUYER AND SELLER WOR.
3 of 13 pages

16034-0
05/27/04
RTA

# Sub Area 1 ("F West")

Seller's obligations to be completed prior to Sept. 30, 2005

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Landscaping and irrigation at islands and parkways including median subdrain and electric and water service, also including fencing. | • Central Parkway median (completed) | • Grafton median<br>• Brannigan median<br>• Grafton Parkway (east side)<br>• Brannigan Parkways<br>• Gleason Parkway (south side)<br>• Central Parkway parkway (north side)<br>• All required fencing. |
| Traffic Signals | • Grafton/Central (modification of existing)<br>• Grafton/Gleason (modification if required) | • Brannigan/Gleason modification if required.<br>• Central/Brannigan modification as required. |

Note:  Bold items under "Sellers Obligation" indicates work to be completed after Sept. 30, 2005.. "Utilities" means dry utilities in this context.

EXHIBIT A
PAGE 59 OF 72



16034-0
5/27/04
RTA

## Sub Area 2 ("F East")

Seller's obligations to be completed prior to June 30, 2006

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Grafton Street Streetwork and utilities including street lighting. (Gleason to Central) | • Completed with Sub Area 1 | • Additional dry utility construction as required for service.<br>• Sidewalk east side<br>• Intersection improvements as required to connect onsite streets or close median breaks if required. |
| Gleason Drive Streetwork and Utilities including street lighting. (Grafton to Fallon) | • Curb-to-curb construction of street, street lighting and utilities per plans entitled "Gleason Drive Improvement Plans – Tassajara Rd. to Fallon Rd. – Dublin, California -- July 2003 (Job #16034-31) and appurtenant joint trench and street lighting plans. | • Sidewalk southside<br>• Intersection improvements as required to connect onsite streets. |
| Central Parkway Streetwork and Utilities including street lighting. (Grafton to Lockhart) | • Center (TIF) portion of Streetwork and Utilities including street lighting per plans entitled "Improvement Plan Tract 7453, Dublin Ranch" (Job #11267-15) and appurtenant joint trench and street lighting plans.<br>• Final 2" lift of asphalt at existing pavement including striping and resetting iron. (when required by the City) | • Non TIF portion of Streetwork (north side) including hydrants.<br>• Additional dry utility construction as required for service.<br>• Sidewalk (north side).<br>• Intersection improvements as required to connect onsite streets or close median breaks for planned intersections if required. |

EXHIBIT ___A___
PAGE __61__ OF __72__

BUYER AND SELLER WO.    6 of 13 pages

16034-0
5/27/04
RTA

# Sub Area 2 ("F East")

Seller's obligations to be completed prior to June 30, 2006

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Lockhart Street Streetwork, utilities and street lighting. (Gleason to Central) | • Curb-to-curb street construction including street lighting.<br><br>• Sewer, water, recycled water, storm drains, street lighting and signal interconnect utilities.<br><br>• Joint trench conduit and joint trench boxes and conductor as required for street lighting system operation. | • Sidewalks both sides<br><br>• Additional dry utility construction as required for service.<br><br>• Misc. intersection improvements to connect to onsite streets including left turn lanes. |
| Landscaping and irrigation at islands and parkways including median subdrain and electric and water service, also including fencing. | • Central Parkway median | • Grafton median<br>• Lockhart median<br>• Grafton Parkway (east side)<br>• Lockhart Parkways (both sides)<br>• Gleason Parkway (south side)<br>• Gleason Drive parkway (south side) @ creek corridor (Lockhart to Fallon)<br>• Central Parkway parkway (north side)<br>• All required fencing. |
| Traffic Signals | • Grafton/Central (modification of existing)<br><br>• Central/Lockhart<br><br>• Grafton/Gleason (modification if required)<br><br>• Keegan/Central (3 way) | • Keegan/Central modification if required.<br><br>• Lockhart/Gleason modification if required. |

16034-0
5/27/04
RTA

## Sub Area 2 ("F East")

Seller's obligations to be
completed prior to June 30, 2006

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Stream Corridor from Fallon to Central | • **Design, update, observation & supervision during construction, as built plans, annual reports, monitoring, (all consulting services).** | • Construction and maintenance<br>• Install culverts and headwalls at parksite entries & other crossings. |
| Storm Drain Backbone | • Storm drain connector, Keegan to G-3 | • 36" storm drain previously in Keegan Street, Gleason to Central. |

Note:  **Bold** items under "Seller's Obligation" indicates work to be completed after June 30, 2006. "Utilities" means dry utilities in this context.

