1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6
    TOLL BROTHERS, INC.,            )    No. C-08-0987 SC
7                                   )
              Plaintiff,            )
8                                   )    MEMORANDUM OF
                                    )    DECISION, FINDINGS OF
9         v.                        )    FACT, AND CONCLUSIONS
                                    )    OF LAW
10                                  )
    CHANG SU-0 LIN, HONG LIEN LIN,  )
11  HONG YAO LIN,                   )
                                    )
12            Defendants.           )
    _____)
13                                  )
    AND RELATED CROSS-ACTION.       )
14  _____)

15  **I.    INTRODUCTION**

16        This case concerns the requirements of a Purchase and Sale

17  Agreement ("PSA") entered into between Chang Su-O Lin, Hong Lien

18  Lin, and Hong Yao Lin (the "Lins") and Toll Brothers, Inc.

19  ("Toll").  Exs. P-26, D-519.  Plaintiff and Counter-Defendant Toll

20  brought this suit against the Lins, alleging causes of action for:

21  (1) rescission; (2) breach of contract; (3) foreclosure of

22  contractual lien; (4) foreclosure of purchaser's lien; and (5)

23  declaratory relief.  Second Am. Compl. ("SAC"), Docket No. 39.

24  The Lins answered and filed counterclaims against Toll.  Answer to

25  SAC and Counterclaim ("Answer"), Docket No. 40.  During trial, the

26  Court granted the Lins' motion to dismiss their own fourth, fifth,

27  and sixth counterclaims.  Docket No. 192.  The Lins have five

28  remaining counterclaims for: (1) declaratory judgment; (2) breach

of contract; (3) breach of duty of good faith and fair dealing; (4) quiet title; and (5) promissory estoppel.  See Def.'s Closing Trial Br., Docket No. 208.

Generally, Toll alleges that the Lins breached the PSA by constructing six utility vaults on Sub-Area 3, constructing a temporary power line across Sub-Area 3, and by granting easements to Pacific Gas & Electric ("PG&E") associated with the utility vaults and the power line.  Toll also alleges that the PSA is illegal and void for failure to comply with California's Subdivision Map Act ("SMA"), Cal. Gov. Code § 66410, et seq.  Toll seeks restitution of its Sub-Area 3 deposit of $7,735,000.

Generally, the Lins allege that Toll breached the PSA by failing to reconvey an elementary school parcel in Sub-Area 2 to the Lins, and that Toll breached the duty of good faith and fair dealing by failing to cooperate with the Lins to resolve Toll's concerns regarding the utility vaults, the temporary power line, and the associated easements.  The Lins seek to retain Toll's deposit of $7,735,000 as liquidated damages.

On January 14, 2009, the Court denied Toll's motion for judgment on the pleadings.  Docket No. 76.  On February 9, 2009, the Court denied the Lins' motion for summary judgment.  Docket No. 99.  The Court held a trial beginning March 16, 2009.  On March 25, the Lins filed a Motion for Judgment on Partial Findings.  Docket No. 197.  The Court deferred ruling on the motion until the end of trial.  See RT at 1366:9-1367:10.[1]  Having

---

[1]    "RT" refers to the Transcript of Record from the trial held March 16, 2009, to March 27, 2009.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

now considered all the evidence and testimony offered at trial and the arguments of counsel, the Court DENIES the Lins' Motion for Judgment on Partial Findings as moot.

The Court by this memorandum of decision issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court concludes that the Lins did not breach the PSA by constructing six utility vaults and a temporary power line on Sub-Area 3, and by granting associated easements to PG&E.  The Court concludes that Toll was not entitled to terminate or rescind the PSA.  The Court's decision is based on an understanding that the Lins did not meet all of the requirements in the PSA as of the scheduled closing date for Sub-Area 3.  However, the PSA allowed for the closing date to be extended to accommodate the resolution of de minimus issues of this kind.  Instead of cooperating with the Lins, Toll terminated the contract on December 7, 2007.  The issues that Toll raises as justifications for termination were not substantial when considered in relation to the totality of the PSA.  When Toll entered into this contract in May 2004, the real estate market was strong, and when Toll was due to close on Sub-Area 3 in June 2007, market conditions had deteriorated significantly.  These deteriorating market conditions explain why Toll sought to terminate or rescind the PSA.

II.  **FINDINGS OF FACT**

A.   **The Parties**

1.  Toll is a Delaware corporation, with its principal

3

place of business in Horsham, Pennsylvania.  Toll builds homes and
communities throughout the country, including in Northern
California.  Id. at 47:5-19, 49:22-51:2 (Testimony of James Boyd
(hereinafter "JB")).

2.  The Lins are individuals who reside in Taiwan.  They
own land in Alameda County, California.  They are the master
developers of a residential and commercial development in Dublin,
California, known as Dublin Ranch.  Id. at 531:4-533:14 (Testimony
of Rodney Andrade (hereinafter "RA")), 656:24-658:18 (Deposition
Testimony of Hong Lien Lin (hereinafter "HL")), 662:17-663:24(HL).

**B.    Relevant Non-Parties**

3.  James Boyd ("Boyd") is a Regional President with
Toll.  Id. at 45:2 (JB).  During the period of time involved in
this case, Boyd had overall responsibility for Toll's operations
in California.  Id. at 46:4-7(JB).

4.  Warren Inouye ("Inouye") is a real estate attorney
who has worked as outside counsel for Toll since 1993.  Id. at
305:2-3, 305:24-306:9, 419:13-19 (Testimony of Warren Inouye
(hereinafter "WI")).

5.  James Tong ("Tong") is the Lins' authorized
representative with regard to Dublin Ranch.  Id. at 910:9-18
(Testimony of Tong (hereinafter "JT")).

6.  Martin Inderbitzen ("Inderbitzen") was the Lins'
attorney regarding the Dublin Ranch development, and has worked
for the Lins since 1985.  Id. at 1264:8-23 (Testimony of
Inderbitzen (hereinafter "MI")).

7.  Rodney Andrade ("Andrade") is an engineer who works

**United States District Court**
For the Northern District of California

4

for MacKay & Somps ("M&S").  Id. at 529:7-10(RA).  M&S is a civil engineering firm used by the Lins in the development of Dublin Ranch.  Toll was required to retain M&S.  See PSA § 13.7(a).  Andrade was the main liason between the Lins and M&S, working primarily through Tong and Inderbitzen.  Id. at 532:5-533:14, 534:25-535:10(RA).

8.  Howard Jon Paynter ("Paynter") was the Area Manager for Toll operations in the Bay Area until April 2007.  Id. at 1493:3-22 (Testimony of Jon Paynter (hereinafter "JP")).

9.  Robert Gray & Associates ("RGA") is a utility consultant used by the Lins on the Dublin Ranch development, including the infrastructure for Fairway Ranch.  Id. at 597:10-12(RA), 750:22-751:7(RA).

**C.   The PSA**

1.  The Purchase Price and Scheduled Closing Dates

10.  On May 27, 2004, Toll and the Lins entered into a written contract for the purchase and sale of approximately 147 acres of real estate located in Dublin, California.  See PSA § A.

11.  The total purchase price was $241,500,000.  Id. § 2.1.  Toll was required to make a deposit of $21,735,000.  Id. § 2.2.

12.  Toll was to buy the land in three stages, and the deposit was to be credited as follows: $7,000,000 at the closing of Sub-Area 1; $7,000,000 at the closing of Sub-Area 2; and $7,735,000 at the closing of Sub-Area 3.  Id. § 2.2(c).

13.  The scheduled date of the first closing was September 30, 2005, after an additional payment of $64,765,000.

United States District Court
For the Northern District of California

Id. § 5.1.   The scheduled date of the second closing was June 30, 2006, after an additional payment of $99,000,000.   Id. § 5.2.   The scheduled date of the third closing was June 30, 2007, after an additional payment of $56,000,000.   Id. § 5.3.

14.   The PSA provides that:

> The dates for the respective closings shall be the later of (a) the discrete dates set forth above or (b) if the special closing conditions and general closing conditions have not been satisfied as of the discrete dates set forth above three (3) business days after all the special closing conditions and general closing conditions have been satisfied.

Id. § 6.1.

2.   <u>Obligation to Convey Legal Parcels</u>

15.   In the section of the PSA entitled "Parcel Map to Create Legal Parcel," it states:

> The entirety of the Property is not currently subdivided in a manner that would permit its conveyance in the contemplated Sub-Areas. Seller shall, at its sole cost and expense, cause the City to record a parcel map or other map or maps (the "*Map*") in order to create the Property as legal parcels that can be conveyed consistent with the requirements of the Subdivision Map Act and the City's Subdivision Ordinance.

