IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOLL BROTHERS, INC., ) | Case No. 08-987 SC |
| ) | |
| Plaintiff, ) | FINDINGS OF FACT AND |
| ) | CONCLUSIONS OF LAW ON |
| v. ) | REMAND |
| ) | |
| CHANG SU-O LIN; HONG LIEN LIN; ) | |
| and HONG YAO LIN, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## I. INTRODUCTION

This case arises from a 2004 agreement for the purchase and sale of land in Dublin, California. Ex. 26 ("PSA").[1] Landowners Chang Su-O Lin, Hong Lien Lin, and Hong Yao Lin (the "Lins") agreed to sell a homebuilder, Toll Brothers, Inc. ("Toll"), three separate parcels of land in three separate closings for a total sale price of $241.5 million. Toll deposited $21,735,000 into an escrow account, to be paid out in increments with each closing. Toll and the Lins successfully closed on two parcels of land, Sub-Areas 1 and 2. The present dispute between Toll and the Lins concerns the failure to close on Sub-Area 3 and the disposition of the $7,735,000 that remains in the escrow fund. The Sub-Area 3 closing had been scheduled for either (1) June 30, 2007 or (2) three days

---

[1] "Ex." refers to exhibits accepted into evidence at the March 2009 bench trial of this case.

after all of the special and general closing conditions had been met, whichever came later. The closing did not occur on June 30, 2007, and on December 7, 2007 Toll terminated the PSA. This litigation followed, culminating in a nine-day bench trial on the parties' claims and counter-claims for breach of the PSA. In short, Toll claims that it is entitled to the remaining escrow fund as a returned deposit, while the Lins say they are entitled to the remaining funds as liquidated damages.

Of the many matters raised at trial, the Court is presently concerned with only one: a temporary, non-exclusive easement that the Lins granted to non-party Pacific Gas and Electric ("PG&E") in late 2005. The easement allowed PG&E to string temporary, above-ground electrical wires over Sub-Area 3 for the purpose of connecting a water pump station needed by the Dublin San Ramon Services District ("DSRSD"), a project whose completion was required to satisfy conditions in the PSA.[2] Notably, the above-ground electrical facilities were a stopgap measure that would have to be replaced by permanent, below-ground facilities pursuant to local ordinance. The Lins asked PG&E to abandon the easement for the above-ground facilities in September 2006, but PG&E did not quitclaim the easement until June 2008, roughly a year after Sub-Area 3's scheduled closing date of June 30, 2007.

Following trial, the Court issued a memorandum of decision setting forth extensive findings of fact and conclusions of law,

---

[2] Specifically, the water pump station was needed to complete the development of a separate property owned by the Lins, Fairway Ranch. Fairway Ranch, in turn, had to be completed for the Lins to obtain certain affordable housing credits from the City of Dublin. These affordable housing credits were needed before Toll could begin building on Sub-Area 2. See MOD ¶¶ 53-55.

2

and entered judgment in favor of the Lins. ECF Nos. 216 ("MOD"), 226 ("Judgment"). Toll appealed, and a Ninth Circuit panel reversed. ECF No. 247. The Lins successfully petitioned the panel for rehearing. See ECF No. 250. On rehearing, the panel, over Judge Callahan's dissent, agreed with this Court's earlier disposition of the issues Toll raised on appeal, but determined that, "[i]n ruling on the Lins['] counterclaim for breach of the covenant of good faith and fair dealing, the district judge did not make any finding that [1] the Lins were acting in good faith in attempting to comply with the closing conditions or [2] that the delay was not unreasonable under all of the circumstances." ECF No. 252 ("Aug. 31 Memo.") at 5-6. The panel remanded the case to this Court to make those two findings. Id. at 6. Under California law, "good faith and reasonableness are questions of fact." Peak-Las Positas Partners v. Bollag, 172 Cal. App. 4th 101, 106 (Cal. Ct. App. 2009).[3]

**II. FINDINGS OF FACT**

The Court has already made findings of fact covering the period between the Lins' initial grant of the easement to PG&E on December 12, 2005 and PG&E's quitclaim of the easement on June 16, 2008. See MOD ¶¶ 58-63. Of particular import are the Court's previous findings that in September 2006, the Lins had completed their portion of the work that had to be done before PG&E could build the permanent underground electrical service, abandon the temporary overhead service, and, consequently, terminate the

---

[3] The parties have submitted briefs on the remanded issues. ECF Nos. 278 ("Toll Br."), 286 ("Lin Br.").