C:\WINDOWS\Temporary Internet Files\Content.IE5\VANAHK3G5\SubArea2[1].doc

EXHIBIT "D"
BUYER AND SELLER WORK

8 of 13 pages



16034-0
5/24/04
RTA

## Sub Area 3 ("Area B")

Seller's obligations to be completed prior to June 30, 2007

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Central Parkway Streetwork, utilities and street lighting (Lockhart to Fallon) | • Center (TIF) portion of Streetwork including street lighting.<br>• Storm, sanitary, water & recycled water utilities & signal interconnect and City communications conduits.<br>• Joint trench conduits and utility boxes and conductor necessary for operation of street light system.<br>• Frontage portion of Streetwork (north side) if required.<br>• Sidewalk (north side if required)<br>• Hydrants (north side) | • Frontage portion of Streetwork (south side).<br>• Sidewalk (south side).<br>• Additional dry utility construction as required for service.<br>• Improvements in center portion of street to accommodate street intersection to connect onsite streets and utilities, including left turn lanes.<br>• Hydrants (south side). |
| Lockhart Street Streetwork, utilities and street lighting. (Central to Dublin) | • Curb-to-curb streetwork, street lighting, and utilities in accordance with (reference preliminary plans).<br>• Sidewalk (west side) | • Sidewalk (east side).<br>• Additional dry utility construction as necessary for service.<br>• Misc. intersection improvements to connect onsite streets and/or utilities. |
| Dublin Blvd. streetwork, utilities and street lighting. (Lockhart to Fallon) | • Center (TIF) portion of streetwork, and street lighting system.<br>• Joint trench conduit and joint trench boxes and conductor to service street light system.<br>• Sewer, water, recycled water, storm drain utilities and signal interconnect and City communications conduits. | • Frontage street improvements at north side residential frontage.<br>• Sidewalk north side at residential frontage.<br>• Hydrants north side at residential frontage.<br>• Improvements in center portion of street to accommodate street intersection to connect to onsite streets and utilities, including left turn lanes. |

EXHIBIT __A__
PAGE _65_ OF _72_

MAY-27-2004  18:11    SIERRA LAND DEVELOPMENT

BUYER AND SELLER WORK                    10 of 13 pages

16034-0
5/24/04
RTA

# Sub Area 3 ("Area B")

Seller's obligations to be completed prior to June 30, 2007

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Fallon Road (580 to Central) | • Streetwork and street lighting as required by the City across commercial and open space frontages.<br>• Center (TIF) portion of streetwork and street lighting at MH site frontage.<br>• Utilities as required by City and/or DSRSD. | • frontage street improvements at medium high density frontage.<br>• Sidewalk at MH frontage.<br>• Hydrants west side of MH frontage. |
| Fallon Road (Gleason to Central) | • All improvements as/if required. | |
| Traffic signals | • Dublin Blvd./Lockhart<br>• Dublin Blvd./Fallon<br>• Central/Fallon | • MH entry/Central<br>• Lockhart/Finnian (if required).<br>• Lockhart/McGuire (if required)<br>• Dublin Blvd./residential entry (if required). |
| Landscaping & irrigation at islands and parkways including median subdrains and electric and water services also including fencing. | • Lockhart median (Central to Dublin)<br>• **Dublin Blvd. median at non-residential frontage.**<br>• Lockhart parkway (west side, Central to Dublin). | • Central median<br>• Dublin Blvd. median (at residential frontage).<br>• Central parkway (south side)<br>• Dublin Blvd. parkway (north side at residential frontage)<br>• Lockhart parkway (east side)<br>• Fallon parkway (west side at MH frontage).<br>• All required fencing. |
| Stream Corridor south of Central Parkway | • **Design, update, field, observation & supervision during construction, as built plans, annual reports, monitoring, (all consulting services).** | • Construction and maintenance<br>• Install culverts and headwalls at street crossings or other crossings. |