Id. § 3.2 (emphasis in original).

16.   The PSA establishes special closing conditions for the third closing.   One of these conditions is that "[t]he entirety of Sub-Area 3 shall be conveyed in the Third Closing pursuant to an Approved Map."   Id. § 5.3.2(a).

17.   The PSA establishes Buyer's closing conditions. Id. § 5.5.   One of Buyer's closing conditions is that "Seller

6

shall have caused the Map (or Maps) to be recorded." _Id._
§ 5.5(d).  Another Buyer's closing condition is that "[t]he
representations and warranties of Seller set forth in this
Agreement shall be deemed remade as of respective Close of Escrow
for each area, and shall be true and accurate as of, the Closing
Date." _Id._ § 5.5(c).  Buyer has the right to waive one or more of
Buyer's closing conditions and proceed with the closing.  _Id._
§ 5.5(h).

### 3.   Elementary School Parcel

18.   A special closing condition for the third closing
is that "Buyer shall have reconveyed to Seller or Seller's
assignee the elementary school parcel in Sub-Area 2." _Id._
§ 5.3.2(g).

19.   In a section of the PSA entitled "School Parcels,"
the PSA provides that: "The parties acknowledge that an as yet
unidentified portion of Sub-Area 2 is intended to be dedicated to
the Dublin United School District to serve an the site of a K5
elementary school." _Id._ § 7.5(a).  The PSA states:

> Buyer shall acquire title to all of Sub-Area 2
> subject to the obligation to reconvey the
> school site to Seller, or Seller's assignee,
> without consideration and with no new title
> exceptions but otherwise without any
> representation, warranty or liability to
> Seller when Buyer has obtained a Parcel Map
> creating the school site as a legal parcel.

_Id._ § 7.5(b).

20.   In the section with the title "School Parcel in
Sub-Area 2," it provides that:

> Buyer agrees that it will acquire title to

7

United States District Court

For the Northern District of California

1
2
3
4
5

Sub-Area 2 subject to the obligation to
reconvey the School Parcel to Seller, or
Seller's assignee, without consideration and
with no new title exceptions but otherwise
without any representation, warranty or
liability to Seller when Buyer has obtained a
Parcel Map creating the School Parcel as a
legal parcel.

6   Id. § 13.13.

7              4.   The Assignment Provision

8      21.   The Assignment paragraph of the PSA provides that:

9
10
11
12
13
14
15
16
17
18

Neither Buyer nor Seller shall assign all or
any portion of its interest in this Agreement
without the prior written consent of the other
(which consent shall not be unreasonably
withheld); provided, however, that (so long as
Buyer and Seller remain liable for the
performance of it's [sic] obligations under
the terms of this agreement) either Buyer or
Seller shall have the right to assign this
Agreement in whole or in part without the
other's consent to: (i) any affiliate of Buyer
or Seller; (ii) any entity in which Buyer or
Seller or such affiliate hold at least a 50%
interest; or (iii) as to Buyer, to any entity
that serves as a "land banker" for Buyer, and
any such assignee shall have the same right to
assign with respect to its interest in this
Agreement.

19   Id. § 18.7.

20              5.   Seller Work

21      22.   In the Section of the PSA entitled "Seller Work,"

22   it states that: "Seller shall be responsible for satisfying all

23   the Seller obligations set forth on Exhibit 'D.'"   Id. § 9.

24      23.   Exhibit D contains a chart for Sub-Area 3 listing

25   the construction item, Seller's obligation and Buyer's obligation.

26   Id. Ex. D at T0014930.   One of the construction items is "Lockhart

27   Street Streetwork, utilities and street lighting."   Id.   With

28

United States District Court
For the Northern District of California

8

regard to Lockhart Street, the Seller's obligation is "[c]urb-to-curb streetwork, street lighting, and utilities in accordance with (reference preliminary plans)." Id.   The Buyer's obligation is "[a]dditional dry utility construction as necessary for service." Id.   Another construction item on Exhibit D is "Dublin Blvd. streetwork, utilities and street lighting (Lockhart to Fallon)." Id.   With regard to Dublin Boulevard, one of the Seller's obligations is "[j]oint trench conduit and joint trench boxes and conductor to service street light system."   Id.

24.   Under Seller Work, the PSA also provides that:

> Seller shall provide either by dedication or by appropriate easement land which is not part of the Property, owned by Seller as may be required to satisfy all Conditions of Approval including but not limited to dedications of school sites, pump station location, streets and roads, park land, bike paths and pedestrian paths and trails, open space corridors, streams, utilities, storm drain easements and water quality ponds . . . Seller shall abandon easements or rights of way as necessary to comply with any Conditions of Approval.

Id. § 9.5.

### 6.   Buyer's General Closing Conditions

25.   The first of Buyer's general closing conditions is that "Seller shall not, as of the Closing Date, be in default in the performance of its obligations under this Agreement."   Id. § 5.5(a).

26.   The second condition is that "Seller shall be prepared to convey title to the Property to Buyer in the Approved Title Condition and the Title Company shall be irrevocably committed to issue the Title Policy in the Approved Title

9

United States District Court
For the Northern District of California

1  Condition."  Id. § 5.5(b).  The PSA defines Approved Title

2  Condition as follows:

3      The Title Policy shall insure fee simple title to
       the respective Areas vested in Buyer or its

4      nominee(s) as the case may be subject only to a
       lien for real property taxes and assessments not

5      yet delinquent and those liens, defects and
       encumbrances mutually agreed to by and between

6      Buyer and Seller during the Feasibility Period.

7  Id. § 3.1.

8              7.   Covenants

9      27.  "Seller and Buyer each covenants to cooperate with

10 the other in pursuing the matters required to be performed by the

11 other as set forth in this Agreement and in otherwise fulfilling

12 the conditions to Closing."  Id. § 13.1.

13     28.  The PSA provides that:

14     Except as necessary to comply with the terms
       of this Agreement, Seller shall not: (a) sell,

15     encumber or transfer any interest in all or
       any portion of the Property between the date

16     of this Agreement and the Closing Date; (b)
       take any action that would or could adversely

17     affect title to the Property; or (c) without
       Buyer's written consent which shall not be

18     unreasonably withheld or delayed, enter into
       any other agreement of any type affecting the

19     Property that would or could survive the
       Closing Dates.  Seller shall fully and timely

20     comply in all material respects with any
       obligations that are applicable to the

21     Property.

22 Id. § 13.2.

23             8.   Representations and Warranties

24     29.  The Lins made a number of representations and

25 warranties for the benefit of Toll.  Id. § 14.1.

26     30.   The Lins represented that: "[e]xcept as Disclosed,

27 to the best of Seller's knowledge, the Property is free of any

28                        10

material physical defects or conditions that preclude or

materially limit its development as a master planned community as

contemplated by this Agreement."   Id. § 14.1(d).

31.   The parties agreed that:

> If any representation or warranty given by
> Seller or Buyer becomes untrue in any material
> respect prior to the applicable Area Closing
> due to changed circumstances, the representing
> party shall promptly give written notice to
> the other party of the changed circumstances.
> The party making the representation or
> warranty shall take all commercially
> reasonable steps to address the changed
> circumstances so as to make the representation
> and warranty true and correct in all material
> respects once again.  If the party making the
> representation and warranty is unable to do so
> to the other party's reasonable satisfaction
> within a reasonable time, or to give
> reasonably satisfactory assurances to the
> other party that the representation and
> warranty will be true and correct in all
> material respects as of the corresponding Area
> Closing Date, then (i) if the party making the
> representation and warranty is Buyer, Seller
> shall have the right to terminate this
> Agreement in full and exercise its remedies
> under Section 1.4, and (ii) if the party
> making the representation and warranty is
> Seller, Buyer shall have the Right to
> Terminate.

Id. § 14.3.

9.   Liquidated Damages and Attorneys' Fees

32.   The PSA contains a liquidated damages provision:

> If the sales of all the respective areas of
> the property are not consummated as a result
> of Buyer's default under the Agreement and if
> Seller is not also in default, the portion of
> the deposit which has not been allocated to
> the closing price of any area(s) already
> purchased by Buyer (and interest on such funds
> actually earned while in escrow) shall be
> retained by Seller as Liquidated Damages.

Id. § 4.4 (block capitals omitted).