easement. Id. ¶ 62. The Lins also had submitted an application for PG&E to do its part. Id. The Court now makes the following additional findings:

    1.    During the last week of October 2006, Rodney Andrade[4] met in person with PG&E representative Brian Bates at least twice to review the project of removing the temporary overhead electrical service and installing permanent underground service. Ex. 522.[5]

    2.    From September 6, 2006 through February 2, 2007, Andrade and PG&E representatives had at least nine telephone contacts concerning the project. During this period, the project was shifted between PG&E representatives Bates and Brian McCoy several times. Bates replaced McCoy in October 2006. McCoy replaced Bates in November 2006. Bates replaced McCoy in December 2006. Id.

    3.    On February 15, 2007, Andrade updated James Tong[6] regarding a conversation with Bates. Bates told Andrade that PG&E had done no work to process the Lins' September 2006 application, despite McCoy having said more than once in the previous months that "all was well." Following Bates's admission, Andrade requested a processing schedule from him. RT at 952:18-953:22(JT); Ex. 95.

---

[4] For all purposes relevant here, Andrade was the Lins' primary civil engineer. See MOD ¶ 7; RT at 535:22-25 (Testimony of Andrade (hereinafter "RTA")), 536:22-537:22(RTA).

[5] This exhibit, relied on by Toll in its remand brief, is titled "Summary of Lin Efforts." It sets forth a chronological list. The Court finds that, due to typographical errors, the dates listed as "10/26/07"and "10/31/07" actually refer to October 26, 2006 and October 31, 2006, respectively.

[6] Tong was the Lins' authorized representative for the project. See MOD ¶ 5; Transcript of Record (hereinafter "RT") at 910:9-18 (Testimony of Tong (hereinafter "JT")).

4. On March 23, 2007, Martin Inderbitzen[7] sent Toll a letter outlining "closing issues" which mentioned the temporary electrical facility but did not mention the easement or the status of the Lins' application to PG&E. Inderbitzen regarded the easement as a minor issue that fell within the infrastructure build-out to which Toll had already consented. At that time, Inderbitzen and Toll were engaged in discussion of Toll's reconveyance to the Lins of a school site located in Sub-Area 2, which was a condition of closing Sub-Area 3. RT at 1267:16-1268:13 (MI), 1400:2-22(MI), 1822:12-19(MI), 1823:22-1824:20(MI); Ex. 101.

5. No earlier than March 23, 2007 and no later than May 2, 2007, Toll learned for the first time of the existence of the easement by independently running a title report on the property comprising Sub-Area 3. RT at 342:9-344:9 (Testimony of Warren Inouye (hereinafter "WI")); Ex. 114.

6. On May 2, 2007, Tong and Inderbitzen received an email from Andrade. Andrade wrote that Toll's title company had issued a title report on Sub-Area 3 which reflected the recording of the easement and that the temporary facility above Sub-Area 3 was an "issue of concern" for Toll. He further explained that to date, the Lins had been told by their title company that the "easement was not of record (yikes!)." Responding to Andrade's report by email, Tong stated that the easement would be an important issue for Toll if it still existed on the scheduled closing date of June 30, 2007.[8] Tong thought that the easement and pole line would give

---

[7] Inderbitzen was the Lins' attorney. See MOD ¶ 6; RT at 1264:8-23 (Testimony of Inderbitzen (hereinafter "MI").

[8] The Court previously detailed how Toll eventually treated the issue of the easement. MOD ¶¶ 87-107.

5

Toll reason to refuse to close on Sub-Area 3. He instructed Inderbitzen to ask Toll to waive this closing condition in exchange for a holdback in the purchase price of fifty to one hundred thousand dollars. He instructed Andrade to explore expediting the relocation of the temporary electrical facility with PG&E. RT at 955:2-25(JT), 957:12-959:3(JT); Ex. 114.

7. On May 3, 2007, Andrade updated Tong on his efforts with PG&E. He reported that he had contacted Bates to receive a schedule update. Andrade informed Tong that PG&E would schedule the work after finishing engineering; preparing and signing work agreements; and receiving funds for the project, estimated at $150,000. Ex. 114.

8. On May 22, 2007, Tong and Andrade received an email from Inderbitzen, telling them he had spoken to Gil Yamzon and Yamzon had "agreed to try and help with Brian Bates." Yamzon is a PG&E representative with whom the Lins, through Tong, had worked during the process of granting the easement. Inderbitzen's email said that he would stay in contact with Yamzon. It is not apparent whether Inderbitzen did so. RT at 974:4-19(JT); RT at 942:12-943:23(JT), 1836:14-1837:15(MI); Ex. 121.