C:\WINDOWS\Temporary Internet Files\Content.IE5\TTUCKJRS\sbArea3[1].doc

EXHIBIT _A_
PAGE _66_ OF _72_

MAY-27-2004  18:12   SIERRA LAND DEVELOPMENT

BUYER AND SELLER WORK

11 of 13 pages

16034-0
5/24/04
RTA

## Sub Area 3 ("Area B")

Seller's obligations to be completed prior to June 30, 2007

| Construction Item | Seller's Obligation | Buyer's Obligation |
|---|---|---|
| Backbone Storm Drains | • **Storm drains at Community Park**<br>• Box culvert connection Lockhart to G-3<br>• Fallon Road storm drain. | |
| Backbone water main | • **Water main in Fallon if required (possibly by DSRSD).** | |

Note:   Bold items under "Sellers Obligation" indicates work to be completed after June 30, 2007. "Utilities" means dry utilities in this context.

C:\WINDOWS\Temporary Internet Files\Content.IE5\ITUCLK3I\Sub Area3(1).doc

EXHIBIT  A
PAGE  67  OF  72

SIERRA LAND DEVELOPMENT
EXHIBIT "D"
BUYER AND SELLER WORK

## SELLER'S OFFSITE OBLIGATIONS

Seller shall be responsible for completing the offsite improvements performing such obligations and paying all fees related to the obligations set forth in the Agreements referenced below. All such improvements shall be completed by such dates as will not delay in any way Buyer's ability to obtain building permits for the construction of its project on the Property, nor delay Buyer's ability to obtain a Certificate of Occupancy for each of the homes in the project upon completion of construction of such home.

1.    Construction of the G-3 Drainage Facility Including Lines C and D.

2.    The Fallon Road North Improvement Agreement, dated February 6, 2001 between the City of Dublin and DR Acquisitions, LLC (including but not limited to the responsibility to complete all environmental mitigation, obtain all Army Corps of Engineer permit requirements necessary for the extension of Fallon Road north from the existing terminus at Signal Hill Drive to the Silvera property line.

3.    The Improvement Agreement and Right of Entry for Gleason Drive entered into with the City of Dublin on October 7, 2003 with the Lins and Sierra Land Development Corporation (except to the extent modified by the Buyer and Seller Work Obligations contained herein if any).

4.    The Interchange Agreements between the City of Dublin and the Lins relating to the Fallon Interchange at Interstate 580 and the Tassajara Road Interchange at Interstate 580.

    (a)    The Agreement between the Lin Family and the City of Dublin regarding Funding for Construction of Fallon Road/I580 Interchange dated May 1, 2001.
    (b)    The Agreement between Jennifer Lin and the City of Dublin regarding Design of the Interstate 580 Fallon Road Interchange Improvements dated May 16, 2000.
    (c)    The Agreement between the Lin Family and the City of Dublin regarding Funding for Construction of Tassajara Interchange dated July 18, 2000.

5.    Area Wide Facility Agreements Between the Lins and the Dublin San Ramon Services District:

    (a)    Area Wide Facility Agreement Between the Lins and the District dated August 2, 1994.
    (b)    Amendment 1 to the Area Wide Facility Agreement Between the Lins and DSRSD, dated December 8, 1996.

EXHIBIT _A_
PAGE _68_ OF _72_

    (c)     First Supplemental Agreement to the Area Wide Facility Agreement with Jennifer Lin Properties, dated November 10, 1998.

    (d)     Second Supplemental Agreement to the Area Wide Facility Agreement with Jennifer Lin Properties, dated September 8, 2000.

    (e)     Third Supplemental Agreement to the Area Wide Facility Agreement with Jennifer Lin Properties, dated December 21, 2000.

6.     Condition 7 to the Master Vesting Tentative Map for Tract 7281 (it shall be the Seller's responsibility for entering into and performing the terms of the Community Park Agreement required by this Condition).

7.     Condition 8 of Master Vesting Tentative Map Tract 7281 (it shall be the be the Seller's responsibility to update the Master Drainage Plan Hydrology Map).