11

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

33.   The PSA contains an attorneys' fees provision:

> If any legal action or other proceeding is commenced to enforce or interpret any provision of, or otherwise relating to, this Agreement, the losing party shall pay the prevailing party's actual expenses incurred in the investigation of any claim leading to the proceeding, preparation for and participation in the proceeding, any appeal or other post judgment motion, and any action to enforce or collect the judgment including contempt, garnishment, levy, discovery and bankruptcy. For this purpose, "expenses" include, without limitation, court or other proceeding costs and experts' and attorneys' fees and their expenses.  The phrase "prevailing party" shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

Id. § 18.1.

D.   **Memorandum of Understanding**

34.   The Lins and Toll also executed a Memorandum of Understanding, recorded on May 28, 2004, by which Toll was granted a lien against the property "to secure the performance of Seller's obligation to refund the Deposit provided by Buyer and disbursed to Seller if Buyer becomes entitled to such reimbursement in accordance with the terms of the Agreement."  Ex. P-24.

E.   **SubArea 1 and SubArea 2 Assignment**

35.   Escrow closed on Sub-Area 1 in September 2005, but Toll never sold all of the homes it built on Sub-Area 1.  RT at 84:14-85:25(JB).

36.   Sub-Area 2 was scheduled to close on June 30, 2006, but on May 31, 2006, Toll notified the Lins that:

> Toll wants to "assign" the Purchase Agreement with respect to Subarea 2 to Regent Land Investment LLC.  This is a land banking

> transaction of the type referred to in the
> Purchase Agreement's assignment clause . . .
> The reason this is not a real "assignment" of
> the Purchase Agreement is that Toll is only
> designating a title holding nominee.  Because
> Toll retains all the duties under the Purchase
> Agreement . . . it satisfies the requirements
> of the assignment paragraph of the Purchase
> Agreement.

Ex. P-45.

37.   In response to questions from the City of Dublin,
Toll explained that:

> Toll is entering into a Nomination Agreement
> and Construction Agreement by which Toll will
> continue to seek entitlements and develop the
> infrastructure for Area F West [i.e. Sub-Area
> 2] as the contractor/agent for Regent Land
> Investment. . . Toll will continue to work
> toward the entitlement and development of the
> Property.

Ex. P-58.

38.   A land banking arrangement is a financial
transaction whereby the land banker pays for the land, and the
home builder has the option to buy back the land from the land
banker when the home builder is ready to begin construction.  RT
at 86:23-87:22, 88:11-89:1(JB).

39.   The Lins did not object to Toll's assignment of
Sub-Area 2 to Regent Land Investment LLC ("Regent").  See Ex.
P-52.  The Lins signed a written consent to the assignment, but
Inderbitzen never delivered it to Toll.  RT at 1348:8-24 (MI).

40.   Toll assigned all of its "right, title and
interest" under the PSA relating to Sub-Area 2 to Regent.  See Ex.
D-572.  Toll and Regent entered into an option agreement so that
Toll could buy back lots on Sub-Area 2 from Regent.  Ex. D-573.

United States District Court
For the Northern District of California

13

1  Toll would continue to seek entitlements and develop

2  infrastructure on Sub-Area 2 as the agent or contractor for

3  Regent.  Ex. P-59.

4         41.   Due to complications arising from the assignment to

5  Regent, escrow for Sub-Area 2 closed later than scheduled, on July

6  20, 2006.  Title to Sub-Area 2 was transferred directly from the

7  Lins to Regent.  RT 103:2-12(JB).  The Lins or their agents

8  understood that Regent had become the owner of Sub-Area 2.  Id. at

9  1350:9-25(MI).

10        **F.   Market Conditions Deteriorate**

11        42.   At the time Toll entered into the PSA in May 2004,

12 the market was very good, Toll was making a profit, and the market

13 for selling residential development property was a "seller's

14 market."  Id. at 71:22-25(JB), 86:17-19(JB), 1494:6-12(JP),

15 1442:10-1443:22(Testimony of Gary Ryness (hereinafter "GR")).

16        43.   In 2005, the real estate market reached its peak.

17 Toll's operations in the Bay Area had their best year in terms of

18 number of sales, selling approximately 600 units.  Id. at 1494:

19 16-24(JP).

20        44.   By August of 2006, the market conditions for

21 selling houses of the type Toll was building was slowing down.

22 Id. at 114:10-20(JB), 1446:3-1447:1(GR).

23        45.   Toll was concerned at how well Sub-Area 1 would

24 sell, given the changing market conditions.  Id. at 115:16-18

25 (JB).  Due to poor sales in Sub-Area 1, Toll put off the start of

26 construction in Sub-Area 2, and exercised its right to extend the

27 deadlines for re-purchasing Sub-Area 2 from Regent.  Id. at 116:7-

28

14

**United States District Court**
For the Northern District of California

24, 118:24-119:4(JB).

46. As of October 2006, Sub-Area 2 was in the red or "under water" by $40 million. Ex. 524.

47. In late 2006, Toll stopped its planning process with the City for Sub-Area 3. RT at 125:6-15(JB).

48. The market continued to slow during 2007, with Toll delivering less than 300 homes. Id. at 68:12(JB), 1495:10-14(JP). As of early 2007, Toll still had approximately 400 out of 450 units left to sell from Sub-Area 1. Id. at 1498:11-20(JP).

49. In early 2007, Toll was experiencing a high rate - approximately 30% - of customers backing out of their contracts to purchase homes. Id. at 1499:8-1500:1(JP).

50. As of early 2007, no homes had yet been constructed on Sub-Area 2, but there were plans to build 650 homes on that property. Id. at 1500:14-21(JP). Toll determined it would not be profitable to build houses on Sub-Area 2. Id. at 117:24-118:6 (JB), 1450:20-1460:4(GR).

51. Sometime around June 2007, after Toll used up its six one-month extensions with Regent, rather than re-purchase Sub-Area 2 from Regent, Toll forfeited its deposit of $30,000,000. Id. at 121:6-14, 122:8-15(JB), 1514:1-7(JP). Toll determined that they would lose less money by forfeiting the deposit to Regent than by re-purchasing the property, developing it, and trying to sell the homes. Id. at 121:17-122:7(JB).

52. Toll considered selling part of Sub-Area 3 to an apartment developer. Id. at 124:11-14(JB).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

### G.  **The Temporary Power Line and Easement**

53.  The Lins were the owners and developers of Fairway Ranch, a residential development located directly to the west of Sub-Area 3 across Lockhart Street, and bounded by Central Parkway on the north, Dublin Boulevard on the south, and Keegan Street on the west.  RT at 929:10-23 (JT).  Fairway Ranch included affordable housing and market rate units.  Id. at 543:5-544:8 (RA).

54.  Before Fairway Ranch could be occupied, progress had to be made on construction of a water pump station for the Dublin San Ramon Services District ("DSRSD") to the east of Sub-Area 3.  Id. at 591:14-593:23(RA), 597:25-598:15 (RA); Ex. P-28. The pump station is on a small piece of land located by the southeast corner of Sub-Area 3.  RT at 1818:17-25 (MI).

55.  The operation of the pump station was necessary for flouridation of water in the area, to provide adequate water pressure to satisfy the fire department, and once Fairway Ranch could be occupied, the Lins would be able to obtain affordable housing credits from the City of Dublin that were necessary in order for Toll to be able to build on Sub-Area 2.  Id. at 1373:4-1374:19(MI).

56.  PG&E determined that the least expensive way to provide power to the pump station was to run a temporary overhead power line across Sub-Area 3 until a permanent source of power was installed.  Id. at 594:18-24(RA); Ex. P-28.

57.  The location of the power line and the language of the easement were negotiated between PG&E and Inderbitzen.  RT at

16

729:13-731:5(RA), 1825:18-20(MI); Exs. P-34, P-36, P-37, P-38, P-40.

58.   On December 12, 2005, the Lins executed the power line easement in favor of PG&E, and Tong sent it to PG&E on January 16, 2006.  RT at 943:7-945:4(JT); Ex. P-40.  The easement was re-executed by the Lins on June 1, 2006, and recorded on July 3, 2006.  Ex. P-53.  Inderbitzen and Tong did not notify Toll of the power line or easement.  RT at 1838:14-24(MI), 927:20-928:13(JT).