9. From February through June 2007, Andrade had two or more telephone conversations with PG&E representatives in an attempt to determine the status of the application. Ex. 522.

10. Between June 28, 2007 and November 2, 2007, Andrade sent ten emails to PG&E inquiring about the status of the application, to which he received five responses. Id.

11. In October 2007, PG&E delivered to Andrade the work agreement that the Lins had to sign before PG&E would complete the

6

1  project. On October 31, 2007, the Lins signed the agreement and
2  paid PG&E. Id.

3     12. Generally, PG&E was motivated by a desire to gain new
4  customers when completing projects related to new building. PG&E
5  prioritized such projects on the basis of which ones were closest
6  to providing PG&E with new customers, and would cooperate with
7  efforts to expedite their projects when PG&E determined there was
8  good reason to expedite. RT at 1781:4-25 (Testimony of Walter
9  Antonio), 1909:17-25 (Testimony of Thomas Gamble).

                    \*    \*    \*

11     As the Court already found, the parties met in August 2007 to
12 discuss the issues that had prevented them from closing Sub-Area 3
13 on June 30, 2007, as planned. Toll proposed extending the closing
14 date by four years to June 30, 2011. The Lins countered with a
15 proposal to extend closing for three years if Toll paid an
16 additional deposit of $5 million. Toll did not accept. MOD ¶ 104.
17 Following the meeting, as found above, the Lins continued to
18 inquire with PG&E as to the status of the easement. In October
19 2007, PG&E completed engineering on the project and became ready to
20 begin work. See supra ¶¶ 9-11. On December 7, 2007, Toll notified
21 the Lins that it was terminating the PSA as to Sub-Area 3. On
22 December 12, 2007, the Lins responded that they continued to
23 prepare for the Sub-Area 3 closing, and reminded Toll of its
24 obligation to reconvey the school site. The parties engaged in an
25 unsuccessful mediation in January 2008. MOD ¶¶ 105-07. PG&E did
26 not quitclaim the easement until June 16, 2008. Id. ¶ 63.
27 ///
28 ///

### III. DISCUSSION AND CONCLUSIONS OF LAW

### A. The Lins Acted in Good Faith in Attempting to Comply with the Sub-Area 3 Closing Conditions

#### 1. The Lins' Grant of the Easement to PG&E Was Made in Good Faith

The Court has already concluded that the Lins did not breach the PSA by granting the easement to PG&E, and the Ninth Circuit agreed. MOD at 32-33; Aug. 31 Memo. at 6-7. Toll argues that, notwithstanding these prior holdings, the Court nevertheless must examine the circumstances of the Lins' 2005 grant of the easement to determine whether the Lins acted in good faith. Toll Br. at 12-13 (citing Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc., 2 Cal. 4th 342, 372-73 (1992)).

The Court determines that it need not make such an examination because the Court already implicitly made the findings required on remand. The Court earlier concluded that the Lins were not in breach of the PSA on December 7, 2007, when Toll repudiated it. MOD at 42. The Court now makes explicit the premise upon which that conclusion rested, namely, that the Lins acted in good faith in attempting to comply with the closing conditions for Sub-Area 3 and, specifically, in granting PG&E the temporary easement for the above-ground power line that crossed Sub-Area 3.

As the Ninth Circuit explained, the PSA was a valid contract, notwithstanding that it gave each party the right to extend the Sub-Area 3 closing beyond the scheduled closing date of June 30, 2007. On appeal, Toll contended that this right to extend closing rendered the PSA illusory. The Ninth Circuit rejected Toll's argument on the ground that the right to extend closing was not

indefinite; rather, it was limited by the implied covenant of good faith and fair dealing, which prevented a party from delaying closing in bad faith or unreasonably. Aug. 31 Memo. at 4-5.

Consistent with the Ninth Circuit's view, if this Court had determined that the Lins had delayed closing unreasonably or in bad faith, the Court would had to have held that the Lins were in breach of the PSA. The Court did the opposite, concluding that the Lins were not in breach of the PSA when Toll repudiated it on December 7, 2007. This conclusion rested on an implicit acknowledgment that the Lins had conducted themselves in good faith in attempting to satisfy the closing conditions and had not been unreasonable in extending the date of closing beyond June 30, 2007. The Court now makes this conclusion express. The Court finds that that the Lins acted in good faith when they granted the power line easement to PG&E.