EXHIBIT E

SELLER GRADING EXHIBIT

41

EXHIBIT __A__
PAGE _70_ OF _72_

MAY-27-2004 18:12        SIERRA LAND DEVELOPMENT                              P.29/30



EXHIBIT E
SELLER GRADING EXHIBIT

City of Dublin
Fire Station

Community Park

OS/Stream Corridor

Fallon Road

OS/Stream Corridor

Open Space

General
Commercial

Sub-Area 3
(Area F End)
38.9 AC. ± Gross
Place
100,000 c.y.

OS/Stream
Corridor

Seller's Other Property

Dublin Boulevard

Lockhart Street

Central Parkway

Croak Street

OS/Stream Corridor

F2
21 Lots

Complete
Gleason Drive

Sub-Area 2
(Area F End)
70.2 AC. ± Gross

1.3 million c.y.
to be removed from
ridgetops

Grafton Street

OS/Stream Corridor

F1
113 Lots

Sub-Area 1
(Area F Well)
44.3 AC. ± Gross

Grading per Grafton
Street Plans

Grading per Middle
School Plans

Middle School

Public/
Semi-Public

Branigan Street

EXHIBIT  A
PAGE 71 OF 72

SCHEDULE 1

DOCUMENT SCHEDULE

42

EXHIBIT A
PAGE 72 OF 72

# EXHIBIT B

2004240384    05/28/2004 01:41 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:    31.00

9    PGS

$A^{15}$
$\theta$
$\frac{}{To}$

Recording requested by,
and when recorded return to:

Toll Brothers
725 Town and Country Rd #500
Orange, CA 92868

MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT ("**Memorandum**") is executed as of May __5__ , 2004, by and between Chang Su-O Lin, Hong Lien Lin and Hong Yao Lin, collectively the Lins("*Seller*") and TOLL BROTHERS, INC., a Delaware Corporation ("*Buyer*").

1.    The parties have entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of May _27_ , 2004 (the "**Agreement**"), which is incorporated herein by reference as if fully set forth herein. All capitalized terms not defined herein shall have the meanings ascribed to them set forth in the Agreement.

2.    Subject to and pursuant to the Agreement, Seller hereby agrees to sell to Buyer and Buyer hereby agrees to purchase from Seller that certain real property described on Exhibit A hereto (the "*Property*").

3.    The parties desire to make the existence of the Agreement a matter of public record and have, therefore, executed this Memorandum and caused it to be recorded in the Official Records of Alameda County, California. However, in the event of any inconsistency between the terms of the Agreement and the terms of this Memorandum, the terms of the Agreement shall control and govern the rights and duties of Buyer and Seller.

4.    The Agreement provides that if for any reason other than a default by Seller, Buyer does not acquire the Property by the Closing Date as established therein, and as same may be extended as provided therein, then Escrow Holder (as defined in the Agreement) is to record a quitclaim deed executed by Buyer to evidence the termination of the Agreement and to remove this Memorandum from title to the Property.

5.    Pursuant to Sections 2881 and 2884 of the California Civil Code, Seller hereby grants to Buyer a lien against the Property, and this Memorandum shall constitute notice of such lien, solely to secure the performance of Seller's obligation to refund the Deposit

33

EXHIBIT _B_
PAGE _1_ OF _9_

provided by Buyer and disbursed to Seller if Buyer becomes entitled to such reimbursement in accordance with the terms of the Agreement.

IN WITNESS WHEREOF, the parties have signed this Memorandum as of the date first above written.