59.   The easement extended five feet on either side of the temporary power line, and the overhead wires had to be at least twenty feet from the ground to allow for the operation of construction vehicles.  See Ex. 53.  The landowner was not to construct any building in a thirty foot strip beneath the power line.  See id.  The extinguishment provision of the power line easement states:

> Upon the execution of an agreement by second
> party [i.e. PG&E] to provide for the
> relocation of the facilities installed within
> the temporary nonexclusive easement, second
> party agrees to quitclaim its interest in any
> portion of said premises which is not occupied
> by the above-described facilities, or which is
> not necessary for the maintenance, replacement
> or use of said facilities, and deliver the
> quitclaim deed to first party [i.e. the Lins].

Id.

60.   The PG&E temporary power line was included on plans for the development of Sub-Area 3.  RT at 1557:7-23(JP); Ex. D-654.

61.   When Paynter, Toll's Area Manager, learned of the

17

**United States District Court**
For the Northern District of California

1   power line in August 2006, he understood that it was going to be

2   temporary.  RT at 1559:16-1560:6(JP).  He did not think the power

3   line would interfere with Toll's development of Sub-Area 3 given

4   the timetable Toll was on.  Id. at 1561:15-18(JP).

5        62.  By September 2006, the Lins had completed the joint

6   trench on the north side of Dublin Boulevard and had therefore

7   completed all necessary work for the temporary power line to be

8   removed from Sub-Area 3.  Id. at 865:9-867:13(RA), 872:14-

9   874:3(RA); Ex. 522.  The Lins applied for abandonment of the

10  temporary overhead power line and the installation of permanent

11  underground service.  RT at 872:14-35(RA).

12       63.  On June 16, 2008, PG&E quitclaimed the power line

13  easement.  Ex. P-189.

14       **H.   The Utility Vaults**

15       64.  After the execution of the PSA, the Lins installed

16  four above-ground utility vaults on the east side of Lockhart

17  Street, on Sub-Area 3, and two utility vaults close to Dublin

18  Boulevard.  Each utility vault required a 10' x 10' easement on

19  the property.  See Exs. P-31, P-49.

20       65.  Two of the six vaults serve Fairway Ranch on the

21  west side of Lockhart street, two of the vaults were intended for

22  the development of Sub-Area 3, and two of the vaults are empty.

23  RT at 1762:9-14 (Testimony of Walter Antonio (hereinafter "WA")),

24  1235:15-16 (Testimony of Paul Giacalone (hereinafter "PG")).

25       66.  The Lins constructed the joint trench and vaults on

26  the west side of Lockhart Street because there was a large, sixty-

27  six (66) inch storm drain running along the east side of the

28

18

1   street.   Id. at 1619:7-13, 1755:10-17 (Testimony of Ernest Boitano

2   (hereinafter "EB")).

3        67.   The utility vaults were included on plans for the

4   development of Sub-Area 3 sent to Toll.   Id. at 1529:21-

5   1533:10(JP); Ex. D-654.

6        68.   Toll representatives first raised questions about

7   the utility vaults on Sub-Area 3 on August 3, 2006.   RT at 1521:6-

8   24(JP); Ex. D-640.

9        69.   Toll continued to design plans for Sub-Area 3 with

10  the utility vaults situated in their current location.   RT at

11  1523:2-12(JP).

12       70.   On September 26, 2006, representatives from Toll,

13  the City of Dublin, and M&S held a meeting regarding the planning

14  of Sub-Area 3.   Ex. D-617.   There was an investigation of whether

15  the utility vaults could be moved.   Id.   It was determined that

16  Matt Jensen, a representative from M&S, was "to move forward with

17  'woonerf' option."   Id.

18       71.   The Woonerf Option is a preliminary land plan for

19  Sub-Area 3 produced by M&S on September 26, 2006, that includes

20  the six utility cabinets.   Ex. D-580.

21       72.   Toll stopped planning for Sub-Area 3 around this

22  time in September or October 2006 because of the deteriorating

23  real estate market.   RT at 1524:11-24(JP).

24       73.   Toll first notified the Lins that the utility

25  vaults would create a problem for the closing of Sub-Area 3 on

26  April 13, 2007.   Ex. P-109.

27       74.   On May 4, 2007, Tong and Inderbitzen were advised

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   that it would take approximately six months for PG&E to engineer a

2   relocation plan.  Ex. P-118.  On June 5, 2007, Tong and

3   Inderbitzen were advised that relocating the vaults would cost

4   from $300,000 to $500,000. Ex. P-128.

5        75.  On October 3, 2007, the Lins applied to PG&E for

6   the relocation of the utility vaults off of Sub-Area 3. Ex. P-158.

7        76.  On March 20, 2008, RGA estimated that relocating or

8   moving the vaults underground would cost $523,060.  Ex. P-181.

9   **I.   <u>Reconveying the School Site</u>**

10       77.  In 1997, as the master developers of Dublin Ranch,

11  the Lins entered into a Mitigation Agreement with the Dublin

12  Unified School District ("School District"), under which the Lins

13  were required to dedicate certain land to the School District for

14  school sites.  RT at 1290:16-1294:16(MI), Ex. P-208.  One of the

15  planned school sites was on Sub-Area 2.

16       78.  After Regent acquired Sub-Area 2 in July 2006, Toll

17  continued to develop Sub-Area 2 as Regent's contractor or agent.

18  RT at 1601:18-1602:21(JP).

19       79.  Inderbitzen communicated with Christopher Muenzen

20  ("Muenzen"), a Toll representative, regarding the obligation to

21  record a parcel map for the school site.  Ex. D-624.

22       80.  On January 2, 2007, Muenzen sent an email to

23  Inderbitzen indicating that the parcel map for the school site was

24  not as far along as Toll would like, and that Toll would probably

25  be recording the map sometime towards the end of April.  <u>Id.</u>

26       81.  On March 8, 2007, Inderbitzen sent Muenzen an email

27  inquiring if the map was still on target for being recorded in

28

20

April.  Id. at 3.  On March 19, 2007, Muenzen indicated that the map was looking like it would be approved in May.  Id. at 5.

82.  On April 3, 2007, Muenzen sent an email to the Lins asking for deeding instructions for the school site.  Id. at 7. Inderbitzen responded on April 9, 2007, and on April 11, 2007. Id. at 6-7.

83.  On July 12, 2007, Inderbitzen sent an email to Muenzen asking about the status of the deed to the school site. Id. at 8.  On July 25, 2007, Muenzen responded that "[p]rojected acceptance of the Sub Area 2 final map is September '07.  Once this is complete we will immediately deed the parcel over."  Id.

84.  Inouye informed Indebitzen that only Regent could convey the school site to the Lins.  RT at 484:6-485:21(WI).

85.  Beginning in the fall of 2007, Inderbitzen held discussions with Regent and the School District about the school site.  RT at 1301:6-23(MI); Exs. P-178, P-190.

86.  The parcel map creating the school site as a legal parcel was recorded on November 7, 2008, and Regent notified the Lins that it was ready to reconvey the School Site to the Lins. Exs. P-193, P-195.

**J.   The Sub-Area 3 Closing Correspondence and Meetings**

87.  On November 17, 2006, Inderbitzen sent an email to Toll representatives seeking to identify issues related to the third closing.  Ex. D-548.

88.  On March 23, 2007, Inderbitzen sent a letter to Toll seeking to review closing issues for the third closing.  Exs. P-101, D-512.  The letter attached an outline of "Subarea 3

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Considerations." Id. at LIN0002716.  The outline mentions how the PG&E power line across Sub-Area 3 required a minor deviation from the approved bulk grading plan for Sub-Area 3.  Id. at LIN0002718.

89.  On April 13, 2007, Toll gave the Lins notice of their concerns regarding the utility vaults and that the Lins may be in default because of the utility vaults.  Ex. P-108.  The letter states the utility vaults "directly interfere with the development plan which Toll has been processing for some time for its project." Id.  The letter did not mention the power line as a closing issue.  Id.

90.  On April 17, 2007, Inderbitzen responded by email.  Ex. P-110.  The email states a meeting has been scheduled for April 15, 2007, and Inderbitzen was unable to tell which utility vaults Inouye was talking about.  Id.

91.  The parties discussed the utility vaults at a meeting on April 23, 2007.  RT at 1402:25-1404:16(MI).

92.  On May 2, 2007, Andrade, Bill Morrison ("Morrison") of Toll, and RGA met to discuss the utility vaults.  Id. 754:16-24(RA).  Morrison told Andrade that Toll wanted to move four of the boxes, underground one, and leave one in its current location.  Id. at 848:8-849:2(RA).  Morrison was going to get back to Andrade if this plan was not acceptable to Toll, but Morrison never did so.  Id. at 849:3-9(RA).