Toll's arguments to the contrary amount to little more than an attempt to relitigate issues that have already been decided by this Court and affirmed by the Court of Appeals. Toll relies on Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc., 2 Cal. 4th 342 (1992), but nothing in that case dictates a different result. Toll states that Carma "mandates" this Court to assess the Lins' conduct in creating the power line easement and that the Court cannot restrict its analysis "to a limited time or task." Toll Br. at 13. But Carma stands for no such principle. Carma merely emphasizes "the difficulty in devising a rule of all-encompassing generality" for contractual good faith claims and sets forth the few general principles that may be derived from the cases. 2 Cal. 4th at 373-74. Carma does not say that a court must

9

take into account any and all conduct every time the question of good faith arises, and certainly does not stand for the proposition that a court must throw out previous findings of fact.

Carma acknowledges the difficulty that may arise from time to time when "deciding whether . . . conduct, though not prohibited, is nevertheless contrary to the contract's purposes and the parties' legitimate expectations." Id. at 374. The Court discerns no such difficulty in this case, however. Section 13.2 of the PSA allowed the Lins, inter alia, to encumber the property "as necessary to comply with the terms of" the PSA. As the Court previously found, the purpose of the power line easement was to allow PG&E to string a temporary, overhead power line across Sub-Area 3 to a DSRSD water pumping station. The water pump station was needed to complete the development of a separate property owned by the Lins, Fairway Ranch. Fairway Ranch, in turn, had to be completed for the Lins to obtain certain affordable housing credits from the City of Dublin. The affordable housing credits were needed before Toll could begin building on Sub-Area 2. See MOD ¶¶ 53-55. The easement was therefore a reasonably necessary step for complying with the PSA. As such, it was authorized by the PSA and could not constitute a breach of the covenant of good faith, even if it would have constituted bad faith in the absence of the PSA's authorization clause. See Carma, 2 Cal. 4th at 374 (holding that party does not breach covenant of good faith if party was "given the right to do what they did by the express provisions of the contract").

Toll argues that the easement was not "necessary" within the meaning of Section 13.1 because, it says, the power line could have

been strung in a way that avoided Sub-Area 3. Toll Br. at 13-14. This argument turns on the meaning of the word "necessary." Toll appears to argue that any action contemplated in Section 13.2 could be made unnecessary by the existence of an alternative. Taken to its logical conclusion, this interpretation would read the "except as necessary" clause out of Section 13.2 because, in all but the most extraordinary circumstances, <u>some</u> alternative will be available at <u>some</u> cost. This reading is particularly untenable in light of California's implied covenant of good faith and fair dealing, as well as the PSA's mutual cooperation clause. PSA § 13.1. The Court reads Section 13.2 as it was written, giving meaning to the language of the exception for acts "necessary to comply with the terms of [the PSA]." Because the easement was reasonably necessary to comply with the closing conditions for Sub-Area 3, the Court declines to find that granting the easement violated Section 13.2 of the PSA.

In doing so, the Court effectuates the purpose of the PSA and upholds the parties' legitimate expectations at the time of its execution. <u>See</u> <u>Carma</u>, 2 Cal. 4th at 373. At the time the PSA was signed, the exact steps needed to develop Sub-Area 3 were difficult to predict, though it was foreseeable that unforeseeable difficulties would arise. One purpose of the PSA was to keep the parties locked into the deal despite these difficulties. This is why the parties bargained for each other's mutual cooperation and the right to extend closing. Toll characterizes the Lins as having granted the easement to PG&E (instead of requiring PG&E to go around Sub-Area 3) solely for the Lins' own benefit -- ostensibly, the completion of the Lin-owned Fairway Ranch development. <u>See</u>

11

Toll Br. at 16. But this contention misconstrues the purpose of the temporary power line. As the Court already found, the ultimate purpose of the temporary power line was for the Lins to garner affordable housing credits which, once transferred to Toll, would allow Toll to build on Sub-Area 2. In other words, by granting the easement to PG&E, the Lins acted to benefit Toll as well as themselves, consistent with the purposes of the PSA and expectations of the parties.