SELLER:

Chang Su-O Lin _by Hong Lien Lin, her attorney in fact_

_Chang Su-O Lin by Hong Lien Lin her attorney in fact_

Hong Lien Lin

Hong Yao Lin

BUYER:

TOLL BROTHERS, INC.
a Delaware corporation

By: _[signature]_
Name: _Jon Brynteson_
Its: _VP_

34

EXHIBIT B
PAGE 2 OF 9

**ACKNOWLEDGMENT**

TAIWAN                              }
CITY OF TAIPEI                      }
                                   } SS.
AMERICAN INSTITUTE IN               }
TAIWAN, TAIPEI OFFICE               }

Taiwan
City of Taipei            }
SS. American Institute in  } SS
Taiwan, Taipei Office     }

                              Mark S. Copeland
ON May 05, 2004 _____ 2004 BEFORE ME. Special Notary (PL96-8)_____
PERSONALLY APPEARED HONG LIEN LIN AS ATTORNEY ~IN-FACT FOR CHANG SU-O LIN, HONG
YAO LIN AND HONG LIEN LIN PERSONALLY KNOWN TO ME (OR PROVED TO ME ON THE BASIS OF
SATISFACTORY EVIDENCE) TO BE THE PERSONS WHOSE NAMES ARE SUBSCRIBED TO THE WITHIN
INSTRUMENT AND ACKNOWLEDGED TO ME THAT THEY EXECUTED THE SAME IN THEIR
AUTHORIZED CAPACITIES, AND THAT BY THEIR SIGNATURES ON THE INSTRUMENT THE PERSONS
OR THE ENTITY UPON BEHALF OF WHICH THE PERSONS ACTED, EXECUTED THE INSTRUMENT.

WITNESS MY HAND AND OFFICIAL SEAL.

SIGNATURE _____

        **Mark S. Copeland**_____
           NAME (PRINTED)

    SPECIAL NOTARY ( 96-8 )

    MY COMMISSION EXPIRES **19 JUL** 2005

Nega\sh\16034-2\2004\16034-36-Lin-Dublin-vow-gration north.doc

EXHIBIT __B__
PAGE __3__ OF __9__

ILLEGIBLE NOTARY SEAL DECLARATION (CODE 27361.7)

I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY SEAL ON THE DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED READS AS FOLLOWS:

Name of Notary:   **Mark S. Copeland**

Date Commission Expires:   .   **July 19, 2005**

Commission Number:       **Special Notary 96-8** ·

**Taiwan
City of Taipei
American Institute in
Taiwan, Taipei Office**

Place of Execution of this Declaration:
**City of Pleasanton, Alameda County, California**

Date:  **May 28, 2004**

Signature: _Diane E. Burk_
          Agent for: First American Title Guaranty Company

EXHIBIT __B__
PAGE __4__ OF __9__

## NOTARY ACKNOWLEDGMENT

STATE OF CALIFORNIA         }ss
COUNTY OF _Alameda_         }

On _May 28, 2004_ , before me, _Diane E. Burton_ , a Notary
Public in and for said State, personally appeared _H. Jon Paynter_

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the
person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _Diane E. Burton_

DIANE E. BURTON
COMM. 1285028
NOTARY PUBLIC - CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires Oct. 22, 2004

(This area for official notary seal)

OPTIONAL:

DESCRIPTION OF ATTACHED DOCUMENT

_Memorandum of Agreement_
Title or Type of Document

_May 5, 2004_
Date of Document

NOTARY BLK (Rev 9/94)

EXHIBIT _B_
PAGE _6_ OF _9_

ILLEGIBLE NOTARY SEAL DECLARATION (CODE 27361.7)

I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY
SEAL ON THE DOCUMENT TO WHICH THIS STATEMENT IS
ATTACHED READS AS FOLLOWS:

Name of Notary:    **Diane E. Burton**

Date Commission Expires:       **Dec. 20, 2004**

Commission Number:     **1285028**

State: **CA**              County:       **Alameda**

Place of Execution of this Declaration:
**City of Pleasanton, Alameda County, California**

Date: **May 28, 2004**

Signature: _Diane Burt_
           Agent for: First American Title Guaranty Company

EXHIBIT __B__
PAGE __6__ OF __9__

Order Number: 61224SALA
Page Number: 9

## LEGAL DESCRIPTION

Real property in the City of Dublin, County of Alameda, State of California, described as follows:

Parcel One:

Being a portion of that certain parcel of land known as: "Parcel B" of that certain final map entitled: "Tract 6959" as filed on the 2nd day of June, 2000 in Book 251 of Maps at Pages 39 to 43, Official Records of Alameda County, California, and a portion of that certain parcel of land known as: "Parcel 1" of that certain final map entitled: "Tract 7148" as filed on the 14th day of February, 2001 in Book 257 of Maps at Pages 3 to 7, Official Records of Alameda County, California, for purposes of a Lot Line Adjustment, lying and being in the City of Dublin, Alameda County, California, and being more particularly described as follows:

Beginning at the Southwest corner of Lot 23 as shown upon said "Tract 6959"; thence along the Northerly property line of said "Parcel 1" as shown upon said "Tract 6959" South 88° 53' 01" East 1010.77 feet to the Northeast corner of said "Parcel 1"; thence along the Easterly property line of said "Parcel 1" as show upon said "Tract 7148" South 0° 38' 11" West 2655.79 feet to the Southeast corner of "Parcel 1"; thence along the Southerly property line of said "Parcel 1" (also being the Northerly right-of-way line of Central Parkway as shown upon said "Tract 7148") the following sixteen (16) courses: (1) North 89° 21' 49" West 43.00 feet; thence (2) South 45° 35' 35" West 28.26 feet; thence (3) North 89° 27' 02" West 39.20 feet to a point of curvature of a tangent curve to the right; thence (4) along said curve having a radius of 2943.00 feet, a central angle of 13° 46' 08", and an arc length of 707.24 feet; thence (5) North 72° 07' 40" West 83.67 feet to a point on a curve to the right whose radius point bears North 15° 56' 48" East therefrom said point; thence (6) along said curve having a radius of 2939.00 feet, a central angle of 1° 26' 35", and an arc length of 74.02 feet to the beginning point of a tangent line; thence (7) along said tangent line North 72° 36' 37" West 103.76 feet; thence (8) North 27° 36' 37" West 28.28 feet; thence (9) North 75° 06' 00" West 92.01 feet; thence (10) South 62° 23' 23" West 28.28 feet; thence (11) North 72° 36' 37" West 502.02 feet to a point of curvature of a tangent curve to the left; thence (12) along said curve having a radius of 3057.00 feet, a central angle of 10° 24' 47", and an arc length of 555.59 feet; thence (13) North 81° 06' 54" West 84.84 feet to a point on a curve to the left whose radius point bears South 5° 23' 21" West therefrom said point; thence (14) along said curve having a radius of 3061.00 feet, a central angle of 3° 17' 32", and an arc length of 175.89 feet; thence (15) North 43° 22' 41" West 28.05 feet; thence (16) North 88° 51' 11" West 59.00 feet to the Southwest corner of said "Parcel 1"; thence along the Westerly property line of said "Parcel 1" the following five (5) courses: (17) North 1° 08' 49" East 1123.10 feet; thence (18) North 88° 39' 20" West 368.18 feet; thence (19) North 1° 13' 07" East 615.00 feet; thence (20) North 5° 56' 41" West 60.94 feet; thence (21) North 1° 44' 49" East 618.51 feet to the Northwest corner of said "Parcel 1" also being a point on a curve to the left whose radius point bears North 19° 21' 27" West therefrom said point, thence along the Northerly property line of said "Parcel 1" the following Eight courses: (22) along said curve having a radius of 816.00 feet, a central angle of 1° 30' 12", and an arc length of 21.41 feet; thence (23) North 69° 08' 21" East 75.12 feet to a point of curvature of a tangent curve to the right; thence (24) along said curve having a radius of 730.00 feet, a central angle of 22° 03' 30", and an arc length of 281.04 feet to the beginning point of a tangent line; thence (25) along said tangent line South 88° 48' 09" East 264.43 feet to a point of curvature of a tangent curve to the left; thence (26) along said curve having a radius of 696.00 feet, a central angle of 9° 43' 27", and an arc length of 118.12 feet; thence (27) South 88° 48' 09" East 573.30 feet; thence (28) South 59° 33' 12" East 186.21 feet; thence (29) South 15° 26' 40" East 228.29 feet; thence continuing along said Northerly property line South 88° 53' 01" East 140.54 feet to the Southwest