93.  On May 16, 2007, Andrade sent RGA a fax requesting RGA to prepare a written cost estimate for the relocation of five of the six utility vaults.  Ex. D-514.

94.  On June 6, 2007, Inderbitzen sent Toll an email

United States District Court
For the Northern District of California

1  attaching a revised Assignment of Development Agreement and

2  advising that the Lins would not extend the closing beyond June

3  30, 2007.  Ex. P-129.  At that time, Inderbitzen believed that

4  Andrade and Morrison had worked out a solution regarding the

5  utility vaults.  RT at 1410:1-13(MI).

6          95.  On June 8, 2007, Inouye sent the Lins a letter

7  regarding outstanding closing conditions for the closing of Sub-

8  Area 3.  Ex. P-132.  The letter stated that the utility vaults and

9  the temporary power line violated various provisions of the PSA.

10 Id.  The letter included an exhibit which was Toll's evaluation of

11 the Seller's work required by the PSA.  Id.  With regard to

12 Lockhart Street, the letter stated "Buyer is inspecting the Joint

13 Trench work to determine if the switches and vaults have been

14 properly located."  Id.  With regard to Dublin Boulevard, the

15 evaluation stated "[t]he joint trench conduit and joint trench

16 boxes and conductor to service street light system are presently

17 being inspected to determine if the switches and vaults have been

18 properly placed."  Id.

19         96.  On June 12, 2007, Inderbitzen responded.  He stated

20 that the June 8, 2007, letter and Inderbitzen's prior June 4,

21 2007, letter should be the basis for discussions at a meeting

22 scheduled for June 14, 2007.  Ex. P-135.  The letter states that

23 "[t]he referenced utility vaults are part of the Seller Work

24 obligation listed in Exhibit D of the Agreement.  Any relocation

25 of the same will be at Buyer's expense and should properly take

26 place, if at all, only after Buyer has completed its Planning for

27 the area and can in fact determine whether or not the vaults cause

28

23

**United States District Court**
For the Northern District of California

any planning problems." Id.  The letter stated the temporary power line was provided to PG&E to deliver power to the DSRSD pump station and that it would eventually be removed.  Id.

97.  On June 13, 2007, Toll postponed the meeting scheduled for the next day.  Ex. P-137.

98.  On June 15, 2007, Inouye responded to the June 12, 2007, letter.  Ex. P-138.  He stated the utilty vaults violated provisions of the PSA, that the temporary power line encumbered the property, and that the location of the vaults "will probably have an affect [sic] upon the size and configuration of the Neighborhood Park, the Open Space Area and the design of the Property, and therefore have an affect upon the net acreage of the Property and the Purchase Price.  These issues must be resolved before Toll pays the Purchase Price."  Id.

99.  On June 22, Inderbitzen spoke to Inouye by telephone to try to get the discussion back on track, but Inouye informed Inderbitzen that he was being taken out of the transaction.  RT at 1423:7-1424:16(MI), 476:19-477:11(WI).

100.  On June 27, 2007, Toll sent the Lins a letter that was intended "to serve as notice of Seller's default under the Agreement."  Ex. P-139.

101.  On June 27, 2007, Inderbitzen responded to the letter sent June 15, 2007.  Ex. P-141.  He expressed disappointment regarding a cancelled meeting and mentioned Mr. Tong's efforts to communicate with Toll representatives.  Id. With regard to the utility vaults, the letter states: "We believe this to be part of the required Seller Work outlined in Exhibit D

24

of the agreement." Id.

102. On June 28, 2007, Inderbitzen responded to the Toll June 27 letter, stating "[w]e look forward to the opportunity to meet and discuss the issues raised in your letter.  All actions taken by Seller have been done in good faith in an attempt to comply with the terms of the agreement.  If, following our discussions, Toll wishes to have the Seller reverse its actions Seller can do so in a timely and effective way."  Ex. P-142.

103. Escrow did not close on Sub-Area 3, as scheduled, on June 30, 2007.

104. On August 8, 2007, the parties held a meeting at the office of James Tong.  Ex. P-151.  The parties discussed the issues that preventing the closing of Sub-Area 3 on the scheduled closing date.  Id.  Toll proposed extending the closing date by four years to June 30, 2011.  Id.  The Lins responded with an offer to extend the closing date by three years, with Toll paying an additional deposit of $5,000,000.  Id.

105. On December 7, 2007, Toll gave notice to the Lins that it was terminating the PSA as to the closing of Sub-Area 3. Ex. P-166.

106. On December 12, 2007, the Lins responded that they continued to prepare for the closing of escrow on Sub-Area 3, and they reminded Toll of the obligation to reconvey the school site. D-655.

107. An unsuccessful mediation occurred in January of 2008.  RT at 164:5-9(JB).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    III.  <u>**CONCLUSIONS OF LAW**</u>

2         A.  <u>**Toll's Claim for Breach of Contract**</u>

3         The elements of a cause of action for breach of contract are:

4    (1) the existence of the contract; (2) performance by the

5    plaintiff or excuse for nonperformance; (3) breach by the

6    defendant; and (4) damages.  <u>First Commercial Mortgage Co. v.</u>

7    <u>Reece</u>, 89 Cal. App. 4th 731, 745 (Ct. App. 2001).  Here, the PSA

8    is the contract, and Toll did not close escrow on Sub-Area 3.

9    Toll's excuse for nonperformance is that the Lins were in breach

10   of the PSA, and Toll was therefore entitled to terminate the

11   contract.  Toll contends that the Lins' breached the PSA by

12   installing utility vaults and a temporary power line on Sub-Area

13   3, and by granting associated easements to PG&E.  <u>See</u> Req. to File

14   Am. Closing Br., Ex. A ("Pl.'s Am. Closing Br.") at 14-15.[2]

15        Before addressing these contentions, the Court starts by

16   noting the minor nature of the alleged breaches when considered in

17   the context of the PSA as a whole.  The PSA is not only a purchase

18   and sale agreement, but also consists of escrow instructions, and

19   requirements for buyer and seller to perform different kinds of

20   construction work.  RT at 423:13-424:7(WI).  The deal was worth

21   $241,500,000, involved approximately 127 acres of land, and it

22   involved three separate closings over a three-year period.  <u>See</u>

23   PSA.  At the time the parties signed the PSA, many issues

24

25        [2] On April 14, 2009, Toll requested leave to file an Amended
     Closing Brief, attaching the Amended Closing Brief as an exhibit.
26   Docket No. 213.  Because the amended version merely adds a table of
     contents, a table of authorities, and some evidentiary citations,
27   the Court GRANTS Toll's request.

28
                                    26

United States District Court

For the Northern District of California

concerning Sub-Area 3 were in flux.  RT at 803:10-11(RA).  For
example, no final decisions had been made regarding the proper
alignment of Dublin Boulevard, the boundary between the required
open space and the residential areas, the exact location of a
creekway, the location of the DSRSD pump station, and the
alignment of Fallon Road.  <u>Id.</u> at 801:13-803:11(RA).  When the
parties signed the PSA, they were not even sure where Sub-Area 3
was going to be.  <u>Id.</u> at 806:8-808:13(RA).  The PSA contemplated
that there might be an adjustment in the overall net acreage
described for residential use in Sub-Area 3, and the PSA provided
for the possibility of adjusting the purchase price for Sub-Area 3
if that occurred.  PSA § 5.3.1(a).

        In light of uncertainties of this kind, the parties
covenanted to cooperate with each other in pursuing the matters
required to be performed under the PSA and in otherwise fulfilling
the closing conditions.  <u>See</u> PSA § 13.1.  Inouye, Toll's outside
counsel, testified that "[t]his transaction required a lot of
cooperation between the parties."  RT at 426:15-16(WI).  Indeed,
on occasions prior to the close of escrow for Sub-Area 3, the
parties did work together to resolve issues that arose.  For
example, in conjunction with the completion of improvements on
Sub-Area 2, Toll and the Lins agreed to swap work.  <u>See</u> Ex. D-596.
Toll installed a traffic light for the Lins at a cost of $223,209,
and the parties agreed that Toll would be reimbursed by the Lins
at the close of escrow in this amount.  <u>See</u> <u>id.</u>  The Lins
completed storm drain work for Toll at a cost of $87,500, and
grading work at a cost of $78,075, and Toll was to reimburse the

27

Lins at the close of escrow for those amounts.  <u>See</u> <u>id.</u>

Similarly, with regard to Grafton Street, the Lins began

construction of the street as required by Exhibit D to the PSA,

but it was decided that Toll would complete the construction of

the street, and that the Lins would reimburse Toll for its

efforts.  RT at 813:12-814:17(RA).  Toll did not continue to

cooperate with the Lins, as required by section 13.1 of the PSA,

when it came to similar issues that arose prior to the third

closing.