This helps to explain why the Lins did not notify Toll of the easement. In its briefing, Toll frequently points to the Lins' failure to affirmatively notify Toll of the existence of the easement as proof positive of the Lins' intent to deceive Toll. E.g., Toll Br. at 14-15, 16 n.7. Looking at the entire record, the Court sees no such intent. The Lins' initial grant of the easement is entirely consistent with a judgment that Toll already had consented to such a grant, as work that was "necessary" to effectuate the PSA within the meaning of Section 13.2. It is also consistent with a view that the easement, like the power line itself, was nothing more than a trivial, temporary prerequisite to other construction. The Court sees no persuasive evidence in the record that the Lins failed to act in good faith when they granted the easement. The Court only sees the Lins pursuing the least expensive means of accomplishing one facet of a large project.

        2.   <u>The Lins Conducted Themselves in Good Faith After Granting the Easement to PG&E</u>

The Lins did not inform Toll of the existence of the easement or of their difficulties with PG&E. Toll discovered the easement in late April or early May 2007 when Toll independently ran a title

12

report. The Lins had previously been told by their title company that the easement was not of record, and appeared surprised by Toll's discovery. The Court finds that the Lins' conduct, while less than perfect, falls short of a breach of good faith.

The important consideration here is the change in market circumstances. When the Lins granted the easement to PG&E, the market was strong and both parties had incentives to hold each other to the PSA, despite the hard-to-predict difficulties that inevitably arise in a large construction project. The Lins had no reason to think of the easement as anything other than one of the myriad details that needed completion before the Sub-Area 3 closing. The Lins finished their portion of the required work in short order, finishing in September 2006. All that was left to be done was for PG&E, the easement's holder, to complete their portion of the work and quitclaim the easement. After receiving the Lins' application for PG&E to do its part, PG&E told the Lins for four months that all was going well. No one has suggested that the Lins had any reason to disbelieve PG&E.

It was not until February 15, 2007 that PG&E informed the Lins that all, in fact, was not well, and that PG&E had yet to start work on the Lins' September 2006 application. By that time, the previously strong real estate market had gone soft. See MOD ¶¶ 42-44. Toll had sold only 50 out of 450 homes in Sub-Area 1, was "under water" by $40 million on the homes in Sub-Area 2, and was facing high rates of cancellation on home purchase contracts. Id. ¶¶ 46, 48-49. Toll determined that continuing with its plan to build houses on Sub-Area 2 would be unprofitable and, rather than doing so, forfeited a $30 million deposit. Id. ¶¶ 49-50. Toll

13

also had stopped its planning process for Sub-Area 3.  Id. ¶ 47.  Toll even considered selling part of Sub-Area 3 to an apartment developer in an attempt to make at least some profit.  Id. ¶ 52.

In short, Toll, which had been gunning the accelerator during the rising housing market, hit the brakes now that the market was falling.  The falling market transformed the parties' incentives.  When the market was rising, both parties had an incentive to keep the contract together.  But, as the Court already determined, when the market began to fall, Toll had an incentive to get out of the PSA with respect to Sub-Area 3.  See MOD at 42 ("[D]eteriorating market conditions explain why Toll wanted to get out of its commitment to purchase Sub-Area 3.").  The Lins and the sophisticated real estate professionals in their employ could not have failed to be aware of Toll's incentives, and they had a corresponding incentive to keep Toll in the deal in what had quickly become a buyer's market.

It is therefore unsurprising that the Lins continued to prod PG&E to abandon the easement and move toward closing Sub-Area 3.  Their representatives queried PG&E with reasonable consistency, given that it was far from the only issue related to closing and that Toll itself was late in focusing attention on the easement, even after Toll discovered its existence.[9]  In the context of a

---

[9] See MOD ¶¶ 92 (Toll expressing concern about utility vaults at same May 2, 2007 meeting where Toll stated that it had learned of recorded easement), 95 (June 8, 2007 letter from Toll expressing concern about utility vaults and overhead line, but not easement), 98 (June 15, 2007 letter from Toll stating that utility vaults violated provisions of PSA, mentioning for first time that temporary power line encumbered property, and opining that location of vaults likely would negatively effect development of Sub-Area 3), 100 (June 27, 2007 letter from Toll informing Lins that Toll regarded them as having defaulted on the PSA).