*First American Title*

EXHIBIT    B
PAGE  7  OF  9

Order Number: 61224SALA
Page Number: 10

corner of said "Parcel B"; thence departing from said Northerly property line and entering said "Parcel 1" the following two (2) courses: (30) along the Southerly prolongation of the Westerly property line of said "Parcel B" South 1° 50' 00" East 27.68 feet; thence (31) North 88° 09' 40" East 25.26 feet; thence continuing traversing through said "Parcel1" and entering said "Parcel B" North 57° 56' 24" East 111.05 feet to the most westerly corner of Lot 24 of said "Tract 6959"; thence along the Southerly property line of said Lot 24 the following two (2) courses: (32) South 52° 18' 04" East 47.82 feet; thence (33) South 79° 31' 50" East 36.46 feet to said point of beginning.

APN: 985-0009-006
    985-0009-007-03

Parcel Two:

Being a portion of that certain parcel of land as described (Parcel 4) in the deed conveyed to "Lin, et al" as recorded on the 12th day of October 1999 in Series No. 99-384198, Official Records of Alameda County, California, and a portion of that certain parcel of land known as "Designated Remainder Area No. 4" of that certain final map entitled "Tract 6925 - Dublin Ranch" as filed on the 16th day of July, 1998 in Book 241 of Maps at Pages 39 to 52, Official Records of Alameda County, California, for purposes of a fee conveyance - Resultant Remainder No. 4 of Lot Line Adjustment No. LLA-99-19, lying and being in the City of Dublin, Alameda County, California, and being more particularly described as follows:

Beginning at the Southeast property corner of said "Remainder" parcel, thence along the Southerly property line of said "Remainder" parcel North 88° 30' 52" West 2693.69 feet to the Southwest corner of said "Remainder" parcel, thence along the Westerly property line of said "Remainder" parcel North 0° 38' 11" East 2675.56 feet to the Northwest corner of said "Remainder" parcel, thence along the Northerly property line of said "Remainder" parcel the following two (2) courses:
(1) South 88° 53' 01" East 240.01 feet, thence (2) North 82° 53' 29" East 210.00 feet, thence continuing along said Northerly property line and the Northeasterly prolongation thereof entering said "Lin" parcel North 39° 54' 38" East 353.00 feet to a point on a curve to the left whose radius point bears North 39° 54' 38" East therefrom said point, thence continuing through said "Lin" parcel along said curve having a radius 1391.00 feet, a central angle of 11° 39' 38", and an arc length of 283.09 feet to the beginning point of a tangent line, thence traversing through said "Lin" parcel and entering said "Remainder" parcel South 61° 45' 00" East 1426.77 feet to a point of curvature of a tangent curve to the right, thence continuing traversing through said "Remainder" parcel along said curve having a radius of 1539.00 feet, a central angle of 11° 47' 52", and an arc length of 316.90 feet to point on a curve to the left who radius point bears South 81° 56' 44" East therefrom said point  and said point being on the Easterly property line of said "Remainder" parcel, thence along said Easterly property line the following five (5) courses  (3) along said curve having a radius of 800.55 feet, a central angle of 1° 43' 36", and an arc length of 24.12 feet , thence (4) South 6° 19' 16" West 1321.37 feet to a point of curvature of a tangent curve to the left, thence (5) along said curve having a radius of 399.94 feet, a central angle of 44° 12' 02", and an arc length of 308.53 feet to the beginning point of a tangent line, thence (6) along said tangent line South 37° 52' 46" East 428.46 feet to a point of curvature of a tangent curve to the right , thence (7) along said curve having a radius of 399.94 feet, a central angle of 10° 23' 54", and an arc length of 72.58 feet to the point of beginning.

Excepting therefrom, all that real property described in the deed  to the City of Dublin, recorded August 22, 2003, Series No. 2003499117, Official Records.

APN: 985-0027-08 (portion)
    985-0030-01

*First American Title*

EXHIBIT ___B___
PAGE __8__ OF __9__

Order Number: 612245ALA
Page Number: 11

Parcel Three:

Lot 4, Tract 7453, filed November 24, 2003, Book 273 of Maps, Pages 52 through 56, inclusive, Alameda County Records.

APN: 985-0027-001 (portion)

*First American Title*

EXHIBIT __B__
PAGE __9__ OF __9__