### 1.   <u>Utility Vaults and Associated Easements</u>

The Court finds that installing utility vaults and granting

associated easements was required under the PSA, and therefore did

not breach the PSA.  The PSA required the parties to perform

different construction tasks.  With regard to Lockhart Street,

Exhibit D of the PSA required the Lins to construct "curb-to-curb

streetwork, street lighting, and utilities in accordance with

(reference preliminary plans)," and the sidewalk on the west side

of the street.  PSA Ex. D at T0014930.  Toll was responsible for

"[a]dditional dry utility construction as necessary for service,"

and miscellaneous "improvements to connect onsite streets and/or

utilities."  <u>Id.</u>  With regard to Dublin Boulevard, Exhibit D

required the Lins to construct Dublin Boulevard, and utilities

including "[j]oint trench conduit and joint trench boxes and

conductor to service street light system."  <u>Id.</u>

The Lins were required to construct the "backbone

infrastructure" for the development of Fairway Ranch and Sub-Area

3.  RT at 551:22-552:9(RA), 764:8-765:11(RA).  Backbone

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

infrastructure means major utility corridors and major arterial streets. Id. at 534:16-18(RA). The backbone infrastructure included joint utility trenches on major streets. Id. at 548:4-10(RA). PG&E designed the joint trench for Lockhart Street, PG&E set the location for the utility vaults, the City approved the plans, and the Lins built the joint trench and the utility vaults as required by the approved plans. Id. at 568:3-6(RA), 569:1-12(RA), 573:8-13(RA), 764:8-765:11(RA), 812:22-813:11(RA), 1229:2-6(PG). PG&E also designed the joint trench and cabinets on Dublin Boulevard. Id. at 1761:12-20(WA).

Inouye's June 8, 2007, letter shows that Toll viewed the construction of the utility vaults as part of Seller's work. See Ex. D-599. The letter expressed concern about "several Seller Work items which remain incomplete." Id. Inouye expressed concern regarding the location of the utility vaults, but not the fact that the Lins had constructed them. See id. The Court finds that the PSA required the Lins to construct the utility vaults. The Lins therefore did not breach the PSA by building the vaults or failing to consult with Toll prior to constructing the vaults.

The Lins did not breach the PSA by constructing the utility vaults in their current locations or by constructing six vaults in close proximity to one another. Utility vaults are a part of all subdivisions that have underground utilities. Id. at 1463:20-23(GR), 1617:15-21(EB). Utility vaults were built on other Toll developments in the area, such as at the entrance of Dublin Ranch Golf Club. Id. at 821:12-18(RA); Ex. 668. On the north side of Gleason Drive, the Lins built a joint trench with three switch

cabinets.  Id. at 835:18-20(RA).  While two of the four utility vaults on the east side of Lockhart Street served Fairway Ranch across the street, because of the wet utilities on the west side of Lockhart Street, there was no other reasonable alternative, from an engineering standpoint, than to put the dry utilities on the east side of Lockhart Street.  Id. at 1755:10-17(EB), 837:1-7(RA).

Toll was on notice of the location and number of utility vaults on Sub-Area 3 since August or September of 2006.  RT at 1521:6-8(JP), 1529:21-1533:10(JP), 1574:5-7(JP); Exs. 640, 654.  By the time Toll raised the location of the utility vaults as a Sub-Area 3 closing issue, Toll had stopped all plans for the development of Sub-Area 3.  RT at 1524:11-24(JP).  The location of the vaults, therefore, could not interfere with Toll's development plans.  Even if Toll had a plan, the utility vaults were located within a setback within which Toll would not have been permitted to build.  Id. at 1891:20-1892:6(MI), 1899:3-1901:13 (Testimony of Thom Gamble (hereinafter ("TG")).  Therefore, the location of the vaults could not have interfered with Toll's plans to develop Sub-Area 3.

The Court is convinced that if Toll wanted to close escrow on Sub-Area 3, then Toll could have cooperated with the Lins to work out a solution regarding the location of the utility vaults.  Utility vaults are relatively simple to move.  Id. at 1633:22(EB).  On a prior occasion, Toll was willing to relocate a utility vault to accommodate its development needs.  Id. at 222:6-224:5(JB); Ex. 501.  In the past, Toll and the Lins were willing to enter into

30

**United States District Court**
For the Northern District of California

1    agreements to swap work and reimburse each other.  <u>See</u> Ex. 596.

2    Estimates about how much relocating the vaults would cost ranged

3    from $300,000 to $523,060.  <u>See</u> Exs. P-128, P-181.  If Toll had

4    built homes on Sub-Area 3, Toll would have expended hundreds of

5    millions of dollars.  RT at 1639:1-1640:1(EB).  The utility vaults

6    would have no significant impact on the sale of the kind of units

7    Toll was planning to build on Sub-Area 3.  <u>Id.</u> at 1462:18-

8    1464:22(GR).  The Court concludes that the issue of the vaults'

9    location was not significant enough to constitute a breach

10   permitting Toll to terminate or rescind the contract.

11       Toll contends that the easements granted to PG&E in

12   conjunction with the Lins' construction of the six utility vaults

13   breached the PSA.  Pl.'s Am. Closing Br. at 8.  However, the Court

14   notes that in a prior land deal between Toll and the Lins, public

15   service easements of the kind at issue here were added to the

16   property between the time the contract was signed and the time for

17   the close of escrow.  RT at 827:8-831:17(RA).  Even with respect

18   to Sub-Areas 1 and 2, utility vault easements were added to the

19   property.  <u>Id.</u> at 831:3-17(RA).  The Court finds that the

20   easements associated with the utility vaults did not breach the

21   PSA.

22            2.   <u>The Temporary Power Line and Associated Easement</u>

23       The Court finds that the construction of the temporary power

24   line did not breach the PSA because it did not interfere with

25   Toll's planning for Sub-Area 3.  The power line appears on plans

26   for Sub-Area 3.  <u>See</u> Ex. D-654 ("Option #10").  This plan shows

27   that Toll expected the power line to be removed by the time it

28

**United States District Court**
For the Northern District of California

started constructing buildings on Sub-Area 3.  When Paynter,
Toll's Area Manager, learned of the power line in August 2006, he
understood that it was going to be temporary.  RT at 1559:16-
1560:6(JP).  He did not think the power line would interfere with
Toll's development of Sub-Area 3 given the timetable Toll was on.
Id. at 1561:15-18(JP).  Since the City of Dublin does not permit
above-ground utility lines, Toll must have understood that the
power line was temporary.  Id. at 864:20-865:4(RA).

Toll ceased planning Sub-Area 3 in September or October 2006.
Id. at 1524:11-24(JP).  By September 2006, the Lins had completed
the joint trench on the north side of Dublin Boulevard and had
therefore completed all necessary work for the temporary power
line to be removed from Sub-Area 3.  Id. at 865:9-867:13(RA),
872:14-874:3(RA); Ex. 522.  In September 2006, the Lins applied
for abandonment of the temporary overhead power line and the
installation of permanent underground service.  Id. at 872:14-
35(RA); Ex. P-184.  If Toll had restarted the planning process for
Sub-Area 3, it would take approximately one year before Toll could
start building houses on the land.  RT at 1526:5-8(JP).  On June
16, 2008, less than one year after the scheduled closing date for
Sub-Area 3, PG&E quitclaimed the temporary easement.  See Ex. P-
189.

The Court finds that the Lins' grant of a temporary easement
associated with the power line did not breach the PSA.  Toll
contends that it should have been informed about the temporary
easement, and that the temporary power line and easement breached
section 13.2 of the PSA by encumbering the property, adversely

32

affecting title to the property, and the Lins breached the PSA by entering into an agreement with PG&E that could survive the closing date.  Pl.'s Am. Closing Br. at 16-19.  Toll also contends that the temporary easement violated other provisions of the PSA, including sections 13.1, 14.1 and 14.3.  Id. at 19-23.

The Court acknowledges that by granting the temporary power line easement to PG&E, the Lins had not complied with all the requirements in the PSA as of the scheduled closing date for Sub-Area 3.  See RT at 926:3-11(JT), 958:10-16(JT).  However, given that the easement was clearly temporary, the Court finds that this issue was not significant enough to justify Toll's termination of the contract.  Indeed, the Court finds that the grant of the temporary power line easement was not a breach of the PSA at all because the Lins had the right to extend the close of escrow beyond June 30, 2007.  The Lins had the right to do so because the school site had not been reconveyed to the Lins as of the scheduled closing date for Sub-Area 3.  If Toll had wanted to purchase Sub-Area 3, the Court is convinced that the parties could have worked out a solution regarding this minor issue during this time extension.  Instead, Toll terminated the PSA on December 7, 2007.