14

large, complex development project like the one contemplated in the PSA, the Lins' efforts to resolve the easement issue were reasonable. Initially, the Lins periodically queried PG&E about the status of the project; PG&E told them the project was progressing. When the Lins discovered that PG&E had misinformed them, they increased their efforts, frequently prodding PG&E in a series of phone calls and emails that received only fitful responses from PG&E. As Sub-Area 3's scheduled closing date approached, the Lins' representatives took the lead in identifying issues that could impede the closing, even though the Lins were under no obligation to close on that date. MOD at 33-34 (Lins had right to extend close of escrow because Toll had not complied with all closing conditions). In short, the Lins moved toward closing, even as Toll backed away from it. E.g., MOD ¶¶ 97, 99, 101 (Toll postponing and canceling meetings, removing personnel); see also MOD at 28 (Toll stopped cooperating), 33 (same), 42 (same). Looking at all the circumstances, including market conditions which provide strong circumstantial evidence of the parties' motives and intent, the Court concludes that the Lins acted with good faith in attempting to comply with the closing conditions.

Toll makes much of Andrade's statement in his May 2, 2007 email that the Lins' title company had told him the "easement was not of record (yikes!)." To Toll, the word "yikes" shows that the Lins were caught in the act of trying to pull the wool over Toll's eyes about the true title condition of the property. Toll Br. at 16 n.7. The Court disagrees. Under all the circumstances, Andrade's statement is more consistent with an innocent exclamation of surprise (namely, that the Lins' trusted title company had been

15

wrong). The Lins and Toll were, at that point, attempting to raise and resolve issues that could prevent or delay the Sub-Area 3 closing. In that context, Andrade's remark plausibly suggests surprise at the existence of another issue, or perhaps concern that a triviality now might take on inflated importance. Either way, it does not establish a lack of good faith.

### B. The Lins' Delay in Closing Was Not Unreasonable

For several reasons, the Court finds that the Lins' delay in closing was not unreasonable. Some of the Lins' delay can be attributed to Toll's own unwillingness to cooperate with them by extending the close of escrow, which the Court extensively detailed in the Memorandum of Decision. Some of the delay may be attributable to PG&E's initial misrepresentations to the Lins, as suggested supra in Sections II and IV.A.2. Another reason for the delay in obtaining the quitclaim from PG&E is that Toll had ceased its planning process for developing the property; consequently, PG&E de-prioritized the power line replacement project. Finally, Toll itself was unable to close on Sub-Area 3 until it had arranged for the school site to be reconveyed to the Lins. MOD at 34. Before that day ever came, Toll had repudiated and canceled the PSA, extinguishing the Lins' obligation to perform under it. Essentially, the Lins performed what they needed to do in advance of the June 30, 2007 closing date, and then waited as other parties, for a variety of reasons, dragged their heels.

Toll faults the Lins for not having contacted anyone within PG&E's legal department or having sued PG&E to quiet title. Indeed, Toll insists that the Lins were "required . . . to take every possible step to clear title." Toll Br. at 3. As a legal

16

matter, Toll cites no authority that would impose such an exacting duty on the Lins. As a factual matter, Toll does not explain why the Lins' failure -- if it was "failure" -- to bring or threaten a lawsuit against PG&E was unreasonable. The record reflects that the Lins reached out to PG&E on a consistent basis, including at least a dozen telephone calls and emails by Andrade and at least one contact (by Inderbitzen to Yamzon) aimed at resolving a perceived problem with the Lins' assigned PG&E representative. The Court finds that these efforts were reasonable under the circumstances, which included Toll's having ceased planning on Sub-Area 3 and Toll's having failed to comply with the closing conditions of Sub-Area 3 by causing the school site to be reconveyed to the Lins.

In short, neither the parties' covenant of mutual cooperation nor the implied covenant of good faith and fair dealing required the Lins to take any and every measure that bore some possibility of hastening the process. Further, the Court is dubious that bringing or threatening legal action would have done anything but inflame and prolong the situation. This course of action would have run the risk of seriously disadvantaging Toll, if Toll actually did desire to close on Sub-Area 3 despite the adverse market conditions. Even if Toll is right that suing or threatening to sue PG&E would have been a more reasonable course of action for the Lins, that does not make the Lins' actual course of action unreasonable. The relevant question here is not, as Toll claims, whether the Lins did everything that was possible -- only whether the Lins did something that was reasonable. The Court finds that they did.

17

## IV. CONCLUSION

As set forth above, the Court finds that the Lins acted in good faith in attempting to comply with the closing conditions of Sub-Area 3, and that the delay was not unreasonable under all the circumstances. Accordingly, the Court's Judgment in favor of the Lins, entered on June 25, 2009, stands. ECF No. 226.

IT IS SO ORDERED.

Dated: May 23, 2012

UNITED STATES DISTRICT JUDGE