Section 6.1 of the PSA permitted the Buyer to extend the close of escrow if the Seller had not done everything Seller was required to do in the special and general closing conditions, and it permitted Seller to extend the close of escrow if the Buyer had not done everything Buyer was supposed to do in the special and general closing conditions.  See PSA § 6.1.  As Toll concedes,

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    "permitting the parties to extend the closing date to allow the

2    *other* party to satisfy closing conditions, makes perfect sense."

3    Pl.'s Am. Closing Br. at 26 (emphasis in original).  Prior to the

4    close of escrow on Sub-Area 2, Toll invoked this provision to

5    extend the close of escrow due to concerns about whether the Lins

6    had fulfilled all of their requirements.  <u>See</u> Ex. 585.  On June

7    30, 2007, the Lins were entitled to extend the close of escrow

8    because the elementary school parcel had not been reconveyed to

9    the Lins, which was one of the closing conditions for the third

10   closing.  <u>See</u> PSA § 5.3.2(g).

11       The Court finds that the construction of the power line and

12   the granting of the temporary easement were not circumstances that

13   triggered Toll's right to terminate.  Toll could terminated the

14   PSA if any of the Lins' representations or warranties became

15   untrue in a material respect prior to the closing date due to

16   changed circumstances.  <u>See</u> PSA § 14.3.  As noted earlier, many

17   issues concerning Sub-Area 3 were in flux at the time the parties

18   signed the PSA.  RT at 803:10-11(RA).  Nonetheless, the Lins

19   represented that the property was free of material physical

20   defects or conditions that precluded or materially limited its

21   development as a master planned community.  <u>See</u> <u>id</u> § 14.1(d).  The

22   construction of the temporary power line and the grant of an

23   easement did not limit Toll's ability to develop Sub-Area 3

24   because Toll stopped planning the development of Sub-Area 3 in

25   late 2006.  RT at 125:6-15(JB), 1524:11-22(JP).  When Paynter, the

26   Area Manager for Toll's operations, learned of the power line

27   around August 2006, he did not think it would interfere with

28

                                    34

Toll's development of Sub-Area 3.  <u>Id.</u> at 1558:14-1561:18(JP).

The utility vaults, the power line, and the associated easements were minor issues of a kind that could have easily been resolved if Toll had lived up to its contractual obligation to cooperate with the Lins.  The Court concludes that Toll cannot prevail on its breach of contract claim against the Lins.  <u>See</u> <u>Rischard v. Miller</u>, 182 Cal. 351, 352-53 (1920) (contract can be enforced where it had been substantially performed and where "the omissions are so slight that it cannot be regarded as an integral or substantive part of the contract. . . .").

**B.   <u>Toll's First, Third, and Fourth Causes of Action</u>**

Toll's first, third, and fourth causes of action are for rescission, foreclosure of contractual lien, and foreclosure of purchaser's lien.  <u>See</u> SAC ¶¶ 7-17, 21-31.

1.   <u>Rescission</u>

A party may unilaterally rescind a contract if (1) "the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds," or (2) "the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause."  Cal. Civ. Code § 1689(b)(2), (4); <u>Rano v. Sipa Press, Inc.</u>, 987 F.2d 580, 586 (9th Cir. 1993)("A breach will justify rescission . . . only when it is 'of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties.'"(citations omitted)).  "Whether a breach constitutes a failure of consideration sufficient to be deemed material and thus

35

to warrant rescission of a contract is a question of fact." <u>Fed.</u>
<u>Deposit Ins. Corp. v. Air Fla. Sys., Inc.</u>, 822 F.2d 833, 840 (9th
Cir. 1987).  "[T]he law is well settled in this state that a
person is not entitled to rescind or abandon a contract for an
alleged breach of that contract when the breach does not go to the
root of the consideration."  <u>Karz v. Dept. of Prof'l and</u>
<u>Vocational Standards</u>, 11 Cal. App. 2d 554, 557 (Ct. App. 1936).

Here, as explained above, the Court finds that the Lins did
not breach the PSA.  Hence, there has been no material failure of
consideration or material breach warranting rescission of the
contract.  The Court concludes that Toll was not entitled to
rescind the PSA.

2.   Foreclosure of Liens

Where the parties intended to create a security interest in
property, the Court may order the sale of the property to pay for
the debt owed.  <u>Grappo v. Coventry Fin. Corp.</u>, 235 Cal. App. 3d
496, 509 (Ct. App. 1991).  The Lins and Toll executed a Memorandum
of Understanding, recorded on May 28, 2004, by which Toll was
granted a lien against the property "to secure the performance of
Seller's obligation to refund the Deposit provided by Buyer and
disbursed to Seller if Buyer becomes entitled to such
reimbursement in accordance with the terms of the Agreement."  Ex.
P-24.  The Court finds that Toll is not entitled to the return of
its deposit because the Lins were not in breach of the PSA when
Toll terminated the contract.  The Court concludes that Toll is
not entitled to foreclosure on its liens.

C.   **PSA Complies with Subdivision Map Act ("SMA")**

Toll's final cause of action seeks a declaration that the PSA is illegal or void for failure to comply with the SMA.  Section 66499.30(b) of the SMA provides that:

> No person shall sell, lease or finance any parcel or parcels of real property or commence construction of any building for sale, lease or financing thereon, except for model homes, or allow occupancy thereof, for which a parcel map is required by this division or local ordinance, until the parcel map thereof in full compliance with this division and any local ordinance has been filed for record by the recorder of the county in which any portion of the subdivision is located.

Cal. Gov. Code § 66499.30(b).  The SMA contains a limited exception to this prohibition for contracts that are "expressly conditioned upon the approval and filing of a final subdivision map or parcel map, as required under this division." Id. § 66499.30(e).

Toll argues that the Agreement is illegal and void because it is not "expressly conditioned" upon the recording of a map since it allows the recording to be waived.  Pl.'s Am. Closing Br. at 34.  Section 5.5 of the Agreement outlines the Buyer's closing conditions.  One of these conditions is that "Seller shall have caused the Map (or Maps) to be recorded."  PSA § 5.5(d).  The Agreement states that "if any Buyer's Closing Conditions remain unsatisfied as of the date then established as the Closing Date, Buyer shall have the right, in its sole and absolute discretion, to (1) waive one or more of Buyer's Closing Conditions and proceed with the Closing."  Id. § 5.5(h).

However, in a different section of the PSA, entitled  "Parcel

37

**United States District Court**
For the Northern District of California

Map to Create Legal Parcel," it states:

> The entirety of the Property is not currently subdivided in a manner that would permit its conveyance in the contemplated Sub-Areas. Seller shall, at its sole cost and expense, cause the City to record a parcel map or other map or maps (the "*Map*") in order to create the Property as legal parcels that can be conveyed consistent with the requirements of the Subdivision Map Act and the City's Subdivision Ordinance.

Id. § 3.2.  This section of the PSA is not part of the Buyer's closing conditions.  Therefore, Toll could not waive this provision.  Also, one of the special closing conditions for the third closing states that "[t]he entirety of Sub-Area 3 shall be conveyed in the Third Closing pursuant to an Approved Map."  Id. § 5.3.2(a).  Toll could not waive this provision.  The Court determines that Toll could not waive the obligation to comply with the SMA in sections 3.2 and 5.3.2(a) of the PSA.  This case is therefore distinguishable from Black Hills Investments, Inc. v. Albertson's, Inc., 146 Cal. App. 4th 883 (Ct. App. 2007), and Sixells, LLC v. Cannery Business Park, 170 Cal. App. 4th 648 (Ct. App. 2008), where the requirement to record maps could be waived.  In addition, Inouye, Toll's outside counsel, was aware of the need to create legal parcels.  RT at 423:16-424:9(WI), 439:18-21(WI).  Toll does not dispute that the Lins obtained the approvals creating Sub-Area 3 as a legal parcel.  RT at 149:21-24(JB); Ex. 49.  The PSA complies with the SMA.  Toll is not entitled to a refund of its deposit based on the argument that the PSA is illegal or void.

**United States District Court**
For the Northern District of California

**D.   The Lins' Request for Declaratory Relief and Breach of Contract Counterclaim**

        1.   The School Site

     The Lins contend that Toll failed to perform a condition precedent by failing to transfer the school site to the Lins.   See Def.'s Closing Trial Br. at 2.   The Lins raise the school site issue as both an affirmative defense to Toll's breach of contract claim, see Def.'s Mot. to Dismiss, Docket No. 188, at 3-4, and as the basis for their counterclaim that Toll breached the contract, see Def.'s Closing Trial Br. at 4.   Since the Court finds that the Lins did not breach the contract, the Court does not address the school site issue as an affirmative defense.   The Court finds that Toll did not breach the PSA by failing to convey the school site to the Lins.

     In the section of the PSA that establishes "Special Closing Conditions" for the Third Closing, it states that "Buyer shall have reconveyed to Seller or Seller's assignees the elementary school parcel in Sub-Area 2."   PSA § 5.3.2(g).   In the section of the PSA entitled "Buyer's Work," it states that:

> Buyer shall acquire title to all of Sub-Area 2 subject to the obligation to reconvey the school site to Seller, or Seller's assignee, without consideration and with no new title exceptions but otherwise without any representation, warranty or liability to Seller when Buyer has obtained a Parcel Map creating the school site as a legal parcel.

PSA § 7.5(b).[3]

-------------------------------------

     [3] The same obligation to reconvey appears in section 13.13 of the PSA.

United States District Court
For the Northern District of California

The Lins contend that the reconveyance of the elementary school parcel in Sub-Area 2 was a condition precedent to their duty to sell Sub-Area 3 to Toll.  See Def.'s Closing Trial Br. at 10-11.  A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed.  Cal. Civ. Code § 1436.  A plaintiff suing for breach of contract must prove it has performed all conditions on its part, or that it was excused from performance.  Consol. World Inv. v. Lido Preferred Ltd., 9 Cal. App. 4th 373, 380 (Ct. App. 1992).  If a plaintiff fails to perform a condition precedent, then the defendant's obligation does not accrue. Thackaberry v. Pennington, 131 Cal. App. 2d 286, 297 (Ct. App. 1955).

It is undisputed that after Toll assigned its interest in Sub-Area 2 to Regent, Regent became the owner of, and acquired title, to Sub-Area 2.  RT at 191:18-22(JB), 1506:12-14(MI). However, the assignment to Regent was a land banking transaction, so it was expected that Toll would buy back lots on the property from Regent, and that Toll would continue to develop Sub-Area 2. See Exs. P-45, P-58.  As stated by Inouye, "Toll will continue as before to complete the entitlement and development of the infrastructure for the Property."  Ex. P-58.  Because Toll continued to develop Sub-Area 2, Inderbitzen worked with Muenzen, a Toll representative, throughout the early months of 2007, to try to make sure a parcel map was created for the school site so that it could be reconveyed to the Lins.  See Ex. D-624.

At the time the parties entered into the PSA, neither party

40

United States District Court
For the Northern District of California

anticipated that the buyer of Sub-Area 2 and the buyer who would
have to fulfill closing conditions for the third closing would be
different buyers.  Regent bought Sub-Area 2, and the Lins did not
object to the assignment, but Toll was still working on the
entitlement process for Sub-Area 2 on behalf of Regent as a
contractor or agent.  RT at 519:22-25(WI).  The Court concludes
that when Toll assigned Sub-Area 2 to Regent, Toll was required to
obtain a parcel map creating the school site as a legal parcel,
and Regent was required to transfer the school site so that it
could eventually be conveyed to the School District.  See PSA
§ 7.5(b).  The title owner's obligation to convey the school site
"ran with the land."  See RT at 1290:16-1294:16 (MI); Ex. P-208.
When Toll assigned its interest in Sub-Area 2 to Regent, Regent
became obligated to convey the school site.  After the assignment
to Regent, Toll was obligated to obtain a parcel map, but only
Regent could convey the school site.  Therefore, Toll's failure to
reconvey the school site was not a failure to perform a condition
precedent to the Lins' duty to sell Sub-Area 3.

However, the failure to reconvey the school site did permit
the Lins to extend the date for the third closing.  The conveyance
of the school site was one of the special closing conditions for
the third closing.  Because the Lins could extend the close of
escrow, the utility vaults, temporary power line, and associated
easements did not put the Lins in breach of the PSA on the
scheduled closing date of June 30, 2007, as contended by Toll.

///

///

41

1              2.   <u>Toll Breached the PSA by Failing to Purchase Sub-</u>
2                   <u>Area 3</u>

3         The Court concludes that Toll breached the PSA by failing to

4    close escrow on Sub-Area 3 and by terminating the contract on

5    December 7, 2007.  When Toll entered into the PSA, market

6    conditions were very favorable, but by 2007, market conditions had

7    deteriorated significantly.  As a result, Toll was willing to

8    forfeit its deposit to Regent of over $30 million rather than

9    repurchase Sub-Area 2.  RT at 121:6-122:15(JB), 1514:1-7(JP).

10   These deteriorating market conditions explain why Toll wanted to

11   get out of its commitment to purchase Sub-Area 3.

12        As noted above, the Court is convinced that if Toll wanted to

13   close escrow on Sub-Area 3, then Toll could have cooperated with

14   the Lins to work out a solution regarding the location of the

15   utility vaults and associated easements.  <u>See</u> Section III(A)(1),

16   <u>supra</u>.  Similarly, Toll could have cooperated with the Lins to

17   work out a solution regarding the temporary power line and the

18   easement granted to PG&E.  <u>See</u> Section III(A)(2), <u>supra</u>.  Toll had

19   made accommodations of this kind on prior occasions.  <u>See</u> Ex. 596.

20   When Toll terminating the PSA, the Lins were not in breach of the

21   contract.  Toll's termination was therefore a breach of the PSA.

22        **E.   <u>Breach of Covenant of Good Faith and Fair Dealing</u>**

23        A claim for breach of the covenant of good faith and fair

24   dealing is superfluous if it merely seeks to invoke the terms of

25   the contract.  <u>Guz v. Bechtel Nat'l, Inc.</u>, 24 Cal. 4th 317, 352

26   (2000).  A bad faith claim must involve unfair dealing beyond the

27   breach of a contractual duty.  <u>Careau & Co. v. Sec. Pac. Bus.</u>

28                                   42

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Credit, 222 Cal. App. 3d 1371, 1394 (Ct. App. 1990).  As the Lins themselves point out, the PSA contained an express covenant of mutual cooperation.  Def.'s Closing Trial Br. at 27.  The Court finds that Toll breached the PSA by failing to close escrow on Sub-Area 3 and by terminating the PSA based on issues that did not put the Lins in breach.  Toll failed to cooperate with the Lins to resolve these minor issues, but since cooperation was required under the contract, the Court finds that the Lins' bad faith claim is superfluous.  See Careau, 222 Cal. App. 3d at 1394-95 ("If the allegations do not go beyond the statement of a mere contract breach . . . they may be disregarded as superfluous . . . .").  The Lins' counterclaim for breach of the covenant of good faith and fair dealing fails.

   **F.  <u>Quiet Title, and Promissory Estoppel Counterclaims</u>**

     The Lins and Toll executed a Memorandum of Understanding, recorded on May 28, 2004, by which Toll was granted a lien against the property "to secure the performance of Seller's obligation to refund the Deposit provided by Buyer and disbursed to Seller if Buyer becomes entitled to such reimbursement in accordance with the terms of the Agreement." Ex. P-24.  The Court finds that Toll breached the PSA, so Toll is not entitled to reimbursement of its deposit.  Therefore, the Court finds that the Lins are entitled to have Toll's lien against the property expunged.  To the extent that a lis pendens has been recorded against the property, the Court finds that the Lins are also entitled to have the lis pendens expunged.  The Court takes no action with respect to the Lins' promissory estoppel counterclaim because the Court finds

43

that the PSA is not illegal or void.

**IV.   <u>CONCLUSION</u>**

For the foregoing reasons, the Court concludes that the Lins did not breach the PSA, and Toll breached the PSA by failing to close on Sub-Area 3 and terminating the PSA on December 7, 2007. Under the liquidated damages provision of the PSA, the Lins are entitled to retain the deposit in the amount of $7,735,000. Toll's lien against the property and the lis pendens should be expunged.   The Lins are the prevailing party, and are entitled to recover their attorneys' fees and costs.   The Lins' motion for fees and the bill of costs must comply with the local rules of this Court.

IT IS SO ORDERED.

Dated: April 30, 2009

_____
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

44